**ORAL ARGUMENT HAS NOT BEEN SCHEDULED**

No. 13-1219

IN THE

# United States Court of Appeals
# for the District of Columbia Circuit

_____

MYERSVILLE CITIZENS FOR A RURAL COMMUNITY, INC. et al.,

Petitioners,

v.

FEDERAL ENERGY REGULATORY COMMISSION,

Respondent,

DOMINION TRANSMISSION, INC.,

Intervenor.

_____

On Petition for Review from the
Federal Energy Regulatory Commission

_____

**OPENING BRIEF FOR PETITIONERS**

_____

Law Offices of Carolyn Elefant
2200 Pennsylvania Avenue NW,
Fourth Floor
Washington, DC 20037
Tel: (202) 297-6100
Fax: (305) 675-8075
carolyn@carolynelefant.com

*Counsel for Petitioners*

November 13, 2013

BEFORE THE UNITED STATES COURT OF APPEALS
DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| Myersville Citizens for a<br>　　　Rural Community et. al.<br>　　　　　　Petitioners<br><br>　　　　v.<br><br>Federal Energy Regulatory<br>　　　Commission,<br>　　　Respondents<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Docket No. 13-1219 |

CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

A.　　Parties and Amici

　　　1.　　Parties Below[1]

　　　　　Myersville Citizens for a Rural Community (MCRC) Inc.
　　　　　Theodore Cady
　　　　　Franz Gerner
　　　　　Tammy Mangan
　　　　　Ann Nau
　　　　　Dominion Transmission Incorporated

_____

　　　　[1] The list of all parties below is voluminous and has already been submitted with the Petition for Review.  This section lists only those entities that filed timely rehearing requests and are considered parties for purposes of judicial review.

### 2. Parties Before the Court

    **a.**    **Petitioners**

        MCRC Inc.
        Franz Gerner
        Theodore Cady
        Tammy Mangan

    **b.**    **Respondent**

        Federal Energy Regulatory Commission

    **c.**    **Intervenors**

        Dominion Transmission Incorporated

## B.   Rulings Under Review

  (1) *Dominion Transmission, Inc.*, Order Issuing Certificate, Docket CP12-72, 141 FERC ¶ 61,240 (December 20, 2012), (FERC Accession Number 20121220-3031); and

  (2) *Dominion Transmission, Inc.*, Order Denying Requests for Rehearing, Docket CP12-72, 143 FERC ¶ 61,148 (May 16, 2013) (FERC Accession Number 20130516-3063).

## C.  Statement of Related Cases

      To the best of counsel's knowledge, there are no related cases pending before this Court. A potentially related case before the

Commission is the Dominion Cove Point Liquefaction Project CP13-113,

since one of the issues before this court relates to the Commission's

unlawful segmentation of the Allegheny Storage Project, which is the

subject of this proceeding and the Cove Point project.

Respectfully submitted,

_____

Carolyn Elefant
LAW OFFICES OF CAROLYN ELEFANT
2200 Pennsylvania Avenue N.W.
Fourth Floor East
Washington D.C. 20037
(202) 297-6100
Carolyn@carolynelefant.com


Dated August 13, 2013
Washington D.C.

# Table of Contents

TABLE OF AUTHORITIES ...................................................................... iv

GLOSSARY ............................................................................................ ix

JURISDICTIONAL STATEMENT .............................................................. 1

INTRODUCTION .................................................................................... 4

ISSUES PRESENTED FOR REVIEW ........................................................ 5

STATUTES AND REGULATIONS ............................................................ 7

STATEMENT OF FACTS ........................................................................ 7

I.  BACKGROUND AND DESCRIPTION OF THE MYERSVILLE COMPRESSOR STATION PROPOSAL .......................................... 7

  A.  Overview of the Town of Myersville, Maryland ......................... 7

  B.  The Proposed Compressor Station ...................................... 8

II.  THE PUBLIC PARTICIPATION PROCESS THAT WASN'T ........ 9

  A.  Motions to Intervene .................................................... 9

  B.  Residents' Efforts to Obtain Confidential and Privileged Information ...................................................................... 10

  C.  Comments on the Environmental Assessment .................... 12

III.  RELATED PROCEEDINGS ................................................ 13

  A.  Myersville Town Zoning Proceeding ................................ 13

  B.  Clean Air Act Permit .................................................... 14

IV.  COMMISSION ISSUANCE OF THE CERTIFICATE ................ 15

  A.  Environmental Assessment ............................................ 15

  B.  Post-EA Activity .......................................................... 16

  C.  Commission Order Issuing Certificate .............................. 17

  D.  Rehearing ................................................................... 18

  E.  Post-Rehearing Resolutions ............................................ 19

SUMMARY OF ARGUMENT .................................................................. 20

STANDING ........................................................................................... 21

STANDARD OF REVIEW ...................................................................... 23

ARGUMENT ........................................................................25

  I.  THE COMMISSION VIOLATED THE NATURAL GAS ACT
  AND THE CERTIFICATE POLICY STATEMENT BY GRANTING A
  CERTIFICATE FOR THE PROJECT WHEN THERE WAS NO
  SUBSTANTIAL EVIDENCE OF NEED IN THE RECORD.................25

    A.  The Natural Gas Act and Certificate Policy Require a Showing
    of Need for a Specific Facility Supported By Substantial Evidence.25

    B.  The Commission's Findings of Need Are Not Supported   By
    Substantial Evidence.................................................26

      1.  The precedent agreements submitted by Dominion do not
      provide sufficient evidence of need. ...............................26

      2.  The proposed compressor station reflects overbuild. ............29

      3.  The Myersville Compressor will be used for purposes other
      than those stated in the application................................30

  II.  THE COMMISSION ERRED IN ISSUING A CERTIFICATE TO
  DOMINION BEFORE IT OBTAINED AN AIR QUALITY PERMIT
  NEEDED TO OPERATE THE PROJECT AND BY CONCLUDING
  THAT THE PROJECT WILL NOT HAVE SIGNIFICANT IMPACTS
  ON AIR QUALITY ...................................................32

    .  The Commission's Conditioned Certificate Violated the  Natural
    Gas Act.............................................................32

    B.   By Issuing the Certificate, The Commission Improperly
    Encroached on the State's Authority Under the Clean Air Act. .......33

    C.  The Commission Erred in Concluding That the Project Will Not
    Have Significant Impacts on Air Quality. .............................37

  III.  THE COMMISSION VIOLATED THE NATIONAL
  ENVIRONMENTAL POLICY ACT BY FAILING TO CONSIDER
  AND ADOPT PROJECT ALTERNATIVES AND BY UNLAWFULLY
  SEGMENTING REVIEW OF THE PROJECT FROM THE
  DOMINION COVER POINT LNG FACILITY
  NOTWITHSTANDING A DEMONSTRATED CONNECTION
  BETWEEN THE PROJECTS. ...................................................39

    A.  The Commission violated NEPA by failing to take a hard look
    at viable project alternatives, including the looping alternative
    proposed by MCRC president Franz Gerner, the viability of other
    sites, or the "no build" alternative proposed by MCRC. ..................40

B.    The Commission did not fully consider impacts on property values or alternative uses of land by the Town. ...................................41

C.    The Commission Unlawfully Segmented Review of the Myersville Compressor Station and the Cove Point Facility. .............45

    1.    Definition of Interrelated Projects Under NEPA. ...................45

    2.    The Myersville Compressor and Cove Point LNG    Facilities Are Both Part of the Same Project. .......................................46

IV.   THE COMMISSION VIOLATED ITS OWN RULES AND RESIDENTS' DUE PROCESS RIGHTS BY FAILING TO ENFORCE ITS RULES GOVERNING SERVICE OF DOCUMENTS ON INTERVENORS OR ENSURE TIMELY ACCESS TO CEII INFORMATION. .........................................................................48

A.    The Commission Did Not Enforce Its Regulations That Require Prompt Service of All Documents on Intervenors. .............................48

B.    The Commission's Refusal to Enforce Its Own Regulations Combined With Intervenors' Lack of Access to Information Violated Requesters' Due Process Rights. ............................................................50

CONCLUSION ..................................................................53

CERTIFICATE OF COMPLIANCE ...................................54

CERTIFICATE OF SERVICE ..........................................55

# TABLE OF AUTHORITIES

**COURT CASES:**                                                           **PAGE**

*AES Sparrows Point v. Smith,*
   527 F.3d 120 (2008)...........…………............…….................................... .39

*ANR Pipeline Co. v. FERC,*
   771 F.2d 507 (D.C. Cir. 1985)…………………..................................... 7

*Atlantic Refining Co. v. Public Service Commission of New York,*
   360 U.S. 378 (1945)...........……………….................................... 28, 30, 31

**Bangor Hydro v. FERC,*
   78 F.3d 659 (D.C. Cir. 1996)……………………................................……. 27, 32

*Board of County Commissioners v. Gaston,*
   401 A.2d 666 (Md. 1979)………………………............................……. 49

*Canadian Ass'n. of Petroleum Producers,*
   254 F.3d 289 (D.C. Cir. 2001)..……………….............................…… 60

*City of Grapevine, Texas v. Department of Transportation,*
   17 F.3d 1502 (D.C. Cir. 1994)..……………….............................……. 40, 41

*Dominion Transmission, Inc. v. Summers,*
   723 F.3d 238 (D.C. Cir. 2013)......................………………….. 16, 17, 21, 38, 39

*Dominion Transmission v. Town of Myersville Town Council,*
   Civil Action No. RDB-13-0338 (D.Md Oct. 7, 2013)………………. 22

*Dominion Transmission v. Town of Myersville Town Council,*
   Civil Action No. RDB-13-0338 (D.Md Oct. 7, 2013)…………..……. 22

*Fla. Wildlife Fed'n v. United states Army Corps of Eng'rs,*
   401 F. Supp.2d 1298 (S.D. Fl. 2005)........……….....................……. 52

*Friends of the Earth v. Laidlaw Environmental Services,*
    528 U.S. 167 (2000)...........……………………….......................…… 26

*Hammond v. Norton,*
    370 F. Supp.2d 226 (D.C. 2005)...………….....................…….… 52

*Horsehead Development Company v. Browner,*
    286 A.2d 766 (Md. 1972)…......…………………………………… 7

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992)...........…………………........................ 25

*Michigan Consol. Gas Co. v. Fed. Power Commission,*
    283 F.2d 204 (D.C. Cir. 1960)…………………......................…… 27

*Midwestern Gas Transmission v. 2.62 Acres,*
    Case No. 3:06-cv-0290 (M.D. Tennessee 2011)...........................…… 50

*Moreau v. FERC,*
    982 F.2d 556 (D.C. Cir. 1993)…………………......................…… 24

*National Miner's Association v. USEPA,*
    59 F.3d 1351 (D.C. Cir. 1995)...…………………......................…… 43

*National Wildlife Fed'n v. Hodel,*
    839 F.2d 694 (D.C. Cir. 1988)……………………...……....…… 24

*Natural Resources Defense Council, Inc. v. Morton,*
    458 F.2d 827 (D.C. Cir. 1972)…………………….....................…… 45

*PEACH v. U.S. Army Corps,*
    87 F.3d 1242 (11th Cir. 1996).....................................………......……… 52

*Public Utility Comm'n of the State of California,*
    900 F..2d 269 (D.C. Cir. 1990)………………….......................……….....40, 41

*Rectory Park, L.C. v. City of Delray Beach,*
    208 F. Supp. 2d 1320 (S.D. Fl. 2002)..........……........................…… 49

*Washington Gas Light v. FERC,*
 532 F.3d 928 (D.C. Cir. 2009)………………….............................…….… 27

*Western Resources Inc. v. FERC,*
 9 F.3d 1568(D.C.Cir.1993)……………………...........................…….27

*Willsey v. Kansas City,*
 631 P.2d 268 (Kan. 1981)……………………….......................... ..50

**ADMINISTRATIVE:**

*Bidding by Affiliates in Open Season,*
 137 FERC ¶61, 126 (2011)…………………..........................……… 9

*Certification of New Interstate Natural Gas Pipeline Facilities,*
 88 FERC ¶61, 227 (1999)........……………….............................…… 29, 30

*Certification of New Interstate Natural Gas Pipeline Facilities (clarified),*
 90 FERC ¶61, 128 (1999)........………………...........................…    29

*Certification of New Interstate Natural Gas Pipeline Facilities (further clarified),*
 92 FERC ¶61,0947 (2000)........……………….......................…… 29

**ADMINISTRATIVE:**

*Dominion Transmission, Inc., Order Denying Stay,*
 141 FERC ¶61, 022 (2012)........………………..........................…… 26

*Dominion Transmission, Inc., Order Issuing Certificate,*
 141 FERC ¶61, 240 (Dec. 20, 2012)……………...........................…… 1, 2

*Dominion Transmission, Inc., Order Denying Rehearing,*
 143 FERC ¶61, 148 (May 16, 2013)……………..........................…… 1

*National Fuel,*
 137 FERC ¶61,054 (2011)........……………….........................…… 34

*Notice of Storage Factory Project Application,*
    73 F.R. 4856 (Jan. 28, 2008)...………........................……….....

9 *TransColorado,*
    106 FERC ¶61, 265 (2004).....………………........................……. 34

## STATUTES:

Natural Gas Act

    Section 7(c), 15 U.S.C. §717f(c)..............………........................…… 1

    Section 717r(d), 15 U.S.C. §717r(d)........……........................…… 1

      Section 717r(d), 15 U.S.C. §717r(d)(2)...………........................…… 3, 16

## STATUTES:

Clean Air Act

    42 U.S.C. §7431...............................……........................        5, 39

Natural Gas Act

    15 U.S.C. §717b(d)...........................……........................        39, 40

    15 U.S.C. §717f(e)...........................……........................        28, 37

    15 U.S.C. §717r(b)...........................……........................        27

## REGULATIONS:                                    PAGE

    18 C.F.R. §157.10...........................……........................…        55,

    18 C.F.R. §157.10(b).........................……........................        11

    18 C.F.R. §157.21...........................……........................        8

18 C.F.R. §385.214(c)(1).........................…… …......................… 2

18 C.F.R. §385.2010...............................…… …........................ 55

18 C.F.R. §385.2010(c)............................…… …..................… 11

18 C.F.R. §388.112 (2012)........................…… …..................… 11

18 C.F.R. §388.112 (2013)........................…… …..................… 12

18 C.F.R. §2007(a)(2)...............................…… …....................... 3

## REGULATIONS:

40 C.F.R. §51.21(b)(4)...........…… …......................…….......... 43

40 C.F.R. §51.165(a)(1)(iii)...............…… …........................…....... 43

40 C.F.R. §51.166(b)(4)...............…… …......................……....... 43

40 C.F.R. §52.21(b)(4)...............…… …........................……....... 43

40 C.F.R. §1502.14.................…… …......................……....... 45

40 C.F.R. §1502.16.................…… …......................……....... 45

40 C.F.R. §1508.25(a)(1)(i)-(iii)......…… …......................……........... 51

# GLOSSARY

| | |
|---|---|
| BGE | Baltimore Gas & Electric |
| CAA | Clean Air Act |
| CEII | Critical Energy Infrastructure Information |
| Certificate Order | *Dominion Transmission, Inc.*, 141 FERC, ¶61, 240 (December 20, 2012), R.564, J.A.____ |
| Certificate Policy Statement | *Certification of New Interstate Natural Gas Pipeline Facilities*, 88 FERC ¶61,227 (1999) at 61,749; *clarified* 90 FERC ¶ 61,128, *further clarified*, 92 FERC ¶61,094 (2000) |
| Commission or FERC | Federal Energy Regulatory Commission |
| DEP | Maryland Department of Environmental Protection |
| EA | Environmental Assessment |
| EPA | Environmental Protection Agency |
| DTI | Dominion Transmission, Inc. |
| FOIA | Freedom of Information Act |
| Intervenors | Intervenors in Support of Petitioners Myersville Citizens for a Rural Community, Inc. |
| LNG | Liquefied Natural Gas |
| MCRC | Myersville Citizens for Rural Community, Inc. |
| MDE | Maryland Department of Environmental |
| NDA | Non-Disclosure Agreement |

ix

| | |
|---|---|
| NEPA | National Environmental Policy Act |
| NGA | Natural Gas Act |
| PTE | Potential to Emit Emissions |
| Rehearing Order | *Dominion Transmission, Inc.*, 143 FERC ¶61, 148 (May 16, 2013), R.595, J.A.____ |
| WGL | Washington Gas & Light |

## JURISDICTIONAL STATEMENT

This case seeks review under Section 717r(d) of the Natural Gas Act, 15 U.S.C. §717r(d), of two orders issued by the Federal Energy Regulatory Commission (Commission): *Dominion Transmission Inc.*, CP12-72, Order Issuing Certificate, 141 FERC ¶61, 240 (December 20, 2012), R.564, J.A.____(Certificate Order) and *Dominion Transmission Inc.*, Order Denying Rehearing, 143 FERC ¶61, 148 (May 16, 2013) (Rehearing Order), R.595, J.A.____.

On February 17, 2012, Dominion Transmission, Inc. (Dominion), filed an application at the Federal Energy Regulatory Commission (Commission), pursuant to section 7(c) of the Natural Gas Act, 15 U.S.C. § 717f(c), for a certificate of public convenience and necessity to construct and operate the Allegheny Storage Project, consisting of various natural gas storage and infrastructure, including as relevant here, a 16,000 horsepower natural gas compressor station located in the Town of Myersville in Frederick County Maryland.  R.340, J.A.____.  The Commission published notice of DTI's application on March 2, 2012. *77 Fed. Reg.* 12,824; *also* R. 344.

Subsequently, Petitioner Myersville Citizens for a Rural Community, Inc. (MCRC,) timely moved to intervene before the Commission (R.407,

J.A.___) as did each individual petitioner in this case.  *See* Motions to

Intervene of Dr. Franz Gerner (R.373, J.A.____), Tammy Mangan (R.404,

J.A.___) and Ted Cady (R.407, J.A.___) (collectively, Residents).

Unopposed, the motions to intervene were granted by operation of law.

*See*  18 C.F.R. §385.214(c)(1); Order Issuing Certificate, 141 FERC ¶61, 240

(December 20, 2012), R.564, J.A.____ (Certificate Order).

On December 20, 2012, the Commission issued a certificate for the

Allegheny Storage Project, including the Myersville Compressor Station, to

Dominion. R.564, J.A.____.  On January 22, 2013, MCRC and Gerner,

Cady and Mangan each filed timely requests for rehearing within thirty

days of the Commission's issuance of the Certificate Order.[1]

The Commission denied rehearing on May 16, 2013.  Rehearing

Order, R.595, J.A.____.  On July 12, 2013, MCRC, Gerner, Cady and

Mangan filed a joint petition for review of the Commission's orders.

This Court has jurisdiction over the petitions under Section

717r(d)(2) of the NGA.  The Act authorizes "any party aggrieved by a

Commission order to obtain review…in the United States Court of

---

[1]  Because day 30 fell on January 19, 2013, which is a Saturday,
rehearing requests were due on the next day that the Commission was
open for business, which was Tuesday, January 22, 2013, the day after
Martin Luther King Day, a federal holiday when the Commission was also
closed.  *See* 18 C.F.R. §2007(a)(2)(explaining Commission's rules for
computation of time when deadlines fall on a Saturday).

Appeals for the District of Columbia….by filing a petition for review within sixty days after the order of the Commission" and raise those objections previously brought before the Commission on rehearing. MCRC and the individual petitioners satisfied these jurisdictional requirements.

# INTRODUCTION

This case involves small community – the Town of Myersville, Maryland, but raises a big question with longstanding implications for siting of natural gas infrastructure:  Whether the Commission may reasonably conclude that a natural gas compressor station serves the public convenience and necessity under the Natural Gas Act in the absence of substantial evidence in the record showing either that the project is needed, or that DTI will actually use the project for the purpose stated in its application?  Here, the Commission did just that.

Ignoring precedent showing that a 16,000 horsepower compressor station is far larger than needed to serve DTI's two contracts, as well as evidence showing that the compressor station will be used primarily to transport gas to Dominion's Cove Point Export facilities, Commission instead accepted, without investigation, DTI's representations of the need and purpose for the project and issued the certificate.

The Commission's failure to carry out its public interest obligations under the Natural Gas comes at a particularly high cost to the Town of Myersville and its residents, the petitioners in this case.  The Commission's orders approving the Myersville Compressor Station overrode the Town's pre-existing Site Master Plan, which would have otherwise barred the

siting of a massive industrial facility in this quiet rural community, and
stripped the Town of its authority, preserved by another federal statute,
the Clean Air Act to plan and control land-use. CAA, 42 U.S.C. §7431.

As a result of the Commission's orders, MCRC and its individual
members must endure the project's extensive adverse impacts, ranging
from toxic emissions, degradation of viewshed, safety risks, and
diminished property values to clear the way for a project for which there
is, at best, questionable need, and that serves a purpose other than that
represented in DTI's application.  Further, the repercussions of the
Commission's practices extend far beyond this case, opening the door for
companies to foist unnecessary and unsupported projects on small other
communities to gain a toehold in lucrative shale gas and LNG export
markets.[2]  The public interest deserves better.

## ISSUES PRESENTED FOR REVIEW

1.    Whether the Commission's approval of the project based on a
      finding of need violates the Natural Gas Act, the Commission
      Certificate Policy and is unsupported by substantial evidence given
      that (a) the only evidence of need for the project are outdated

---

[2]  *See* EIA Annual Energy Outlook 2013, online at
http://www.eia.gov/forecasts/aeo/MT_naturalgas.cfm (showing LNG
exports soon to surpass imports and growth of shale production).

contracts that are not in the record and (b) the size of the Myersville Compressor Station well exceeds the putative demand.

2. Whether the Commission majority was arbitrary and capricious in (a) issuing a certificate for the project conditioned on DTI's ability to secure an air quality permit under the Clean Air Act that may never be granted and (b) concluding that the Myersville Compressor Station will not have significant adverse impacts on air quality based on inaccurate assumptions about the station's potential to emit (PTE) that are inconsistent with the Clean Air Act and unsupported by the record.

3. Whether the Commission violated the National Environmental Policy Act by failing to consider and adopt alternatives such as an electric compressor station and an alternative route proposal and unlawfully segmenting review of the Allegheny Storage Project from the Dominion Cove Point Liquefied Natural Gas (LNG) Export Project No. CP13-113, notwithstanding evidence showing a connection between the two projects.

4. Whether the Commission violated Residents' due process rights by failing to enforce its rules governing service of documents on intervenors and ensure timely access to confidential critical energy infrastructure information (CEII).

6

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are reprinted in the Addendum to this brief.

## STATEMENT OF FACTS

### I. BACKGROUND AND DESCRIPTION OF THE MYERSVILLECOMPRESSOR STATION PROPOSAL

### A. Overview of the Town of Myersville, Maryland

The Town of Myersville, Maryland is a quaint, but thriving rural community that lies fifty miles northwest of Washington D.C.. Surrounded by farmland, forests, a state park and several Civil War-era battlefields and historic structures. Myersville serves as a tranquil home to its 1650 residents.

In 2007, the Town adopted a Site Master Plan to preserve its small town character while, allowing for managed commercial growth to support economic development. Correspondence by Town of Myersville (August 28, 2012) R. 551, J.A.____. The Town's plan has paid off, enabling it to accommodate modern-day necessities such as proximity to an interstate highway, without diminishing its rural character or transforming it into a site suitable for industrial development. *See Frederick Gas Company v. Abrams*, 286 A.2d 766, 771 (Md. 1972) (recognizing that property located near road still retains rural character).

7

## B.      The Proposed Compressor Station

Following a six-month pre-filing process,[3] Dominion filed an

abbreviated application for a certificate for the Allegheny Storage Project,

consisting of compression, pipeline, and facilities located in Maryland,

Ohio, West Virginia and Pennsylvania on February 17, 2012.  Certificate

Order, R.564, J.A._____.   The largest component of the Allegheny Storage

Project – and the one that is the subject of Residents' challenge -- is the

Myersville Compressor Station, a 16,000 horsepower, gas-fired unit that

would be located in Myersville, Maryland, just off the Main Street at the

gateway to the Town.  With a price tag of $62 million, the Compressor

Station accounts for more than half of the overall $112,315,305 project cost.

DTI Application at 50, R. 341, J.A.____.

DTI did not hold a new open season to gauge customer interest for

the Allegheny Storage Project as is customary for new natural gas projects

under Commission policy. [4]  Instead, DTI relied on the results of an open

season that it had conducted in July 2007 for the Storage Factor Project

---

[3] The Commission's regulations allow companies seeking a Section 7
certificate under the Natural Gas Act to engage in an optional pre-filing
process to vet their proposals and gather feedback in advance of filing an
application.  *See* 18 CFR §157.21.

[4] *See Bidding by Affiliates in Open Season*, 137 FERC ¶61, 126 (2011), P 2
(summarizing Commission open season policy).

PF07-12, which contemplated a 14,000 horsepower compressor station for Middletown, Maryland, a few miles from Myersville. DTI Application at 4; R. 341, J.A._____.[5] DTI's open season for the Storage Factory Project resulted in executed precedent agreements with two local distribution companies, Washington Gas & Light (WGL) and Baltimore Gas & Electric (BGE) for 115,000 deckatherms/day (dth) for firm transportation service enabled by the compressor station. Certificate Order at n.8, R. 564, J.A._____. DTI discontinued the Storage Factory Project in November 2008, but states that the four-year old precedent agreements associated with the earlier project will now be fulfilled by the Allegheny Storage Project. DTI Application at 4, n.5, R. 340, J.A._____.

## II.    THE PUBLIC PARTICIPATION PROCESS THAT WASN'T

### A.    Motions to Intervene

Once notice of Dominion's application issued in February 2012, Myersville residents, who had already learned the basics about the proposal during the pre-filing process, began taking steps to participate in the Commission proceeding. Hundreds of Myersville residents, including petitioners Cady, Mangan and Gerner, filed motions to intervene and

---

[5]  *See also Notice of Storage Factory Project Application*, PF07-12, 73 F.R. 4856 (January 28, 2008) (describing 14,000 horsepower compressor station in Middletown).

comments with the Commission opposing the compressor station, citing a
range of adverse impacts and identifying numerous alternative sites.
Several residents also formed and incorporated MCRC, which filed a
motion to intervene in March 2012.

> ### B.    Residents' Efforts to Obtain Confidential and Privileged Information

After the deadline for interventions closed, residents took steps to
access the portions of Dominion's application designated as "confidential"
or "privileged."  Application at 2, R. 340, J.A.____ (listing confidential and
privileged sections).  The protected sections contained reports on historic
and cultural resources, Exhibit G flow diagrams (Application at 32, R. 340,
J.A.___and hydraulic studies, which could shed light on the need for the
project and alternative routes, and Exhibit H Gas Supply data (Application
at 34, R.340, J.A.____).  As intervenors, MCRC and individual residents
were entitled to service of these documents under the Commission's
regulations.  18 C.F.R. §385.2010(c) (requiring inclusion of intervenors on
service list without *any* exceptions for CEII or privileged documents), 18
C.F.R. §157.10(b) (requiring certificate applicant to promptly provide
intervenors with applicant at their request).

On May 10, 2012, MCRC filed a FOIA request (FY10-45) seeking
Exhibit H Gas Supply Information, which was granted on June 22, 2012

over DTI's opposition.  Addendum at 42 (Letter Summary).
Subsequently, on May 11, 2012, Dr. Gerner filed with the Commission a
CEII request, accompanied by the required non-disclosure agreement
(NDA) on behalf of MCRC seeking flow data and hydraulic studies
relevant to feasibility of alternative routes.  In both instances, the
Commission notified Dominion of the request for information but
Dominion refused to voluntarily disclose it.  Nearly two months passed
without a response from the Commission.  On July 5, 2012, counsel for
MCRC wrote a letter to the Commission seeking prompt disclosure of the
CEII materials, which were finally released on July 11, 2012, nearly two
months after Dr. Gerner's request. *See* Addendum at 42 Letter of Counsel
summarizing events (July 5, 2012).

   Unfortunately, the non-disclosure agreement (NDA) that Dr.
Gerner signed did not permit him CEII materials with his fellow MCRC
members, so on August 3, 2012, he filed a request to add Tammy Mangan,
Ted Cady and Ann Nau to the access list. This time, three months passed
before the Commission approved the new CEII requests on November 4,
2012. J.A._____.

   Finally, on June 14, 2012, MCRC submitted a FOIA request,
docketed as FY10-57, seeking access to DTI's cultural resources report

11

and the list of potentially impacted landowners that DTI notified about the proposed compressor station. On July 20, 2012, the Commission denied Dr. Gerner's request for cultural resources information and landowner list. On September 4, 2012, Dr. Gerner filed a timely appeal. As a result, on October 17, 2012, the Commission staff partially reversed its original position and released the cultural resources report but not the landowner lists. J.A._____.

### C.    Comments on the Environmental Assessment

On June 14, 2012, the Commission released the EA for the project and established a thirty-day period for comment. R. 507, JA_____. Because Dr. Gerner had requested, but not yet received, either the CEII materials or the cultural resources studies, MCRC asked the Commission to extend the deadline for comments on the EA until after the outstanding information requests were fully resolved. R.516, J.A.____. Instead, on July 13, 2012, the Commission granted a two-week extension for until July 30, 2012. R. 522, J.A.____. This left Dr. Gerner only two weeks to prepare comments on the EA based on the CEII materials, and without any opportunity to comment on the cultural resources analysis which was not

released until October 17, 2012.[6]   Meanwhile, Ted Cady, who did not

receive his CEII materials until November 4, 2012, supplemented MCRC's

comments on the EA on November 21, 2012.  R.559, J.A.____.

## III.  RELATED PROCEEDINGS

In addition to applying for a Section 7 certificate for the Allegheny

Storage Project, DTI sought two other related authorizations unique to

the Myersville Compressor station: zoning approval from the Town and

an air quality permit from the Maryland Department of Environmental

Protection (DEP).  These processes moved forward on parallel tracks.

### A.    Myersville Town Zoning Proceeding

In April 2012, Dominion filed a request to amend the Town's 2007

Master Site Plan to allow it to construct the compressor station.  Following

consideration of Dominion's application and public hearings, the Town

denied the application, concluding that the compressor station was

inconsistent with the goal of maintaining the small town character of

Myersville, would pose a health hazard and be a public nuisance. R.551,

J.A.____.  The Town notified the Commission that it had denied

Dominion's application and asked the Commission to take the Town's

---

[6] The remaining MCRC members initially believed that they would
automatically have access to CEII materials obtained by Dr. Gerner, so they
did not request the CEII materials until August 2012, after the deadline for
comment on the EA had passed.

decision into account when making a decision on the certificate.  R.551,

J.A._____.

### B.    Clean Air Act Permit

As a new source of emissions, Dominion was required to obtain an

air quality permit under the Clean Air Act in addition to a certificate from

the Commission.  Because Frederick County is a nonattainment area, there

are more stringent caps on certain emissions, and thus, the Myersville

Compressor Station faced potential classification as a major emissions

source subject to a myriad of additional regulations.  To avoid this

outcome, Dominion stipulated that it would not run its compressor station

more than 6000 hours/year, resulting in nitrogen oxide emissions (NOx) of

23.53 tons per year (tpy) (EA at 62, R.508, J.A.___)  just below the 25 tons

per year (tpy) limit for classification as a major source.  Md. Code Regs.

26.11.17.01(17)(a)(i) (defining "major source" as 25 tpy or more per year of

NOx and VOC for Frederick County).  But promised emissions do not

downgrade a source's potential to emit (PTE), unless included as a

federally enforceable restriction in a state air quality permit.  *See* Md. Code

Regs. 26.11.17.01 (2012).

In January 2012, Dominion applied for an air quality permit from the

Maryland Department of Environmental (MDE).  Initially, MDE rejected

Dominion's application because Dominion could not show proof that the

project complied with applicable local zoning law; a prerequisite for MDE's

acceptance of the permit under Maryland law.  *See* MD §2-404(b)(1).  In

March 2013, Dominion sought direct review of DEP's action under Section

717r(d)(2), arguing that the Commission certificate sufficed as proof of

compliance with applicable law.  *Dominion Transmission, Inc. v. Summers*, 723

F.3d 238, 240 (D.C. Cir. 2013).

The court remanded the case to Maryland to determine whether the

FERC certificate satisfied the compliance requirements of Section 2-404.  *Id*.

The court stated:

> Having been presented with a FERC certificate that approves
> Dominion's compressor station, [MDE] must apply this
> standard to determine which of Myersville's zoning and land
> use requirements the [certificate] preempts.

*Id*. at 243.  Although MDE has not made these findings, it has

commenced the air quality permit process and will issue a decision in

July 2014.

## IV.    COMMISSION ISSUANCE OF THE CERTIFICATE

### A.    Environmental Assessment

The Commission's EA released June 14, 2012 found that the

Allegheny Storage Project would not have significant impacts. EA at 1, R.

507, J.A.___.  As relevant here, the EA adopted Dominion's preferred

alternative for the Myersville Compressor over the other options –
including no-build, electric compressor station, pipeline looping and two
alternative sites. *See* EA 93-96; R.507, J.A.____. The EA also minimized the
Myersville Compressor Station's adverse impacts on property values,
noise, historic structures, viewshed and public safety (EA at 19, 47-48, 58;
R.507, J.A.____) and rejected Residents' claims that the Myersville
Compressor Station would primarily be used to transport gas to
Dominion's intended Cove Point LNG Export. EA at 19, R.507, J.A.____.
With regard to air quality, the EA found that if Dominion adhered to a
6000/hour operation, it would comply with applicable state air quality
requirements for minor emissions sources.

### B.    Post-EA Activity

MCRC and residents filed comments (based on then-available CEII)
challenging the statements in the EA.   Meanwhile, at the end of July 2013,
the Town denied Dominion's application for a zoning variance and notified
the Commission on August 28, 2012. R.551, J.A.____.

After the EA issued, MCRC also discovered that the state of
Maryland had refused to accept Dominion's air quality permit because
Dominion could not show that the compressor station complied with
applicable local law. On October 1, 2012, MCRC filed a motion to dismiss

the application.  MCRC argued that the proposed Myersville Compressor

Station cannot obtain the necessary permits required under the federal

Clean Air Act.  This is because the Environmental Protection Agency

(EPA) approved Maryland state implementation plan requires projects to

obtain a zoning variance as a pre-requisite to obtaining the necessary air

quality permits.  *See* MD Env. 2-404(b)(i).  Because the Myersville Council

denied DTI's request for a variance on August 27, 2012, DTI would never

be able to obtain the Clean Air Act permits that were a pre-requisite to

obtaining a Commission certificate of public necessity.

### C.    Commission Order Issuing Certificate

On December 20, 2012, the Commission issued an order granting

DTI a certificate for the Allegheny Storage Project.  Applying the first step

of the *Certificate Policy*, the Commission majority accepted DTI's claimed

need for the Myersville Compressor Station based on its existing

precedent agreements, and determined that existing customers would not

subsidize the cost of the Compressor Station. Certificate Order, P 18, 23,

R.564, J.A.____.  The Commission disregarded any connection between

the Compressor Station and LNG exports, and ignored arguments that

the compressor station was overbuilt.  Finding a need for the project and

no subsidies, the Commission agreed with the EA's finding that the project

17

would not significantly impact the environment. ,The Commission also agreed with the EA's recommendation of the Myersville option rather than the alternatives.

In reference to the Maryland air quality permits, the Commission said that "Maryland state and local agencies retain full authority to grant or deny air quality permits; if the State of Maryland rejects DTI's air quality permit application, or refuses to process it, then it is up to DTI to determine how it wishes to proceed." Certificate Order P71, R.564, J.A.____.

Finally, the Commission declined to address Mr. Cady's comments, filed November 21, 2012, offering a detailed explanation of the connection between they Myersville Compressor and the Cove Point facility, showing that there is no need for the Myersville compressor and also that the project were impermissibly segmented.  Certificate Order n. 110, R. 564, JA____. The Commission found that the comments were submitted too late and "in any event, the comments were addressed in the order."

## D.    Rehearing

On January 22, 2013 MCRC, Gerner, Cady and Mangan filed timely requests for rehearing of the Commission's order.  Again, Residents raised the connection between the Myersville Compressor Station and

Cove Point LNG export, which was now in the pre-filing stages. Cady

Rehearing Request, R.572, J.A.____. Residents also reiterated the

arguments about the station's adverse impacts, availability of other

preferable alternatives and the Commission's improper issuance of the

license before an air quality permit was issued.

On May 16, 2013, the Commission issued an order denying

rehearing. R.595. This petition for review ensued.

### E.    Post-Rehearing Resolutions

On July 19, 2013, this Court issued an order directing the state of

Maryland to accept Dominion's air quality permit for processing and to

determine whether any state and local laws have not been preempted by

the NGA. *Dominion Transmission Inc. v. Summers*, 723 F.3d 238 (D.C. Cir.

2013). Finally, on October 7, 2013, in response to a petition filed by

Dominion in February 2013, the Federal District Court for the District of

Maryland ruled that those portions of the Town of Myersville's

ordinances that affect sting, construction or operation of the Myersville

Compressor are null and void as applied to Dominion. *Dominion*

*Transmission v. Town of Myersville Town Council*, Civil Action No. RDB-13-

0338 (D.Md October 7, 2013). As a result of the court's ruling, the Town's

denial of siting approval for the compressor will not bar its construction.

## SUMMARY OF ARGUMENT

The Commission's orders granting a certificate for the Allegheny Storage Project, specifically, the Myersville Compressor Station violate the NGA and are arbitrary, capricious and unsupported by substantial evidence.

First, the Commission's findings of need for the compressor station, a required element of the NGA, are unsupported by substantial evidence. The record contains only summaries of the terms of Dominion's precedent agreements with two local utilities which, in any event, are outdated and related to a now-defunct project with a smaller compressor station. The 16,000 horsepower Myersville Compressor Station is also far larger than justified by either existing marketing studies which predict declining gas demand and customer needs, and exceeds the size of other stations approved by the Commission for similar load. Finally, the Commission ignored evidence showing that the Myersville Compressor Station will be used primarily to transport gas to Dominion's Cove Point LNG facility and not to serve local utilities as stated in Dominion's application.

Second, the Commission's grant of a certificate to Dominion, prior to its receipt of an air quality permit under the Clean Air Act was unlawful. Without a Clean Air Act permit, Dominion cannot carry out its obligations under the certificate as required by the NGA. In addition, by conditioning

20

the certificate instead of denying it outright for want of an air quality permit, the Commission improperly influenced the outcome of Maryland's air quality permit program which is authorized by the Clean Air Act and carries the force of federal law.  Finally, the Commission's findings that the Myersville Compressor Station are based on inaccurate assumptions about the station's potential to emit.

Third, the Commission violated NEPA by failing to consider viable project alternatives such as a looping option or an electric compressor station in the environmental assessment (EA).  Further, the Commission unlawfully segmented review of the Myersville Compressor Station from the Cove Point LNG facility.

Last, the Commission violated petitioners' due process rights by failing to grant them prompt access to critical energy infrastructure information (CEII), and allow additional time to file comments on the EA given the delays experienced.  For all of these reasons, the Commission's orders granting a certificate to Dominion must be overturned.

## STANDING

Petitioners Ted Cady, Franz Gerner, and Tammy Mangan, who are members of MCRC and residents of the Town of Myersville, each have standing to seek judicial review because they live in the community

21

"impacted by the challenged action." *National Wildlife Fed'n v. Hodel*, 839 F.2d 694, 707 (D.C. Cir. 1988) (finding injury to organization's members who "live in communities" subject to environmental degradation resulting from agency's action); *accord*, *Horsehead Development Company v. Browner*, 16 F.3d 1246 (1994). This Circuit has also found that a pipeline's "permanent aesthetic eyesore" and continuing safety hazards constitute "injury-in-fact" sufficient to establish standing by adjacent property owners. *Moreau v. FERC*, 982 F.2d 556, 566 (D.C. Cir. 1993).

Cady, Gerner and Mangan live in the Town of Myersville within a one-mile radius of the project. *See* Affidavits, Addendum at 47. Given the project's location at the gateway to the Town, they drive by the site several times a week. *Id*.

Cady, Gerner and Mangan are directly affected by the project's adverse impacts, including release of a steady stream of airborne toxins, degraded viewshed, increased noise pollution and safety risks. They also face the prospect of diminished property values as a result of the encroachment of industrial infrastructure in a once rural community. Because the Commission's approval of the Myersville Compressor Station overrode the Town of Myersville Site Master Plan, which was designed to preserve the Town's idyllic character while allowing for managed commercial growth, the Town will also lose much of the tranquil, small-

22

town quality that made it a desirable place for petitioners to live. *See* Affidavits, Addendum at 47.

All of these injuries are directly traceable to the challenged Commission's orders action approving the project.  All are capable of redress by this Court. *See* Order Denying Stay, 141 FERC ¶ 61,022 (2012), P17, P21, R. 899, J.A.____; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (delineating elements for constitutional standing).

MCRC, a citizens group incorporated under the laws of the State of Maryland, for the purpose of opposing the Myersville Compressor station also has standing.  As discussed, MCRC's members are directly impacted by the compressor station and have standing to sue in their own right and the relief sought—reversal of the Commission's order—does not require the participation of MCRC's individual members., *Friends of The Earth v. Laidlaw Environmental Services*, 528 U.S. 167, 183 (2000),(describing test for association standing and accepting affidavits by individual members in support of standing claims).

## STANDARD OF REVIEW

This Court applies the Administrative Procedure Act's "arbitrary and capricious standard" review to Commission orders issued under the Natural Gas Act to ensure that the Commission's decision-making is

reasoned, principled, and based on the record. *ANR Pipeline Co. v. FERC*, 771 F.2d 507, 517 (D.C. Cir. 1985) (stating that an agency's decision must be supported by substantial evidence on the record). This Court will not sustain Commission orders that do not "adhere to the statutory allocation of burden of proof" or "demonstrate [a satisfactory explanation or rational] connection between the facts found and the choice made." *Western Resources Inc. v. FERC*, 9 F.3d 1568, 1575 (D.C. Cir. 1993) ("we are unpersuaded that the Commission's decision… comports with reason and logic.") A certificate applicant under Section 7 "must bear the burden of proving that the public interest will be served." *Michigan Consol. Gas Co. v. Fed. Power Commission*, 283 F.2d 204, 214 (D.C. Cir. 1960). This Court also rejects factual findings unsupported by substantial evidence in the record. NGA, 15 U.S.C. § 717r(b); *Washington Gas Light v. FERC*, 532 F.3d 928, 933 (D.C. Cir. 2009) (remanding FERC's unsupported findings regarding safety impacts of LNG facility); *See Bangor Hydro v. FERC*, 78 F.3d 659, 664 (D.C. Cir. 1996) (finding lack of substantial evidence for order directing licensee to comply with Interior's fishway prescriptions where Interior's plan documenting need for fishways is "unfortunately" not in the record).

**ARGUMENT**

I.   **THE COMMISSION VIOLATED THE NATURAL GAS ACT
     AND THE CERTIFICATE POLICY STATEMENT BY
     GRANTING A CERTIFICATE FOR THE PROJECT WHEN
     THERE WAS NO SUBSTANTIAL EVIDENCE OF NEED IN THE
     RECORD.**

    A.   **The Natural Gas Act and Certificate Policy Require a
     Showing of Need for a Specific Facility Supported By
     Substantial Evidence.**

In granting a certificate under Section 7 of the NGA, the Commission
must find that "the proposed…construction…to the extent authorized by
the certificate, is or will be required by the present or future public
convenience and necessity." 15 U.S.C. §717f(e).  Conclusory assertions of
need do not suffice; the Supreme Court vacated a Section 7 certificate
when findings of need were "based on conclusory statements" and the
witnesses tendered at the hearing "developed little more information than
the printed contracts." *Atlantic Refining Co. v. Public Service Commission of
New York*, 360 U.S. 378, 392-394 (1945).

The Commission's more recent Certificate Policy Statement likewise
emphasizes that project need must be adequately supported:

> […]*Thus, projects to serve new demand might be approved on a lesser
> showing of need and public benefits than those to serve markets
> already served by another pipeline.*  However, the evidence
> necessary to establish the need for the project will usually
> include a market study.  There is no reason for an applicant to
> do a new market study of its own in every instance.  An

25

applicant could rely on generally available studies by EIA or GRI, for example, showing projections of market growth.  If one of the benefits of a proposed project would be to lower gas or electric rates for consumers, then the applicant's market study would need to explain the basis for that projection. *Vague assertions of public benefits will not be sufficient.*

*[…] if an applicant has entered into contracts or precedent agreements for the capacity, it will be expected to file the agreements in support of the project, and they would constitute significant evidence of demand for the project.*

*Certification of New Interstate Natural Gas Pipeline Facilities*, 88 FERC

¶61,227 (1999) at 61,749; *clarified* 90 FERC ¶ 61,128, *further clarified*, 92

FERC ¶61,094 (2000) (Certificate Policy Statement)(emphasis added).

**B.    The Commission's Findings of Need Are Not Supported By Substantial Evidence.**

**1.    The precedent agreements submitted by Dominion do not provide sufficient evidence of need.**

Dominion's precedent agreements with WGL and BGE do not prove a need for the Myersville Compressor Station.  To begin, the agreements resulted from an open season conducted in 2007, more than five years ago and, therefore, are out of date.  Second, the agreements relate to a completely different project, so at best, they demonstrate only a need for the Storage Factory Project – which contemplated a 14,000 horsepower compressor station – and not for the current proposal, with a 16,000 horsepower compressor station.

26

Although the Commission explains that DTI updated the earlier precedent agreements to reflect the current project (Certificate Order at n.8, R.564, J.A.\_\_\_\_), DTI did not actually file the agreements as required by the Certificate Policy. Instead, DTI only attached a summary of relevant terms which are privileged and therefore not accessible to Residents. Application at 5, R. 340, J.A.\_\_\_\_. In any event, without the full agreements filed, it is difficult to figure how the Commission's finding of need satisfies the minimum requirements of the Certificate Policy Statement – which expects that an applicant will file agreements relied upon in support of a project. Certificate Policy at 61,749.

Nor does the evidentiary support for the Commission's finding of need approach the standard established by the Supreme Court in *Atlantic Refining Company*. There, the record actually included the "printed contracts" proffered to support a finding of need, but still, the Court took the Commission to task for failing to elicit adequate witness testimony to amplify and explain the agreements. 360 U.S. 378, 392-394 (1945). By contrast, Dominion did not even submit the precedent contracts in the record, let alone explain their terms.

As an alternative to proof of need through contracts, the Certificate Policy Statement allows market information, either supplied by the applicant or referenced through EIA. Certificate Policy, 88 FERC ¶61, 227

at 61,749.  Here, the EIA data undercuts the Commission's finding of need by revealing that the demand for gas is declining precipitously.  *See* MCRC EA Comments (July 30, 2012), R.539, JA____; Cady Rehearing Request  at Part VII, R. 572, JA_____.[7]

In the absence of current precedent agreements specifically for the Myersville station, or market data showing growth in demand, the Commission's findings of need are unsupported by substantial evidence and fail to meet the level of proof required under the Certificate Policy Statement.  Accordingly, the Certificate Order must be vacated.  *See Bangor Hydro v. FERC*, 78 F.3d 659, 664 (D.C. Cir. 1996) (finding lack of substantial evidence for order directing licensee to comply with Interior's fishway prescriptions where Interior's plan documenting need for fishways is "unfortunately" not in the record).

---

[7] Mr. Cady's rehearing request discusses the EIA data at length. *See* http://www.eia.gov/forecasts/aeo/er/pdf/0383er(2013).pdf. The EIA data stated that demand natural gas production is higher throughout the AEO2013 Reference case projection than it was in AEO2012, with natural gas increasingly serving the industrial and electric power sectors, as well as an expanding export market" ii. "Residential delivered energy consumption remains roughly constant in the AEO2013 Reference case from 2011 to 2040, reflecting consumption levels lower than those in AEO2012." iii. "In the residential sector, natural gas consumption declines throughout the projection period.  Because natural gas is used in the residential sector directly for heating but not for cooling, residential natural gas consumption is affected by the 6-percent reduction in heating degree days described above."  Cady Rehearing at Part VII, R.572, JA_____.

### 2.      The proposed compressor station reflects overbuild.

Even if Dominion has a need to deliver to WGL and BGE (which again, is unclear from the evidence in the record), the Myersville Station is a far larger size than could ever justify the purported demand.  In fact, Dominion only intends to operate the Myersville four months year.  Certificate Order P65-66, R.564, J.A.\_\_\_\_.   This occasional use hardly justifies a $62 million facility.

Further, the existing delivery requirements for WGL and BGE can be accommodated either on extra capacity existing on Dominion's transmission lines, or through available capacity on Columbia's or Transco's transmission.  MCRC EA Comments 12-14, R.507, J.A.\_\_\_\_\_.  *See also* Cady Request for Rehearing, Part VII, R.572, J.A._____.[8]  Mr. Cady also cited four other pipeline expansion projects in the region that could potentially accommodate service to BGE and WGL.

---

[8]  Cady identified several specific pipeline expansion projects within the region with capability to supply WGL and BGE. These include Transco's Sentinel Expansion Project, El Paso's Tennessee Gas Pipeline expected to add capacity of 200 MMcf per day in Northeast Markets [TED NEED DOCKET #], a Texas Eastern Transmission Project, seeking to expand capacity by 395 MMcf per day.  In addition, there is also existing transportation service available from CP11-30 and CP11-31 Transcontinental Pipeline as well as storage capacity from the recent CP05-130 Cove Point Expansion Project.  Cady Rehearing Part VII, R.\_\_\_\_, J.A.\_\_\_\_\_.

The Commission's precedent also suggests that the 16,000 hp compressor is virtually unprecedented for a peak four-month delivery of 125,000 dh/d. Review of past projects shows that compressor stations of this size typically support larger deliveries of gas, or conversely, smaller, lower cost stations typically suffice for the delivery obligation that DTI says it must meet.[9] The Commission did not even address these arguments.

Commission asserted that because it never considered the possibility that this minimal demand could be met by a smaller facility. Instead, the Commission noted that:

> We are confident that DTI will not invest significant time and resources in a profitless endeavor, and thus find no reason to reverse our prior determination.

Rehearing Order P.31, R. 595, J.A.____. The Commission lacks evidence to justify this vote of confidence in Dominion's investment.

### 3.    The Myersville Compressor will be used for purposes other than those stated in the application.

Finally, Dominion intends to use the facility for a purpose other than

---

[9] *See, e.g., TransColorado*, 106 FERC ¶ 61,265 (2004) (delivery of 125,000 dth/d through 3 smaller compressors of 12,000 hp at cost of $28 million); *National Fuel*, 137 FERC ¶ 61,054 (2011) (320,000 dt/day supported by 14,000 hp expansion at two stations); *Dominion Transmission Inc.*, 99 FERC ¶ 61, 367 (2002) (300,000 dt/day using smaller compressor station).

that stated in its application: to export gas through Cove Point.  MCRC

members Ted Cady and Franz Gerner filed detailed comments based on

CEII data received late in the process showing that Dominion will deliver

excess volumes largely to Loudoun and Cove Point rather than exclusively

to WGL and BGE.  [Gerner Comments, July 30, 2012, R.541, JA____ (also

comments filed confidentially as CEII); Cady Comments, November 21,

2012, R.559, J.A._____].

In response, the Commission asserted that Washington Gas has

numerous delivery points off the Dominion Cove Point Pipeline, and that

residents inaccurately compared design day (contractual obligation) flow

with non-coincidental peak deliveries.  Certificate Order n.109, R. 564,

J.A.____.  Yet, Dr. Gerner's comments already take into account that WGL

will accept delivery at Cove Point.  Gerner EA Comments (July 30, 2013), R.

541, J.A._____; *also* Gerner CEII Comments.  And even accounting for

different forms of service, the fact remains that the flow diagrams analyzed

by residents show that at least half of the volume from the compressor

station will be delivered to Cove Point.  *Id*.

To sum, the Commission's finding of need for the Myersville

Compressor station is unsupportd by substantial evidence.  The

Commission's finding is based on outdated contracts associated with

another project and does not justify why such a large compressor station

31

is needed, unless deliveries will be going for export at Cove Point.[10]

Accordingly, the certificate must be vacated.

## II. THE COMMISSION ERRED IN ISSUING A CERTIFICATE TO DOMINION BEFORE IT OBTAINED AN AIR QUALITY PERMIT NEEDED TO OPERATE THE PROJECT AND BY CONCLUDING THAT THE PROJECT WILL NOT HAVE SIGNIFICANT IMPACTS ON AIR QUALITY.

### A. The Commission's Conditioned Certificate Violated the Natural Gas Act.

The Myersville Compressor Station is a source of emissions and therefore, Dominion requires an air quality permit to operate the station under the Clean Air Act. Dominion had not yet obtained an air quality permit from MDE at the time the Commission granted the Section 7 certificate and, in fact, is not expected to receive the permit at least until June 2014.[11]

Notwithstanding that an air quality permit is required, the Commission jumped the gun and approved the certificate – albeit with the following condition:

---

[10]   Section 7 of the Natural Gas Act and the Certificate Policy are based on the assumption that gas will be delivered to national markets, not exported overseas.

[11] *See* Docket Sheet, *Dominion Transmission v. MDE*, Case No. 13-1019, Document 1450806 (August 8, 2013), online at https://ecf.cadc.uscourts.gov/cmecf/servlet/TransportRoom?servlet=ShowDoc&dls_id=0120751 9373&caseId=29157&dktType=dktPublic (schedule governing processing of air quality permit).

**Condition 8:  Prior to receiving written authorization from the Director of OEP to commence construction of any project facilities**, DTI shall file with the Secretary documentation that it has received all applicable authorizations required under federal law (or evidence of waiver thereof).

Certificate Order, R. 564, J.A.____.  The conditioned certificate does not satisfy the NGA's requirements.

Under Section 7 of the NGA, Commission may issue a certificate only upon finding that "the applicant is able and willing properly to do the acts and to perform the service proposed and to conform to the provisions of the Act."  15 U.S.C. §717f(e).  In order to perform the service proposed in its application, Dominion must obtain an air quality certificate.  Yet, by conditioning an award of a certificate on Dominion's eventual procurement of an air quality permit, the Commission has effectively authorized a facility that may never be built.  The Commission's approach is inconsistent with the public interest.

### B.    By Issuing the Certificate, The Commission Improperly Encroached on the State's Authority Under the Clean Air Act.

Under MD 2-404(b)(1), MDE may not accept an air quality permit application unless an applicant shows either that its project (a) has been approved by local authorities or (b) is otherwise in compliance with applicable local law.  The Commission's decision to issue a conditioned certificate (as opposed to denying the certificate outright because Dominion did not have an air quality permit) unlawfully influenced the

outcome of Maryland's air quality certificate program under Section 2-404(b)(1).

The Commission's conditioned certificate enabled Dominion to show compliance with applicable law. As a result, Maryland was required to accept Dominion's permitting for processing under Section 2-404(b)(1). *See Dominion Transmission Inc.*, 723 F.3d at 245. By contrast, had the Commission denied Dominion's certificate outright, Dominion could never have satisfied Section 2-404(b)(1) -- and Maryland would have been barred from accepting Dominion's permit application. This is because without the Commission certificate, Dominion could not show compliance with applicable law. And because the Town denied Dominion's zoning application, Dominion could not show that the project received local approval either.

The Commission's issuance of a conditioned certificate unlawfully changed the outcome of the air quality permit process, which is a federally-authorized program. As this court just held, MD2-404(b)(1) is incorporated in Maryland's EPA-approved SIP under the Clean Air Act and carries the force of federal law. *Dominion Transmission Inc.*, 723 F.3d 238. Moreover, the Natural Gas Act specifically provides that "nothing in this act affects states' rights under the Clean Air Act." 15 U.S.C. §717b(d); *see also AES Sparrows Point v. Smith*, 527 F.3d 120 (2008) (recognizing Clean Air Act as

34

exception to preemptive scope of Natural Gas Act). Yet, the Commission's issuance of a conditioned certificate did affect Maryland's rights. By issuing a conditioned certificate, the Commission effectively forced MDE to accept an air quality permit application which would have otherwise been deemed deficient under Section 2-404(b)(1) given the Town's denial of zoning approval.

The Commission's issuance of a conditioned certificate undermines the Clean Air Act as well. The Clean Air Act expressly preserves local authority, stating that "nothing in this chapter constitutes an infringement on [local governments] to plan or control land use." 42 U.S.C. §7431. Section 2-404(b)(1) honors the Act's express preservation of local authority by prohibiting MDE from even starting the permit approval process if a local government disapproves a project or if it is not otherwise in compliance with local law. Yet, the Commission's conditioned certificate overrides the federal protection for local control that Maryland's federally-approved statute attempts to preserve. The NGA, by its own terms, does not allow the Commission to subordinate the Clean Air Act – yet that is exactly what happened when the Commission issued a conditioned certificate.

In defense of its conditioned certificates, the Commission cites *City of Grapevine, Texas v. Department of Transportation.* 17 F.3d 1502

(D.C. Cir. 1994) (upholding FAA's approval of airport runway conditioned on compliance with National Historic Preservation Act), and *Public Utility Comm'n of the State of California*, 900 F.2d 269 (D.C. Cir. 1990) (affirming Commission's determination that, contingent upon the completion of environmental review, there were no non-environmental bars to pipeline construction).  Both cases are distinguishable.  Rehearing Order at n.19, R.595, JA_____

First, neither case involves the Clean Air Act, which is expressly preserved by the Natural Gas Act. 15 U.S.C. §717b(d) ("nothing in this act affects states' rights under the Clean Air Act).  Second, neither case involves a statute like MD ENV. §2-404(b)(1) where the state's federally-reserved authority to determine whether to process an air quality application hinges on the outcome of the Commission's certificate process. By conditioning the certificate on compliance with the Clean Air Act, the Commission encroached on Maryland's authority under Section 2-404(b)(1).  In comparison, the conditioned certificate did not diminish the power of the agencies in *Grapevine* and *Public Utility Commissions* to carry out their mandates under the statutes at issue.

To sum, the Commission's conditioned certificate violates the NGA by authorizing a project that Dominion may never be able to build and unlawfully encroaches on the state's federally-protected powers under the

36

CAA. Accordingly, this court must vacate the conditioned certificate, at least insofar as it applies to the Myersville Compressor Station.

### C.  The Commission Erred in Concluding That the Project Will Not Have Significant Impacts on Air Quality.

The EA found that:

> As DTI correctly notes, air emission issues associated with the Myersville Compressor Station were addressed in the EA, which concluded that air impacts should be within environmentally acceptable risks.

Rehearing Order at P. 71, R. 595, J.A.____.  The EA's conclusions – ultimately adopted by the Commission -- are incorrect and reflect a misunderstanding of the requirements of the Clean Air Act.

Most seriously, the EA accepted without question, DTI's representation that the Myersville Compressor Station will emit 23.75 tons per year (tpy) of NOx.  *See* Environmental Assessment at 62, R.507, J.A.____.  However, as MCRC pointed out, an identical compressor station proposed by the El Paso Company estimated emissions of 31.25 tpy of $NO_x.$ [CITE]  Rather than attempt to determine the Myersville Compressor Station's potential to emit, which is the operative metric for assessing air quality impacts under the Clean Air Act, the EA assumes that DTI will operate the facility at 6000 hours per year.  Likewise, on rehearing, the Commission also found that

> DTI has committed to limiting the hours of operation of the Myersville Compressor Station, thereby making its self-imposed limit the potential-to-emit for the compressor station.

Commission Rehearing Order P25, R.595, J.A.\_\_\_\_.

The Commission erred as a matter of law. Under the Clean Air Act, commitments to limit operation do not change a project's PTE, unless those limits are incorporated in a federally enforceable air quality permit. *See* 40 C.F.R. §52.21(b)(4), §51.165(a)(1)(iii), §51.166(b)(4) Md. Code Regs. 26.11.17.01(2012) (implementing Clean Air Act); *National Miner's Association v. USEPA*, 59 F.3d 1351, 1362 (D.C. Cir. 1995) (explaining that operational restriction will not cap project's potential to emit unless restrictions are enforced by federal law). Because DTI's 6000 hour cap was not incorporated into a federally enforceable permit (because an air quality permit has not yet issued), the EA was incorrect in using the 6000/hour limit as the facility's potential to emit. Instead, the EA should have used the Myersville Compressor Station's maximum capacity to emit under its physical and operational design – or in this case, 24/7 (8760 hours). *See* 40 C.F.R. §51.21(b)(4), §51.165(a)(1)(iii), §51.166(b)(4). Had the EA explored the NOx emissions from the facility's PTE *without* a cap, the emissions levels would have been closer to those of the ElPaso Compressor Station. Moreover, the higher emissions levels would bump the Myersville

Compressor Station into the category of a major source which is subject to more stringent regulatory and monitoring requirements.

The Commission has an independent obligation under the NEPA and the NGA to base findings on substantial evidence.  With regard to air quality, the Commission's order does not cite any evidence that the Myersville facility will not adversely impact air quality.  Nor can the Commission assume that the compressor station will not harm air quality if operated in compliance with an air quality permit – because no such permit has yet been issued.

The Myersville Compressor is an enormous new source of emissions in close proximity to residential communities in a county still in non-attainment.  The Commission erred in finding that air quality impacts are not significant.

III.   **THE COMMISSION VIOLATED THE NATIONAL ENVIRONMENTAL POLICY ACT BY FAILING TO CONSIDER AND ADOPT PROJECT ALTERNATIVES AND BY UNLAWFULLY SEGMENTING REVIEW OF THE PROJECT FROM THE DOMINION COVER POINT LNG FACILITY NOTWITHSTANDING A DEMONSTRATED CONNECTION BETWEEN THE PROJECTS.**

NEPA requires agencies to take a hard look at a proposed action and potential alternatives.  *Natural Resources Defense Council, Inc. v. Morton*, 458 F.2d 827, 838 (D.C. Cir. 1972).  Analysis of alternatives lies at the heart of

the EIS. 40 C.F.R. §1502.14. In order to conduct an adequate alternatives analysis, the Commission must "rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated", and includes a "no build" alternative. 40 C.F.R. §1502.14. As part of this analysis, agencies *must* measure the direct effects, indirect effects, and possible conflicts between the proposed action and the objectives of Federal, regional, State, and local law. 40 C.F.R. §1502.16.

The Commission's NEPA analysis fell short in numerous respects. In the sections below, we challenge the most serious errors.

> A. **The Commission violated NEPA by failing to take a hard look at viable project alternatives, including the looping alternative proposed by MCRC president Franz Gerner, the viability of other sites, or the "no build" alternative proposed by MCRC.**

The Commission failed to address the no-action alternative under NEPA. As Mr. Cady explained on rehearing, there are numerous other pipeline systems in the region that could be used to meet BGE's and WGL's needs. Cady Rehearing Part VII, R. 572, JA_____.[12] However, the Commission did not seriously consider alternatives by which Dominion might meet its delivery obligations through existing infrastructure.

---

[12]  *See also* Part I.B, *supra* (discussing alternatives to new compressor station in context of need analysis).

The Commission also rejected the looping alternative, that involves construction of a 30-mile pipeline loop instead of the 16,000 horsepower compressor station.  As Dr. Gerner argued on rehearing, the total lifetime costs of the compressor station (largely consisting of fuel costs) are approximately $153 million as compared to the $155 million estimated cost of the 30-mile looping alternative.  Gerner Rehearing at 3-7, R. 577, JA_____.  Moreover, in contrast to the compressor station, the looping alternative has no emissions.  The Commission rejected Dr. Gerner's analysis, finding that he exaggerated the expected cost of gas.  But the Commission never proposed a more accurate estimate.

The Commission also failed to correct its assumption that the looping option would require 418 acres of land.  Rehearing Order P.38-39, R. 595, JA_____.  On rehearing, Dr. Gerner calculated that the looping option would require only 47.5 acres for construction and 54.5 acres for continued operation – about one fourth of the Commission's estimate.  Gerner Rehearing at 6-7, R. 577, J.A._____.  Use of Dr. Gerner's figures show that the looping option would have far fewer environmental affects than assumed by the Commission.

### B.   The Commission did not fully consider impacts on property values or alternative uses of land by the Town.

The Commission failed to quantify the impacts of the project on

property values or the loss to the Town of future development opportunities.  Not only do property values decline in areas in close proximity to above-ground facilities, but there are also losses associated with the Commission's preemption of Town zoning rules.  MCRC Rehearing 30-32, R. 595, J.A._____.  Many residents moved to Myersville because of its rural characteristics and goals of supporting managed, commercial growth, as articulated in the Town Master Site Plan.  With the site plan (which was in existence since 2007, thus predating Dominion's proposed compressor station) preempted, Myersville will lose some of its appeal to potential home buyers.

The Compressor Station also potentially impacts the Town's tax base and potential to grow.   The compressor station occupies one of the last few sites for commercial development, and as such will disrupt the Town's ability to attract other businesses.  And while a few commercial sites remain, business may be deterred from occupying those sites because they are adjacent to the proposed compressor station. *See* Gerner Rehearing Request 6-7, R. 577, JA_____.

The Commission EA recognized the general potential for property values to be negatively impacted by the construction of nearby energy infrastructure.  Certificate Order at P104, R. 564, J.A.____.  But the Commission did not go far enough in quantifying the impacts of the project on property values and lost development opportunities.

First, and most significantly, the Commission does not discuss the impact of preemption on property values.  Courts recognize that state and local zoning and land-use laws protect property values and promote orderly development directed by the community rather than a private developer.  *See*, *e.g.*, *Rectory Park, L.C. v. City of Delray Beach*, 208 F. Supp. 2d 1320, 1327 (S.D. Fl. 2002) (finding as a matter of law that zoning ordinances were designed in part to protect the property values of all property within the regulated area); *Board of County Commissioners v. Gaston*, 401 A.2d 666 (Md. 1979) (recognizing importance of master plan to avoid having "developer, not the constituted authority of the county…in control of planning for the future of the county").

 As a result of preemption, the Town of Myersville and its residents suffered a loss because a site that would have once sustained uses that would benefit the community has now been taken off the market by Dominion.   Residential property values suffer, as well, when zoning laws

43

are preempted.  Many MCRC members chose to live in Myersville because of the rural character of the area and commitment to open space and orderly development.  These features, which enhance the value of residents' property, have now been obliterated by the Commission's approval of the compressor station.  Yet, the Commission's Certificate Order does not acknowledge the impacts of preemption of local zoning decisions on property values.

The Commission also fails to recognize that a number of jurisdictions in the United States recognize that property values may be reduced that property values in close proximity to compressor stations frequently experience a drop in value due to concerns over risk of explosion, toxic emissions or nuisance caused from living next to a noisy compressor station that fails to comply with applicable permitting requirements.  *See Midwestern Gas Transmission v. 2.62 Acres*, Case No. 3:06-cv-0290 (M.D. Tennessee 2011) (allowing testimony on impact of proximity to fear on perception of property value in compressor station takings case); *Willsey v. Kansas City,* 631 P.2d 268 (Kan. 1981) (summarizing state rulings on impact of fear on property values where transmission lines are located).  Given that academics and courts alike have found ways to quantify impacts of compressor stations and utility facilities on property values, the

44

Commission should have the ability to do the same in the EA.

**C.    The Commission Unlawfully Segmented Review of the Myersville Compressor Station and the Cove Point Facility.**

The Myersville Compressor Station is an integral part of Dominion's planned Cove Point LNG Export Facility.  As such, the Commission should have evaluated both facilities as part of a single environmental review instead of unlawfully segmenting the review process into two different proceedings in violation of NEPA.  *See* Cady Rehearing, 15.v, R.572, J.A._____.

**1.    Definition of Interrelated Projects Under NEPA.**

Under NEPA, actions are connected if they:

> (i)  Automatically trigger other actions, which may require environmental impact statements.

> (ii)  Cannot or will not proceed unless other actions are taken previously or simultaneously.

> (iii)  Are interdependent parts of a larger action and depend on the larger action for their justification.

40 C.F.R. §1508.25(a)(1)(i)-(iii).  CEQ's "anti-segmentation" rule prevents agencies from artificially dividing a major project into multiple components, each of which individually has an insignificant environmental impact, but which collectively have a substantial effect. *Fla. Wildlife Fed'n v. United States Army Corps of Eng'rs*, 401 F. Supp.2d 1298 (S.D. Fl. 2005*), citing PEACH v. U.S. Army Corps*, 87 F.3d 1242 (11th Cir. 1996); *Hammond

*v. Norton*, 370 F. Supp. 2d 226 (D.C. 2005) ("It is established that an agency preparing an EIS may not "segment" its analysis so as to conceal the environmental significance of the project or projects").

## 2. The Myersville Compressor and Cove Point LNG Facilities Are Both Part of the Same Project.

The Myersville Compressor Station is an integral part of Dominion's planned Cove Point LNG Export Facility. First, both projects have been developed in the same time frame. Dominion filed the application for the Allegheny Storage Project (which includes the Myersville station) in February 2012, after a six month pre-filing period. Meanwhile, Dominion sought authorization from Department of Energy (DOE) for its LNG Export facility in October 2011 (the same time that pre-filing for the Myersville Compressor station was ongoing). *See Dominion Cove Point LNG*, DOE Authorization, FE Docket No. 11-128-LNG (September 13, 2013) (conditionally approving Dominion Application filed in October 2011). In June 2012 (a few months after filing its application for the Myersville station), Dominion initiated a pre-filing process at the Commission for the Cove Point Facility (Docket No. PF12-6). Finally, in April 2013, after securing approval of the Myersville facility, Dominion filed an application at the Commission for authorization to construct additional facilities at its existing Cove Point LNG station to support LNG

Export.  *See* Notice of Application, CP13-113 (April 12, 2013), 78 F.R. 23552

online at https://www.dom.com/business/gas-transmission/cove-

point/pdf/NOA-041213.pdf.

 Second, both the Myersville station and the Cove Point facility are

"interdependent parts of a larger action and depend on the larger action

for their justification."  As discussed in Part I.B *supra*, flow diagrams filed

by Dominion show that the majority of gas from the Myersville station

will be delivered to the Cove Point export facility.  Moreover, given the

16,000 horsepower capacity of the Myersville compressor station, and the

relatively minimal load it will serve, there is simply no way to explain the

Myersville station's size unless is it intended to support deliveries to Cove

Point.

The Commission dismissed the connection between Cove Point and

the Myersville Compressor Station. Certificate Order P. 33, R. 564, J.A.____.

First, the Commission explained that the Allegheny Project grew out of the

2007 Storage Factory proposal, which pre-dated Dominion's plans for an

LNG facility.  However, the Commission ignored that the Storage Factory

Project contemplated more storage capacity as well as a smaller compressor

station of 14,000 horsepower, not the 16,000 that Dominion currently plans.

73 F.R. 4856 (January 28, 2008) (describing 14,000 horsepower compressor

station in Middletown as part of Storage Factory Project).  In short, the

Allegheny Storage and earlier Storage Factory proposals are not as similar as Dominion contends – and thus, that the Storage Factory proposal pre-dated Dominion's LNG plans does not disprove the connection between the Myersville station and the LNG export facility.

Second, the Commission found that even if there were a connection between the Myersville station and the LNG Export facility, cumulative impacts would be addressed in the environmental review of the LNG Export Facility.  Certificate Order n.31, R. 564, J.A.____.  By that time, however, the Myersville station will already be constructed and it will be too late to mitigate the adverse impacts.  Given that the Myersville station is a part of the larger Cove Point export facility, the Commission should have conducted a single environmental review for the entire project.  Failure to do so warrants reversal of the Commission order.

## IV. THE COMMISSION VIOLATED ITS OWN RULES AND RESIDENTS' DUE PROCESS RIGHTS BY FAILING TO ENFORCE ITS RULES GOVERNING SERVICE OF DOCUMENTS ON INTERVENORS OR ENSURE TIMELY ACCESS TO CEII INFORMATION.

### A. The Commission Did Not Enforce Its Regulations That Require Prompt Service of All Documents on Intervenors.

Section 2010 of the Commission's regulations provide that "any filing a document in a proceeding must serve a copy on each person on the official service list," and that intervenors are automatically added to the

service list.  18 C.F.R. §385.2010.  A more specific regulation, Section 157.10 which governs certificate applications, likewise states that "copy of each application…including exhibits…shall upon request be *promptly* supplied by the applicant to anyone who has filed a petition for leave to intervene."  18 C.F.R. §157.10.

Neither the Commission's CEII or FOIA regulations alter an applicant's obligation to comply with the Commission's rules for service on intervenors.  Yet Dominion did not voluntarily provide MCRC, Gerner, or Cady copies of the privileged or confidential components of their application.

Moreover, not only did Dominion fail to disclose information as required by the Commission's regulations, it actively opposed intervenors' efforts to procure this information through the CEII process.  For example, when the Commission notified Dominion of its intent to release materials to intervenors, DTI disputed that the residents had any legitimate need for this information.  [J.A.____].

Notwithstanding that Section 157.10 requires *prompt* release of information, the Commission did not move swiftly to ensure disclosure over Dominion's objections.  The Commission did not order release of CEII documents to Dr. Gerner until July 11, 2012 – two months after his May 10,

2012 request and only after the intervention of counsel. *See* Letter dated July 5, 2012, Addendum at 42. Meanwhile, Mr. Cady's and Ms. Mangan's CEII requests, filed on August 5, 2012, required three months to process and were not satisfied until November 4, 2012 – even though by that point, the Commission was well familiar with the need for the information.

**B.    The Commission's Refusal to Enforce Its Own Regulations Combined With Intervenors' Lack of Access to Information Violated Requesters' Due Process Rights.**

Petitioners' inability to timely access the CEII materials violated their due process rights and undermined their ability to meaningfully participate in the proceeding in several ways.  First, Dr. Gerner, who requested CEII information over a month *before* the EA issued, had only two weeks to prepare comments based on the CEII material rather than the full thirty days for comment allowed under the Commission's notice of the EA. Curtailing Dr. Gerner's ability to comment on the EA by a full two weeks due to the Commission's inaction in processing his CEII requests violated his due process rights.

As for Mr. Cady, the Commission found his comments based on CEII untimely and refused to consider them at all.  Certificate Order at 48 and n.110; R.564, J.A.____.  Granted, Mr. Cady did not request the CEII information until August 2012, after the period for comments on the EA

50

had closed,  but had it not taken three months for the Commission to order their release, he could have submitted his comments earlier.  Indeed, the Commission notes that it addressed comments filed as late as November 5, 2012.  Certificate Order P161-162, R. 564, J.A.____.

On rehearing, the Commission rejected allegations of due process violations.  First, the Commission claims all comments were addressed -- even though the Commission stated that rejected Mr. Cady's submissions. Rehearing Order n. 110, R. 595, J.A._____.   Second, the Commission claimed that Residents had at least 30 days to comment on the EA, which was not accurate either.  But Mr. Gerner only had two weeks to comment on the EA once he received the CEII materials; the Commission rejected his request for more time.  *See* MCRC Letter (July 5, 2012), Addendum at 42. Because the Commission rejected Mr. Cady's comments and did not, as it claimed, allow Mr. Gerner 30 days to comment on the EA, residents' due process rights were violated.

Further, the Commission failed to respond to MCRC's arguments that the Commission's then-effective CEII regulations  – which allow project sponsors to object to requests to disclose CEII and does not impose any deadlines on the Commission's processing of CEII requests – violate due process. As MCRC explained on rehearing:

51

Rather than make determinations regarding the release of CEII on its own, the Commission permits the applicant to an opportunity to offer feedback. This is akin to allowing the fox to guard the henhouse, since applicants have a vested interest in publicly releasing as little information about a proposal as possible to avoid objections. In a contested proceeding, where an applicant has a duty under Commission regulations to serve all intervenors with materials filed at the Commission, the applicant should not be given an opportunity to disapprove release of materials to intervenors who execute the Commission's NDA. An applicant cannot decide whether or not to release of relevant data in a formal hearing proceeding, and should not be entitled to similar powers in a quasi-adjudicative certificate proceeding.

The final problem with the Commission's CEII regulations is the lack of any firm deadlines. For information releases under FOIA, the Commission must respond within twenty working days. *See* 18 C.F.R. § 388.108(c)(1). Although, as discussed below, twenty working days is not enough time to allow for meaningful comment, at least the FOIA deadlines make the Commission accountable to respond within a specific period or face a challenge in court. By contrast, the CEII regulations do not establish firm dates for processing requests, which means that they can linger two or three months as was the experience of MCRC members.

MCRC Rehearing Request 48-49; R. 576, JA_____. The Commission failed to respond to these criticisms, thus rendering its decision arbitrary and capricious. *See, e.g. Canadian Ass'n of Petroleum Producers*, 254 F.3d 289, 299 (D.C. Cir. 2001) ("Among other things, "[a]n agency's `failure to respond meaningfully' to objections raised by a party renders its decision arbitrary and capricious.").

Because the Commission's violated the due process rights of MCRC and its individual members, the Commission's certificate order must be vacated.

## CONCLUSION

WHEREFORE for the foregoing reasons, Petitioners MCRC and the individual petitions ask this Court to:

1.     Vacate as arbitrary, capricious and/or unsupported by substantial evidence the Commission orders in their entirety or insofar as they authorize the Myersville Compressor Station; or in the alternative;

2.     Remand the case to the Commission for additional proceedings consistent with this Court's ruling; and

3.     Award any and all other relief that this court deems appropriate.

Respectfully submitted,

Carolyn Elefant
LAW OFFICES OF CAROLYN ELEFANT
2200 Pennsylvania Avenue N.W.
Fourth Floor East
Washington D.C. 20037
(202) 297-6100
Carolyn@carolynelefant.com

Counsel to Petitioners

53

## CERTIFICATE OF COMPLIANCE

I certify that Petitioners' Initial Brief is in compliance with Fed. R.

App. P. 28(a)(11); and Fed. R. App. P. 32(a)(7)(C). The brief was prepared

using 14-point Palantino, a serif font. The brief contains 10,807 words as

calculated by my word processing system.

Respectfully submitted,

_____
Carolyn Elefant
LAW OFFICES OF CAROLYN ELEFANT
2200 Pennsylvania Avenue N.W.
Fourth Floor East
Washington D.C. 20037
(202) 297-6100

## CERTIFICATE OF SERVICE

I certify that on November 13, 2013, I caused to be served a copy of

Petitioners' Initial by email and via the court's ECF filing system.

Respectfully submitted,

_____
Carolyn Elefant
LAW OFFICES OF CAROLYN ELEFANT
2200 Pennsylvania Avenue N.W.
Fourth Floor East
Washington D.C. 20037
(202) 297-6100

# ADDENDUM

| Document | Addendum Page |
|---|---|
| **STATUTES/REGS** | **cover sheet** |
| 15 U.S.C. §717b | 1 |
| 15 U.S.C. §717f | 2 |
| 18 C.F.R. §157.10 | 3 |
| 18 C.F.R. §157.21 | 6 |
| 18 C.F.R.§385.2010 | 11 |
| 18 C.F.R.§388.112 | 16 |
| 40 C.F.R. §51.165(a)(1) | 19 |
| 40 C.F.R. §52.21(b)(4) | 38 |
| **MCRC FOIA Letter (July 7, 2012)** | 42 |
| **AFFIDAVITS** | 47 |

# STATUTES AND REGULATIONS



UNITED STATES CODE SERVICE
Copyright © 2013 Matthew Bender & Company, Inc.
a member of the LexisNexis Group (TM)
All rights reserved.

*** Current through PL 113-47, approved 10/31/13 ***

TITLE 15. COMMERCE AND TRADE
CHAPTER 15B. NATURAL GAS

**Go to the United States Code Service Archive Directory**

*15 USCS § 717b*

§ 717b.  Exportation or importation of natural gas; LNG terminals

(a) After six months from the date on which this Act takes effect [effective June 21, 1938] no person shall export any natural gas from the United States to a foreign country or import any natural gas from a foreign country without first having secured an order of the Commission authorizing it to do so. The Commission shall issue such order upon application, unless, after opportunity for hearing, it finds that the proposed exportation or importation will not be consistent with the public interest. The Commission may by its order grant such application, in whole or in part, with such modification and upon such terms and conditions as the Commission may find necessary or appropriate, and may from time to time, after opportunity for hearing, and for good cause shown, make such supplemental order in the premises as it may find necessary or appropriate.

(b) With respect to natural gas which is imported into the United States from a nation with which there is in effect a free trade agreement requiring national treatment for trade in natural gas, and with respect to liquefied natural gas--
   (1) the importation of such natural gas shall be treated as a "first sale" within the meaning of section 2(21) of the Natural Gas Policy Act of 1978 [*15 USCS § 3301(21)*]; and
   (2) the Commission shall not, on the basis of national origin, treat any such imported natural gas on an unjust, unreasonable, unduly discriminatory, or preferential basis.

(c) For purposes of subsection (a), the importation of the natural gas referred to in subsection (b), or the exportation of natural gas to a nation with which there is in effect a free trade agreement requiring national treatment for trade in natural gas, shall be deemed to be consistent with the public interest, and applications for such importation or exportation shall be granted without modification or delay.

(d) Except as specifically provided in this Act [*15 USCS §§ 717* et seq.], nothing in this Act affects the rights of States under--
   (1) the Coastal Zone Management Act of 1972 (*16 U.S.C. 1451* et seq.);
   (2) the Clean Air Act (*42 U.S.C. 7401* et seq.); or
   (3) the Federal Water Pollution Control Act (*33 U.S.C. 1251* et seq.).



UNITED STATES CODE SERVICE
Copyright © 2013 Matthew Bender & Company, Inc.
a member of the LexisNexis Group (TM)
All rights reserved.

*** Current through PL 113-47, approved 10/31/13 ***

TITLE 15. COMMERCE AND TRADE
CHAPTER 15B. NATURAL GAS

**Go to the United States Code Service Archive Directory**

*15 USCS § 717f*

§ 717f.  Construction, extension, or abandonment of facilities

(a) Extension or improvement of facilities on order of court; notice and hearing.  Whenever the Commission, after notice and opportunity for hearing, finds such action necessary or desirable in the public interest, it may by order direct a natural-gas company to extend or improve its transportation facilities, to establish physical connection of its transportation facilities with the facilities of, and sell natural gas to, any person or municipality engaged or legally authorized to engage in the local distribution of natural or artificial gas to the public, and for such purpose to extend its transportation facilities to communities immediately adjacent to such facilities or to territory served by such natural-gas company, if the Commission finds that no undue burden will be placed upon such natural-gas company thereby: *Provided,* That the Commission shall have no authority to compel the enlargement of transportation facilities for such purposes, or to compel such natural-gas company to establish physical connection or sell natural gas when to do so would impair its ability to render adequate service to its customers.

(b) Abandonment of facilities or services; approval of Commission.  No natural-gas company shall abandon all or any portion of its facilities subject to the jurisdiction of the Commission, or any service rendered by means of such facilities, without the permission and approval of the Commission first had and obtained, after due hearing, and a finding by the Commission that the available supply of natural gas is depleted to the extent that the continuance of service is unwarranted, or that the present or future public convenience or necessity permit such abandonment.

(c) Certificate of public convenience and necessity.
  (1) (A) No natural-gas company or person which will be a natural-gas company upon completion of any proposed construction or extension shall engage in the transportation or sale of natural gas, subject to the jurisdiction of the Commission, or undertake the construction or extension of any facilities therefor, or acquire or operate any such facilities or extensions thereof, unless there is in force with respect to such natural-gas company a certificate of public convenience and necessity issued by the Commission authorizing such acts or operations: *Provided, however,* That if any such natural-gas company or predecessor in interest was bona fide engaged in transportation or sale of natural gas, subject to the jurisdiction of the Commission, on the effective date of this amendatory Act, over the route or routes or within the area for which application is made and has so operated since that time, the Commission shall issue such

15 USCS § 717f

certificate without requiring further proof that public convenience and necessity will be served by such operation, and without further proceedings, if application for such certificate is made to the Commission within ninety days after the effective date of this amendatory Act. Pending the determination of any such application, the continuance of such operation shall be lawful.

(B) In all other cases the Commission shall set the matter for hearing and shall give such reasonable notice of the hearing thereon to all interested persons as in its judgment may be necessary under rules and regulations to be prescribed by the Commission; and the application shall be decided in accordance with the procedure provided in subsection (e) of this section and such certificate shall be issued or denied accordingly: *Provided, however,* That the Commission may issue a temporary certificate in cases of emergency, to assure maintenance of adequate service or to serve particular customers, without notice or hearing, pending the determination of an application for a certificate, and may by regulation exempt from the requirements of this section temporary acts or operations for which the issuance of a certificate will not be required in the public interest.

(2) The Commission may issue a certificate of public convenience and necessity to a natural-gas company for the transportation in interstate commerce of natural gas used by any person for one or more high-priority uses, as defined, by rule, by the Commission, in the case of--

(A) natural gas sold by the producer to such person; and

(B) natural gas produced by such person.

(d) Application for certificate of public convenience and necessity.  Application for certificates shall be made in writing to the Commission, be verified under oath, and shall be in such form, contain such information, and notice thereof shall be served upon such interested parties and in such manner as the Commission shall, by regulation, require.

(e) Granting of certificate of public convenience and necessity.  Except in the cases governed by the provisos contained in subsection (c)(1) of this section, a certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operation, sale, service, construction, extension, or acquisition covered by the application, if it is found that the applicant is able and willing properly to do the acts and to perform the service proposed and to conform to the provisions of the Act [*15 USCS §§ 717* et seq.] and the requirements, rules, and regulations of the Commission thereunder, and that the proposed service, sale, operation, construction, extension, or acquisition, to the extent authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied. The Commission shall have the power to attach to the isssuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require.

(f) Determination of service area; jurisdiction of transportation to ultimate customers.

(1) The Commission, after a hearing had upon its own motion or upon application, may determine the service area to which each authorization under this section is to be limited. Within such service area as determined by the Commission a natural-gas company may enlarge or extend its facilities for the purpose of supplying increased market demands in such service area without further authorization; and

(2) If the Commission has determined a service area pursuant to this subsection, transportation to ultimate consumers in such service area by the holder of such service area determination, even if across State lines, shall be subject to the exclusive jurisdiction of the State commission in the State in which the gas is consumed. This section shall not apply to the transportation of natural gas to another natural gas company.

(g) Certificate of public convenience and necessity for service of area already being served.  Nothing contained in this section shall be construed as a limitation upon the power of the Commission to grant certificates of public convenience and necessity for service of an area already being served by another natural-gas company.

(h) Right of eminent domain for construction of pipelines, etc.  When any holder of a certificate of public convenience and necessity cannot acquire by contract, or is unable to agree with the owner of property to the compensation to be paid for, the necessary right-of-way to construct, operate, and maintain a pipe line or pipe lines for the transportation of

18 CFR 157.10

(b) A copy of each application, supplement and amendment thereto, including exhibits required by §§ 157.14, 157.16, and 157.18, shall upon request be promptly supplied by the applicant to anyone who has filed a petition for leave to intervene or given notice of intervention.

(1) An applicant is not required to serve voluminous or difficult to reproduce material, such as copies of certain environmental information, to all parties, as long as such material is publically available in an accessible central location in each county throughout the project area.

(2) An applicant shall make a good faith effort to place the materials in a public location that provides maximum accessibility to the public.

(c) Complete copies of the application must be available in accessible central locations in each county throughout the project area, either in paper or electronic format, within three business days of the date a filing is issued a docket number. Within five business days of receiving a request for a complete copy from any party, the applicant must serve a full copy of any filing on the requesting party. Such copy may exclude voluminous or difficult to reproduce material that is publically available. Pipelines must keep all voluminous material on file with the Commission and make such information available for inspection at buildings with public access preferably with evening and weekend business hours, such as libraries located in central locations in each county throughout the project area.

(d) Critical Energy Infrastructure Information. (1) If this section requires an applicant to reveal Critical Energy Infrastructure Information (CEII), as defined in § 388.113(c) of this chapter, to the public, the applicant shall omit the CEII from the information made available and insert the following in its place:

(i) A statement that CEII is being withheld;

(ii) A brief description of the omitted information that does not reveal any CEII; and

(iii) This statement: "Procedures for obtaining access to Critical Energy Infrastructure Information (CEII) may be found at *18 CFR 388.113*. Requests for access to CEII should be made to the Commission's CEII Coordinator."

(2) The applicant, in determining whether information constitutes CEII, shall treat the information in a manner consistent with any filings that applicant has made with the Commission and shall to the extent practicable adhere to any previous determinations by the Commission or the CEII Coordinator involving the same or like information.

(3) The procedures contained in §§ 388.112 and 388.113 of this chapter regarding designation of, and access to, CEII, shall apply in the event of a challenge to a CEII designation or a request for access to CEII. If it is determined that information is not CEII or that a requester should be granted access to CEII, the applicant will be directed to make the information available to the requester.

(4) Nothing in this section shall be construed to prohibit any persons from voluntarily reaching arrangements or agreements calling for the disclosure of CEII.

**HISTORY:** [Order 280, *29 FR 4877,* Apr. 7, 1964, as amended by Order 225, *47 FR 19057,* May 3, 1982; *48 FR 786,* Jan. 7, 1983; Order 603, *64 FR 26572, 26605,* May 14, 1999; Order 603-A, *64 FR 54522, 54536,* Oct. 7, 1999; *68 FR 52089, 52095,* Sept. 2, 2003]

**AUTHORITY:** AUTHORITY NOTE APPLICABLE TO ENTIRE PART:
*15 U.S.C. 717*-717z.

**NOTES:** [EFFECTIVE DATE NOTE: *68 FR 52089, 52095,* Sept. 2, 2003, added paragraph (d), effective Oct. 23, 2003.]
NOTES APPLICABLE TO ENTIRE TITLE:

CROSS REFERENCES: Applications and entries conflicting with lands reserved or classified as power sites, or covered by power applications: See Public Lands, Interior, 43 CFR subpart 2320.
Interstate Commerce Commission: See Transportation, 49 CFR chapter X.
Irrigation projects; electrification, Bureau of Indian Affairs, Department of the Interior: See Indians, 25 CFR part 175
Regulations of the Bureau of Land Management relating to rights-of-way for power, telephone, and telegraph purposes: See Public Lands, Interior, 43 CFR Group 2800.
Rights-of-way over Indian lands: See Indians, 25 CFR parts 169, 170, and 265.
Securities and Exchange Commission: See Commodity and Securities Exchanges, 17 CFR chapter II.
Withdrawal of public lands: See Public Lands, Interior, 43 CFR Group 2300.


NOTES APPLICABLE TO ENTIRE CHAPTER:
ABBREVIATIONS: The following abbreviations are used in this chapter: M.c.f.=Thousand cubic feet. B.t.u.=British thermal units. ICC=Interstate Commerce Commission.
[PUBLISHER'S NOTE: For Federal Register citations concerning Chapter I Notice terminating proceedings, see: *73 FR 79316,* Dec. 29, 2008.]
[PUBLISHER'S NOTE: For Federal Register citations concerning Chapter I Policy Statements, see: *74 FR 37098,* July 27, 2009.]


NOTES APPLICABLE TO ENTIRE PART:
[PUBLISHER'S NOTE: For Federal Register citations regarding Part 157 Orders, see: *75 FR 4689,* Jan. 29, 2010.]


**LexisNexis (R) Notes:**

CASE NOTES


CASE NOTES Applicable to entire Part:Part Note




*Tampa Interstate 75 Ltd. P'ship v. Fla. Gas Transmission Co., 294 F. Supp. 2d 1277, 2003 U.S. Dist. LEXIS 22596* (MD Fla Oct. 23, 2003).

   ***Overview:*** *Court ruled that it had to invoke the doctrine of primary administrative jurisdiction and refer the issues raised therein to the Federal Energy Regulatory Commission because the issues raised required the expertise of the agency.*

- The exclusive provisions for rehearing, review, or modification of an order issued by the Federal Energy Regulatory Commission (FERC) are contained within §§ 19(a) and (b) of the Natural Gas Act. *15 U.S.C.S. §§ 717r*(a), (b). The FERC even has procedures for untimely intervention, for good cause shown, to allow aggrieved persons to become parties to its proceedings. *18 C.F.R. § 157.10(a).* Similarly, the Natural Gas Act has exclusive procedures for abandoning facilities and services, *15 U.S.C.S. § 717f*(b). Go To Headnote



LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright (c) 2013, by Matthew Bender & Company, a member
of the LexisNexis Group. All rights reserved.

*** This section is current through the November 7, 2013 ***
*** issue of the Federal Register ***

TITLE 18 -- CONSERVATION OF POWER AND WATER RESOURCES
CHAPTER I -- FEDERAL ENERGY REGULATORY COMMISSION, DEPARTMENT OF ENERGY
SUBCHAPTER E -- REGULATIONS UNDER NATURAL GAS ACT
PART 157 -- APPLICATIONS FOR CERTIFICATES OF PUBLIC CONVENIENCE AND NECESSITY AND
FOR ORDERS PERMITTING AND APPROVING ABANDONMENT UNDER SECTION 7 OF THE NATURAL
GAS ACT
SUBPART A -- APPLICATIONS FOR CERTIFICATES OF PUBLIC CONVENIENCEAND NECESSITY AND
FOR ORDERS PERMITTING AND APPROVING ABANDONMENT UNDER SECTION 7 OF THE NATURAL
GAS ACT, AS AMENDED, CONCERNING ANY OPERATION, SALES, SERVICE, CONSTRUCTION,
EXTENSION, ACQUISTION OR ABANDONMENT

**Go to the CFR Archive Directory**

*18 CFR 157.21*

§ 157.21 Pre-filing procedures and review process for LNG terminal facilities and other natural gas facilities prior to filing of applications.

(a) LNG terminal facilities and related jurisdictional natural gas facilities. A prospective applicant for authorization to site, construct and operate facilities included within the definition of "LNG terminal," as defined in § 153.2(d), and any prospective applicant for related jurisdictional natural gas facilities must comply with this section's pre-filing procedures and review process. These mandatory pre-filing procedures also shall apply when the Director finds in accordance with paragraph (e)(2) of this section that prospective modifications to an existing LNG terminal are modifications that involve significant state and local safety considerations that have not been previously addressed. Examples of such modifications include, but are not limited to, the addition of LNG storage tanks; increasing throughput requiring additional tanker arrivals or the use of larger vessels; or changing the purpose of the facility from peaking to base load. When a prospective applicant is required by this paragraph to comply with this section's pre-filing procedures:

(1) The prospective applicant must make a filing containing the material identified in paragraph (d) of this section and concurrently file a Letter of Intent pursuant to *33 CFR 127.007*, and a Preliminary Waterway Suitability Assessment (WSA) with the U.S. Coast Guard (Captain of the Port/Federal Maritime Security Coordinator). The latest information concerning the documents to be filed with the Coast Guard should be requested from the U.S. Coast Guard. For modifications to an existing or approved LNG terminal, this requirement can be satisfied by the prospective

18 CFR 157.21

applicant's certifying that the U.S. Coast Guard did not require such information.

(2) An application:

(i) Shall not be filed until at least 180 days after the date that the Director issues notice pursuant to paragraph (e) of this section of the commencement of the prospective applicant's pre-filing process; and

(ii) Shall contain all the information specified by the Commission staff after reviewing the draft materials filed by the prospective applicant during the pre-filing process, including required environmental material in accordance with the provisions of part 380 of this chapter, "Regulations Implementing the National Environmental Policy Act."

(3) The prospective applicant must provide sufficient information for the pre-filing review of any pipeline or other natural gas facilities, including facilities not subject to the Commission's Natural Gas Act jurisdiction, which are necessary to transport regassified LNG from the subject LNG terminal facilities to the existing natural gas pipeline infrastructure.

(b) Other natural gas facilities. When a prospective applicant for authorization for natural gas facilities is not required by paragraph (a) of this section to comply with this section's pre-filing procedures, the prospective applicant may file a request seeking approval to use the pre-filing procedures.

(1) A request to use the pre-filing procedures must contain the material identified in paragraph (d) of this section unless otherwise specified by the Director as a result of the Initial Consultation required pursuant to paragraph (c) of this subsection; and

(2) If a prospective applicant for non-LNG terminal facilities is approved to use this section's pre-filing procedures:

(i) The application will normally not be filed until at least 180 days after the date that the Director issues notice pursuant to paragraph (e)(3) of this section approving the prospective applicant's request to use the pre-filing procedures under this section and commencing the prospective applicant's pre-filing process. However, a prospective applicant approved by the Director pursuant to paragraph (e)(3) of this section to undertake the pre-filing process is not prohibited from filing an application at an earlier date, if necessary; and

(ii) The application shall contain all the information specified by the Commission staff after reviewing the draft materials filed by the prospective applicant during the pre-filing process, including required environmental material in accordance with the provisions of part 380 of this chapter, "Regulations Implementing the National Environmental Policy Act."

(c) Initial consultation. A prospective applicant required or potentially required or requesting to use the pre-filing process must first consult with the Director on the nature of the project, the content of the pre-filing request, and the status of the prospective applicant's progress toward obtaining the information required for the pre-filing request described in paragraph (d) of this section. This consultation will also include discussion of the specifications for the applicant's solicitation for prospective third-party contractors to prepare the environmental documentation for the project, and whether a third-party contractor is likely to be needed for the project.

(d) Contents of the initial filing. A prospective applicant's initial filing pursuant to paragraph (a)(1) of the section for LNG terminal facilities and related jurisdictional natural gas facilities or paragraph (b)(1) of this section for other natural gas facilities shall include the following information:

(1) A description of the schedule desired for the project including the expected application filing date and the desired date for Commission approval.

(2) For LNG terminal facilities, a description of the zoning and availability of the proposed site and marine facility

location.

(3) For natural gas facilities other than LNG terminal facilities and related jurisdictional natural gas facilities, an explanation of why the prospective applicant is requesting to use the pre-filing process under this section.

(4) A detailed description of the project, including location maps and plot plans to scale showing all major plant components, that will serve as the initial discussion point for stakeholder review.

(5) A list of the relevant federal and state agencies in the project area with permitting requirements. For LNG terminal facilities, the list shall identify the agency designated by the governor of the state in which the project will be located to consult with the Commission regarding state and local safety considerations. The filing shall include a statement indicating:

(i) That those agencies are aware of the prospective applicant's intention to use the pre-filing process (including contact names and telephone numbers);

(ii) Whether the agencies have agreed to participate in the process;

(iii) How the applicant has accounted for agency schedules for issuance of federal authorizations; and

(iv) When the applicant proposes to file with these agencies for their respective permits or other authorizations.

(6) A list and description of the interest of other persons and organizations who have been contacted about the project (including contact names and telephone numbers).

(7) A description of what work has already been done, e.g., contacting stakeholders, agency consultations, project engineering, route planning, environmental and engineering contractor engagement, environmental surveys/studies, and open houses. This description shall also include the identification of the environmental and engineering firms and sub-contractors under contract to develop the project.

(8) For LNG terminal projects, proposals for at least three prospective third-party contractors from which Commission staff may make a selection to assist in the preparation of the requisite NEPA document.

(9) For natural gas facilities other than LNG terminal facilities and related jurisdictional natural gas facilities, proposals for at least three prospective third-party contractors from which Commission staff may make a selection to assist in the preparation of the requisite NEPA document, or a proposal for the submission of an applicant-prepared draft Environmental Assessment as determined during the initial consultation described in paragraph (c) of this section.

(10) Acknowledgement that a complete Environmental Report and complete application are required at the time of filing.

(11) A description of a Public Participation Plan which identifies specific tools and actions to facilitate stakeholder communications and public information, including a project website and a single point of contact. This plan shall also describe how the applicant intends to respond to requests for information from federal and state permitting agencies, including, if applicable, the governor's designated agency for consultation regarding state and local safety considerations with respect to LNG facilities.

(12) Certification that a Letter of Intent and a Preliminary WSA have been submitted to the U.S. Coast Guard or, for modifications to an existing or approved LNG terminal, that the U.S. Coast Guard did not require such information.

(e) Director's notices. (1) When the Director finds that a prospective applicant for authority to site and construct a new LNG terminal has adequately addressed the requirements of paragraphs (a), (c) and (d) of this section, the Director shall issue a notice of such finding. Such notice shall designate the third-party contractor. The pre-filing process shall be

deemed to have commenced on the date of the Director's notice, and the date of such notice shall be used in determining whether the date an application is filed is at least 180 days after commencement of the pre-filing process.

(2) When the Director finds that a prospective applicant for authority to make modifications to an existing or approved LNG terminal has adequately addressed the requirements of paragraphs (a), (c) and (d) of this section, the Director shall issue a notice making a determination whether prospective modifications to an existing LNG terminal shall be subject to this section's pre-filing procedures and review process. Such notice shall designate the third-party contractor, if appropriate. If the Director determines that the prospective modifications are significant modifications that involve state and local safety considerations, the Director's notice will state that the pre-filing procedures shall apply, and the pre-filing process shall be deemed to have commenced on the date of the Director's notice in determining whether the date an application is filed is at least 180 days after commencement of the pre-filing process.

(3) When a prospective applicant requests to use this section's pre-filing procedures and review for facilities not potentially subject to this section's mandatory requirements, the Director shall issue a notice approving or disapproving use of the pre-filing procedures of this section and determining whether the prospective applicant has adequately addressed the requirements of paragraphs (b), (c) and (d) of this section. Such notice shall designate the third-party contractor, if appropriate. The pre-filing process shall be deemed to have commenced on the date of the Director's notice, and the date of such notice shall be used in determining whether the date an application is filed is at least 180 days after commencement of the pre-filing process.

(f) Upon the Director's issuance of a notice commencing a prospective applicant's pre-filing process, the prospective applicant must:

(1) Within seven days and after consultation with Commission staff, establish the dates and locations at which the prospective applicant will conduct open houses and meetings with stakeholders (including agencies) and Commission staff.

(2) Within 14 days, conclude the contract with the selected third-party contractor.

(3) Within 14 days, contact all stakeholders not already informed about the project, including all affected landowners as defined in paragraph § 157.6(d)(2) of this section.

(4) Within 30 days, submit a stakeholder mailing list to Commission staff.

(5) Within 30 days, file a draft of Resource Report 1, in accordance with § 380.12(c), and a summary of the alternatives considered or under consideration.

(6) On a monthly basis, file status reports detailing the applicant's project activities including surveys, stakeholder communications, and agency meetings.

(7) Be prepared to provide a description of the proposed project and to answer questions from the public at the scoping meetings held by OEP staff.

(8) Be prepared to attend site visits and other stakeholder and agency meetings arranged by the Commission staff, as required.

(9) Within 14 days of the end of the scoping comment period, respond to issues raised during scoping.

(10) Within 60 days of the end of the scoping comment period, file draft Resource Reports 1 through 12.

(11) At least 60 days prior to filing an application, file revised draft Resource Reports 1 through 12, if requested by Commission staff.

(12) At least 90 days prior to filing an application, file draft Resource Report 13 (for LNG terminal facilities).

(13) Certify that a Follow-on WSA will be submitted to the U.S. Coast Guard no later than the filing of an application with the Commission (for LNG terminal facilities and modifications thereto, if appropriate). The applicant shall certify that the U.S. Coast Guard has indicated that a Follow-On WSA is not required, if appropriate.

(g) Commission staff and third-party contractor involvement during the pre-filing process will be designed to fit each project and will include some or all of the following:

(1) Assisting the prospective applicant in developing initial information about the proposal and identifying affected parties (including landowners, agencies, and other interested parties).

(2) Issuing an environmental scoping notice and conducting such scoping for the proposal.

(3) Facilitating issue identification and resolution.

(4) Conducting site visits, examining alternatives, meeting with agencies and stakeholders, and participating in the prospective applicant's public information meetings.

(5) Reviewing draft Resource Reports.

(6) Initiating the preparation of a preliminary Environmental Assessment or Draft Environmental Impact Statement, the preparation of which may involve cooperating agency review.

(h) A prospective applicant using the pre-filing procedures of this section shall comply with the procedures in § 388.112 of this chapter for the submission of documents containing privileged materials or critical energy infrastructure information.

**HISTORY:** *[70 FR 60439, 60440,* Oct. 18, 2005; *77 FR 4891, 4894,* Feb. 1, 2012; *77 FR 65463, 65475,* Oct. 29, 2012]

**AUTHORITY:** AUTHORITY NOTE APPLICABLE TO ENTIRE PART:
*15 U.S.C. 717-*717z.

**NOTES:** [EFFECTIVE DATE NOTE: *77 FR 4891, 4894,* Feb. 1, 2012, amended paragraph (a)(1), effective Feb. 1, 2012; *77 FR 65463, 65475,* Oct. 29, 2012, amended paragraph (h), effective Dec. 28, 2012.]
NOTES APPLICABLE TO ENTIRE TITLE:
CROSS REFERENCES: Applications and entries conflicting with lands reserved or classified as power sites, or covered by power applications: See Public Lands, Interior, 43 CFR subpart 2320.
Interstate Commerce Commission: See Transportation, 49 CFR chapter X.
Irrigation projects; electrification, Bureau of Indian Affairs, Department of the Interior: See Indians, 25 CFR part 175
Regulations of the Bureau of Land Management relating to rights-of-way for power, telephone, and telegraph purposes:
See Public Lands, Interior, 43 CFR Group 2800.
Rights-of-way over Indian lands: See Indians, 25 CFR parts 169, 170, and 265.
Securities and Exchange Commission: See Commodity and Securities Exchanges, 17 CFR chapter II.
Withdrawal of public lands: See Public Lands, Interior, 43 CFR Group 2300.


NOTES APPLICABLE TO ENTIRE CHAPTER:
ABBREVIATIONS: The following abbreviations are used in this chapter: M.c.f.=Thousand cubic feet. B.t.u.=British thermal units. ICC=Interstate Commerce Commission.
[PUBLISHER'S NOTE: For Federal Register citations concerning Chapter I Notice terminating proceedings, see: *73 FR 79316,* Dec. 29, 2008.]



LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright (c) 2013, by Matthew Bender & Company, a member
of the LexisNexis Group. All rights reserved.

*** This section is current through the November 7, 2013 ***
*** issue of the Federal Register ***

TITLE 18 -- CONSERVATION OF POWER AND WATER RESOURCES
CHAPTER I -- FEDERAL ENERGY REGULATORY COMMISSION, DEPARTMENT OF ENERGY
SUBCHAPTER X -- PROCEDURAL RULES
PART 385 -- RULES OF PRACTICE AND PROCEDURE
SUBPART T -- FORMAL REQUIREMENTS FOR FILINGS IN PROCEEDINGS BEFORE THE COMMISSION

**Go to the CFR Archive Directory**

*18 CFR 385.2010*

§ 385.2010 Service (Rule 2010).


  (a) By participants. (1) Any participant filing a document in a proceeding must serve a copy of the document on:

    (i) Each person whose name is on the official service list, or applicable restricted service list, for the proceeding or phase of the proceeding; and

    (ii) Any other person required to be served under Commission rule or order or under law.

    (2) If any person receives a rejectionletter or deficiency letter from the Commission, the person must serve a copy of the letter on any person previously served copies of the rejected or deficient filing.

    (b) By the Secretary. The Secretary will serve, as appropriate:

    (1) A copy of any complaint on any person against whom the complaint is directed;

    (2) A copy of any notice of tariff or rate examination or order to show cause, on any person to whom the notice or order is issued;

    (3) A copy of any rule or any order by a decisional authority in a proceeding on any person included on the official service list, or applicable restricted service list, for the proceeding or phase of the proceeding, provided that such person has complied with paragraph (g) of this section.

    (c) Official service list. (1) The official service list for any proceeding will contain:

18 CFR 385.2010

(i) The name, address and, for proceedings commenced on or after March 21, 2005, e-mail address of any person designated for service in the initial pleading, other than a protest, or in the tariff or rate filing which is filed by any participant; and

(ii) The name of counsel for the staff of the Commission.

(2) Any designation of a person for service may be changed by following the instructions for the Commission's electronic registration system, located on its Web site at http://www.ferc.gov or, in the event that the proceeding was commenced prior to March 21, 2005, or the person designated for service is unable to use the electronic registration system, by filing a notice with the Commission and serving the notice on each person whose name is included on the official service list.

(d) Restricted service list. (1) For purposes of eliminating unnecessary expense or improving administrative efficiency, the Secretary, an office director, or the presiding officer may establish, by order, a restricted service list for an entire proceeding, a phase of a proceeding, one or more issues in a proceeding, or one or more cases in a consolidated proceeding.

(2) Any restricted service list will contain the names of each person on the official service list, or the person's representative, who, in the judgment of the decisional authority establishing the list, is an active participant with respect to the proceeding or consolidated proceeding, any phase of the proceeding, or any issue in the proceeding, for which the list is established.

(3) Any restricted service list is maintained in the same manner as, and in addition to, the official service list under paragraph (c) of this section.

(4) Before any restricted service list is established, each person included on the official service list will be given notice of any proposal to establish a restricted service list and an opportunity to show why that person should also be included on the restricted service list or why a restricted service list should not be established.

(5) Any designation of a person for service on a restricted service list may be changed by filing written notice with the Commission and serving that notice on each person whose name is on the applicable restricted service list.

(e) Intervenors. If a motion to intervene or any notice of intervention is filed, the name, address and, for proceedings commenced on or after March 21, 2005, e-mail address of any person designated for service in the motion or notice are placed on the official service list or any applicable restricted service list, provided that such person has complied with paragraph (g) of this section. Any person placed on the official service list under this paragraph is entitled to service in accordance with this section. If a motion to intervene is denied, the name, address and e-mail address of each person designated for service pursuant to that motion will be removed from the official service list.

(f) Methods of service. (1) Except as provided in paragraph (g) of this section, service of any document in proceedings commenced prior to March 21, 2005, must be made by:

(i) Electronic means where the sender and recipient agree to such means;

(ii) United States mail, first class or better; or

(iii) Delivery in a manner that, and to a place where, the person on whom service is required may reasonably be expected to obtain actual and timely receipt.

(2) Except as provided in paragraph (g) of this section, service of any document in proceedings commenced on or after March 21, 2005, must be made by electronic means unless the sender and recipient agree otherwise or the recipient's e-mail address is unavailable from the official service list, except in the case of a recipient who has secured a

waiver under the provisions of § 390.3 of this chapter, or is exempt under the provisions of § 390.4 of this chapter, or in the case of a protected or confidential document the security of which might be jeopardized by electronic service, in which case service upon that recipient or of that document only shall be made by:

(i) United States mail, first class or better; or

(ii) Delivery in a manner that, and to a place where, the person on whom service is required may reasonably be expected to obtain actual and timely receipt.

(3) Service of a document by electronic means shall be made by the transmission of a link to that document in the Commission's eLibrary system or by alternate means reasonably calculated to make the document available to required recipients. Alternate means may include but are not limited to, attachment of an electronic copy of the document to an e-mail or transmission of a link to an Internet site containing the document. It is the sender's responsibility to take reasonable steps to ensure that the means employed for service will be within the technological capabilities of the recipients.

(g) Methods of Service by the Secretary. Service by the Secretary shall be made by electronic means, unless such means are impractical, in which case service shall be made by United States mail.

(h) Electronic registration. In the case of proceedings commenced on or after March 21, 2005, any person, to be included on a service list, must have complied with the procedures for electronic registration made available on the Commission's Web site, at http://www.ferc.gov, unless such person has secured a waiver under the provisions of § 390.3 of this Chapter, or is exempt under the provisions of § 390.4 of this Chapter.

(i) Timing of service. (1) Service is made under this section when the document served is deposited in the mail or is delivered in another manner.

(2) Service of any document must be made not later than the date of the filing of the document.

(3) In the case of a document served through a link to the Commission's eLibrary system, as specified in paragraph (f)(2) of this section, if a link to the document does not become available in eLibrary within two business days after the document is filed, the person responsible for serving the document must immediately serve the document by other means, as specified in paragraph (f)(1) or (f)(2) of this section.

(j) Certification. (1) At the time any document required to be served is filed with the Commission, theoriginal of a certificate of service must be attached to the document and a copy of the certificate must be attached to each copy of the document filed with the Commission.

(2) The certificate of service must conform to the following format:

I hereby certify that I have this day served the foregoing document upon each person designated on the official service list [or the restricted service list, if applicable] compiled by the Secretary in this proceeding.

Dated at this

day of , 19 .

-------------------------------------------------------------

Name -------------------------------------------------------

-------------------------------------------------------------

18 CFR 385.2010

(if applicable)

Address -------------------------------------------------------

------------------------------------------------------------------

------------------------------------------------------------------

Telephone No. -------------------------------------------------

(k) Designation of Corporate Officials to Receive Service. (1) Any entity subject to regulation by the Commission must designate at least one, but not more than two, corporate officials or other persons to receive service of complaints, petitions for declaratory order, show cause orders, data requests, investigatory letters or other documents where a person to receive service has not otherwise been designated under Commission regulations. Each entity must file with the Secretary of the Commission:

(i) The name of the corporate official or person that is to receive service;

(ii) The title of the corporate official or person, if applicable;

(iii) The address of the corporate official or person, including, where applicable, department, room number, or mail routing code;

(iv) The telephone number of the corporate official or person;

(v) The facsimile number of the corporate official or person, if applicable; and

(vi) The electronic mail address of the corporate official or person, if applicable.

(2) Each regulated entity has a continuing obligation to file with the Secretary of the Commission updated information concerning the corporate official or person designated to receive service.

(3) A list of corporate officials and persons designated to receive service pursuant to this paragraph will be maintained by the Secretary of the Commission and will be made available to the public in hard copy upon request and through the Commission's web site at http://www.ferc.gov.

(4) Any person who wishes to serve a complaint or petition for declaratory order on any entity regulated by the Commission must serve the corporate official or person designated pursuant to this paragraph (i).

(5) The Commission will serve show cause orders, data requests, investigatory letters or other documents on the corporate official or person designated under this paragraph (i).

**HISTORY:** *[47 FR 19022,* May 3, 1982; *64 FR 31493, 31496,* June 11, 1999; *64 FR 62580, 62582,* Nov. 17, 1999; *69 FR 32436, 32440,* June 10, 2004; *70 FR 8720, 8725,* Feb. 23, 2005; *70 FR 21330, 21332,* Apr. 26, 2005]

**AUTHORITY:** AUTHORITY NOTE APPLICABLE TO ENTIRE PART:
*5 U.S.C. 551-*557; *15 U.S.C. 717-*717z, 3301-3432; *16 U.S.C. 792-*828c, 2601-2645; *28 U.S.C. 2461; 31 U.S.C. 3701,* 9701; *42 U.S.C. 7101-*7352, 16441, 16451-16463; *49 U.S.C. 60502; 49 App. U.S.C. 1-*85 (1988).

**NOTES:** [EFFECTIVE DATE NOTE: *69 FR 32436, 32440,* June 10, 2004, amended paragraph (i)(3), effective July 12, 2004; *70 FR 8720, 8725,* Feb. 23, 2005, amended this section, effective Mar. 21, 2005; *70 FR 21330, 21332,* Apr. 26, 2005, amended paragraph (c)(2) and revised paragraph (f), effective Apr. 26, 2005.]
NOTES APPLICABLE TO ENTIRE TITLE:

CROSS REFERENCES: Applications and entries conflicting with lands reserved or classified as power sites, or covered by power applications: See Public Lands, Interior, 43 CFR subpart 2320.

Interstate Commerce Commission: See Transportation, 49 CFR chapter X.

Irrigation projects; electrification, Bureau of Indian Affairs, Department of the Interior: See Indians, 25 CFR part 175

Regulations of the Bureau of Land Management relating to rights-of-way for power, telephone, and telegraph purposes: See Public Lands, Interior, 43 CFR Group 2800.

Rights-of-way over Indian lands: See Indians, 25 CFR parts 169, 170, and 265.

Securities and Exchange Commission: See Commodity and Securities Exchanges, 17 CFR chapter II.

Withdrawal of public lands: See Public Lands, Interior, 43 CFR Group 2300.


NOTES APPLICABLE TO ENTIRE CHAPTER:

ABBREVIATIONS: The following abbreviations are used in this chapter: M.c.f.=Thousand cubic feet. B.t.u.=British thermal units. ICC=Interstate Commerce Commission.

[PUBLISHER'S NOTE: For Federal Register citations concerning Chapter I Notice terminating proceedings, see: *73 FR 79316,* Dec. 29, 2008.]

[PUBLISHER'S NOTE: For Federal Register citations concerning Chapter I Policy Statements, see: *74 FR 37098,* July 27, 2009.]


NOTES APPLICABLE TO ENTIRE PART:

[PUBLISHER'S NOTE: For Federal Register citations concerning Part 385 Orders, see: *60 FR 15868,* Mar. 28, 1995; *69 FR 5268,* Feb. 4, 2004; *72 FR 11287,* Mar. 13, 2007; *75 FR 4689,* Jan. 29, 2010.]

[PUBLISHER'S NOTE: For Federal Register citations concerning Part 385 requests for clarification, see: *66 FR 10573,* Feb. 16, 2001.]

[PUBLISHER'S NOTE: For Federal Register citations concerning Part 385 Notice Providing Detail on Software Availability, see: *71 FR 76126,* Dec. 20, 2006.]


**LexisNexis (R) Notes:**


CASE NOTES


CASE NOTES Applicable to entire Part:Part Note


*Swanson Mining Corp. v. Federal Energy Regulatory Com., 790 F.2d 96, 1986 U.S. App. LEXIS 23497* (DC Cir Apr. 8, 1986).

   ***Overview:*** *Federal Energy Regulatory Commission lacked authority to grant license exemption for the mining company and shareholder's proposed hydroelectric plant refurbishing project on a wild and scenic river; and its order vacating that exemption was proper.*



LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright (c) 2013, by Matthew Bender & Company, a member
of the LexisNexis Group. All rights reserved.

*** This section is current through the November 7, 2013 ***
*** issue of the Federal Register ***

TITLE 18 -- CONSERVATION OF POWER AND WATER RESOURCES
CHAPTER I -- FEDERAL ENERGY REGULATORY COMMISSION, DEPARTMENT OF ENERGY
SUBCHAPTER X -- PROCEDURAL RULES
PART 388 -- INFORMATION AND REQUESTS

**Go to the CFR Archive Directory**

*18 CFR 388.112*

§ 388.112 Requests for privileged treatment and Critical Energy Infrastructure Information (CEII) treatment for documents submitted to the Commission.

  (a) Scope. (1) By following the procedures specified in this section, any person submitting a document to the Commission may request privileged treatment for some or all of the information contained in a particular document that it claims is exempt from the mandatory public disclosure requirements of the Freedom of Information Act, *5 U.S.C. 552* (FOIA), and should be withheld from public disclosure. For the purposes of the Commission's filing requirements, information subject to an outstanding claim of exemption from disclosure under FOIA, including critical energy infrastructure information (CEII), will be referred to as privileged material.

    (2) Any person submitting documents containing CEII as defined in § 388.113, or seeking access to such information should follow the procedures in this chapter.

    (b) Procedures for filing and obtaining privileged or CEII material. (1) General Procedures. A person requesting that material be treated as privileged information or CEII must include in its filing a justification for such treatment in accordance with the filing procedures posted on the Commission's Web site at http://www.ferc.gov. A person requesting that a document filed with the Commission be treated as privileged or CEII must designate the document as privileged or CEII in making an electronic filing or clearly indicate a request for such treatment on a paper filing. The cover page and pages or portions of the document containing material for which privileged treatment is claimed should be clearly labeled in bold, capital lettering, indicating that it contains privileged, confidential and/or Critical Energy Infrastructure Information, as appropriate, and marked "DO NOT RELEASE." The filer also must submit to the Commission a public version with the information that is claimed to be privileged material redacted, to the extent practicable.

    (2) Procedures for Proceedings with a Right to Intervene. The following procedures set forth the methods for filing and obtaining access to material that is filed as privileged in complaint proceedings and in any proceeding to which a

right to intervention exists:

(i) If a person files material as privileged material or CEII in a complaint proceeding or other proceeding to which a right to intervention exists, that person must include a proposed form of protective agreement with the filing, or identify a protective agreement that has already been filed in the proceeding that applies to the filed material. This requirement does not apply to material submitted in hearing or settlement proceedings, or if the only material for which privileged treatment is claimed consists of landowner lists or privileged information filed under §§ 380.12(f), (m), (o) and 380.16(f) of this chapter.

(ii) The filer must provide the public version of the document and its proposed form of protective agreement to each entity that is required to be served with the filing.

(iii) Any person who is a participant in the proceeding or has filed a motion to intervene or notice of intervention in the proceeding may make a written request to the filer for a copy of the complete, non-public version of the document. The request must include an executed copy of the protective agreement and a statement of the person's right to party or participant status or a copy of their motion to intervene or notice of intervention. Any person may file an objection to the proposed form of protective agreement. A filer, or any other person, may file an objection to disclosure, generally or to a particular person or persons who have sought intervention.

(iv) If no objection to disclosure is filed, the filer must provide a copy of the complete, non-public document to the requesting person within 5 days after receipt of the written request that is accompanied by an executed copy of the protective agreement. If an objection to disclosure is filed, the filer shall not provide the non-public document to the person or class of persons identified in the objection until ordered by the Commission or a decisional authority.

(v) For material filed in proceedings set for trial-type hearing or settlement judge proceedings, a participant's access to material for which privileged treatment is claimed is governed by the presiding official's protective order.

(vi) For landowner lists, information filed as privileged under §§ 380.12(f), (m), (o) and 380.16(f), forms filed with the Commission, and other documents not covered above, access to this material can be sought pursuant to a FOIA request under § 388.108 or a CEII request under § 388.113 of this chapter. Applicants are not required under paragraph (b)(2)(iv) of this section to provide intervenors with landowner lists and the other materials identified in the previous sentence.

(c) Effect of privilege or CEII claim. (1) For documents filed with the Commission:

(i) The documents for which privileged or CEII treatment is claimed will be maintained in the Commission's document repositories as non-public until such time as the Commission may determine that the document is not entitled to the treatment sought and is subject to disclosure consistent with §§ 388.108 or 388.113 of this chapter. By treating the documents as nonpublic, the Commission is not making a determination on any claim of privilege or CEII status. The Commission retains the right to make determinations with regard to any claim of privilege or CEII status, and the discretion to release information as necessary to carry out its jurisdictional responsibilities.

(ii) The request for privileged or CEII treatment and the public version of the document will be made available while the request is pending.

(2) For documents submitted to Commission staff. The notification procedures of paragraphs (d), (e), and (f) of this section will be followed before making a document public.

(d) Notification of request and opportunity to comment. When a FOIA or CEII requester seeks a document for which privilege or CEII status has been claimed, or when the Commission itself is considering release of such information, the Commission official who will decide whether to release the information or any other appropriate Commission official will notify the person who submitted the document and give the person an opportunity (at least five

18 CFR 388.112

calendar days) in which to comment in writing on the request. A copy of this notice will be sent to the requester.

(e) Notification before release. Notice of a decision by the Commission, the Chairman of the Commission, the Director, Office of External Affairs, the General Counsel or General Counsel's designee, a presiding officer in a proceeding under part 385 of this chapter, or any other appropriate official to deny a claim of privilege, in whole or in part, or to make a limited release of CEII, will be given to any person claiming that the information is privileged or CEII no less than 5 calendar days before disclosure. The notice will briefly explain why the person's objections to disclosure are not sustained by the Commission. A copy of this notice will be sent to the FOIA or CEII requester.

(f) Notification of suit in Federal courts. When a FOIA requester brings suit to compel disclosure of information for which a person has claimed privileged treatment, the Commission will notify the person who submitted the documents of the suit.

**HISTORY:** *[53 FR 1473,* Jan. 20, 1988, as amended at *53 FR 15032,* Apr. 27, 1988; *54 FR 47761,* Nov. 17, 1989; *58 FR 62521,* Nov. 29, 1993; *63 FR 5452, 5455,* Feb. 3, 1998; *68 FR 9857, 9869,* Mar. 3, 2003; *68 FR 46456, 46459,* Aug. 6, 2003; *72 FR 63980, 63985,* Nov. 14, 2007; *75 FR 43400, 43405,* July 26, 2010; *77 FR 65463, 65476,* Oct. 29, 2012]

**AUTHORITY:** AUTHORITY NOTE APPLICABLE TO ENTIRE PART:
*5 U.S.C. 301-*305, 551, 552 (as amended), 553-557; *42 U.S.C. 7101-*7352.

**NOTES:** [EFFECTIVE DATE NOTE: *77 FR 65463, 65476,* Oct. 29, 2012, revised this section, effective Dec. 28, 2012.]
NOTES APPLICABLE TO ENTIRE TITLE:
CROSS REFERENCES: Applications and entries conflicting with lands reserved or classified as power sites, or covered by power applications: See Public Lands, Interior, 43 CFR subpart 2320.
Interstate Commerce Commission: See Transportation, 49 CFR chapter X.
Irrigation projects; electrification, Bureau of Indian Affairs, Department of the Interior: See Indians, 25 CFR part 175
Regulations of the Bureau of Land Management relating to rights-of-way for power, telephone, and telegraph purposes: See Public Lands, Interior, 43 CFR Group 2800.
Rights-of-way over Indian lands: See Indians, 25 CFR parts 169, 170, and 265.
Securities and Exchange Commission: See Commodity and Securities Exchanges, 17 CFR chapter II.
Withdrawal of public lands: See Public Lands, Interior, 43 CFR Group 2300.


NOTES APPLICABLE TO ENTIRE CHAPTER:
ABBREVIATIONS: The following abbreviations are used in this chapter: M.c.f.=Thousand cubic feet. B.t.u.=British thermal units. ICC=Interstate Commerce Commission.
[PUBLISHER'S NOTE: For Federal Register citations concerning Chapter I Notice terminating proceedings, see: *73 FR 79316,* Dec. 29, 2008.]
[PUBLISHER'S NOTE: For Federal Register citations concerning Chapter I Policy Statements, see: *74 FR 37098,* July 27, 2009.]


NOTES APPLICABLE TO ENTIRE PART:
[PUBLISHER'S NOTE: For Federal Register citations concerning Part 388 Denial of petition for rehearing, see: *72 FR 18572,* Apr. 13, 2007.]



LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright (c) 2013, by Matthew Bender & Company, a member
of the LexisNexis Group. All rights reserved.

*** This section is current through the November 7, 2013 ***
*** issue of the Federal Register ***

TITLE 40 -- PROTECTION OF ENVIRONMENT
CHAPTER I -- ENVIRONMENTAL PROTECTION AGENCY
SUBCHAPTER C -- AIR PROGRAMS
PART 51 -- REQUIREMENTS FOR PREPARATION, ADOPTION, AND SUBMITTAL OF IMPLEMENTATION
PLANS
SUBPART I -- REVIEW OF NEW SOURCES AND MODIFICATIONS

**Go to the CFR Archive Directory**

*40 CFR 51.165*

§ 51.165 Permit requirements.


[PUBLISHER'S NOTE: Paragraphs (a)(1)(v)(G), and (a)(1)(vi)(C)(3) were stayed indefinitely at *76 FR 17548,* Mar. 30, 2011, effective Mar. 30, 2011.]

(a) State Implementation Plan and Tribal Implementation Plan provisions satisfying sections 172(c)(5) and 173 of the Act shall meet the following conditions:

(1) All such plans shall use the specific definitions. Deviations from the following wording will be approved only if the state specifically demonstrates that the submitted definition is more stringent, or at least as stringent, in all respects as the corresponding definition below:

(i) Stationary source means any building, structure, facility, or installation which emits or may emit a regulated NSR pollutant.

(ii) Building, structure, facility, or installation means all of the pollutant-emitting activities which belong to the same industrial grouping, are located on one or more contiguous or adjacent properties, and are under the control of the same person (or persons under common control) except the activities of any vessel. Pollutant-emitting activities shall be considered as part of the same industrial grouping if they belong to the same Major Group (i.e., which have the same two-digit code) as described in the Standard Industrial Classification Manual, 1972, as amended by the 1977 Supplement (U.S. Government Printing Office stock numbers 4101-0065 and 003-005-00176-0, respectively).

(iii) Potential to emit means the maximum capacity of a stationary source to emit a pollutant under its physical and

operational design. Any physical or operational limitation on the capacity of the source to emit a pollutant, including air pollution control equipment and restrictions on hours of operation or on the type or amount of material combusted, stored, or processed, shall be treated as part of its design only if the limitation or the effect it would have on emissions is federally enforceable. Secondary emissions do not count in determining the potential to emit of a stationary source.

(iv)(A) Major stationary source means:

(1) Any stationary source of air pollutants that emits, or has the potential to emit, 100 tons per year or more of any regulated NSR pollutant, except that lower emissions thresholds shall apply in areas subject to subpart 2, subpart 3, or subpart 4 of part D, title I of the Act, according to paragraphs (a)(1)(iv)(A)(1)(i) through (vi) of this section.

(i) 50 tons per year of volatile organic compounds in any serious ozone nonattainment area.

(ii) 50 tons per year of volatile organic compounds in an area within an ozone transport region, except for any severe or extreme ozone nonattainment area.

(iii) 25 tons per year of volatile organic compounds in any severe ozone nonattainment area.

(iv) 10 tons per year of volatile organic compounds in any extreme ozone nonattainment area.

(v) 50 tons per year of carbon monoxide in any serious nonattainment area for carbon monoxide, where stationary sources contribute significantly to carbon monoxide levels in the area (as determined under rules issued by the Administrator).

(vi) 70 tons per year of PM-10 in any serious nonattainment area for PM-10;

(2) For the purposes of applying the requirements of paragraph (a)(8) of this section to stationary sources of nitrogen oxides located in an ozone nonattainment area or in an ozone transport region, any stationary source which emits, or has the potential to emit, 100 tons per year or more of nitrogen oxides emissions, except that the emission thresholds in paragraphs (a)(1)(iv)(A)(2)(i) through (vi) of this section shall apply in areas subject to subpart 2 of part D, title I of the Act.

(i) 100 tons per year or more of nitrogen oxides in any ozone nonattainment area classified as marginal or moderate.

(ii) 100 tons per year or more of nitrogen oxides in any ozone nonattainment area classified as a transitional, submarginal, or incomplete or no data area, when such area is located in an ozone transport region.

(iii) 100 tons per year or more of nitrogen oxides in any area designated under section 107(d) of the Act as attainment or unclassifiable for ozone that is located in an ozone transport region.

(iv) 50 tons per year or more of nitrogen oxides in any serious nonattainment area for ozone.

(v) 25 tons per year or more of nitrogen oxides in any severe nonattainment area for ozone.

(vi) 10 tons per year or more of nitrogen oxides in any extreme nonattainment area for ozone; or

(3) Any physical change that would occur at a stationary source not qualifying under paragraphs (a)(1)(iv)(A)(1) or (2) of this section as a major stationary source, if the change would constitute a major stationary source by itself.

(B) A major stationary source that is major for volatile organic compounds shall be considered major for ozone.

(C) The fugitive emissions of a stationary source shall not be included in determining for any of the purposes of

40 CFR 51.165

this paragraph whether it is a major stationary source, unless the source belongs to one of the following categories of stationary sources:

(1) Coal cleaning plants (with thermal dryers);

(2) Kraft pulp mills;

(3) Portland cement plants;

(4) Primary zinc smelters;

(5) Iron and steel mills;

(6) Primary aluminum ore reduction plants;

(7) Primary copper smelters;

(8) Municipal incinerators capable of charging more than 250 tons of refuse per day;

(9) Hydrofluoric, sulfuric, or nitric acid plants;

(10) Petroleum refineries;

(11) Lime plants;

(12) Phosphate rock processing plants;

(13) Coke oven batteries;

(14) Sulfur recovery plants;

(15) Carbon black plants (furnace process);

(16) Primary lead smelters;

(17) Fuel conversion plants;

(18) Sintering plants;

(19) Secondary metal production plants;

(20) Chemical process plants--The term chemical processing plant shall not include ethanol production facilities that produce ethanol by natural fermentation included in NAICS codes 325193 or 312140;

(21) Fossil-fuel boilers (or combination thereof) totaling more than 250 million British thermal units per hour heat input;

(22) Petroleum storage and transfer units with a total storage capacity exceeding 300,000 barrels;

(23) Taconite ore processing plants;

(24) Glass fiber processing plants;

(25) Charcoal production plants;

(26) Fossil fuel-fired steam electric plants of more than 250 million British thermal units per hour heat input; and

(27) Any other stationary source category which, as of August 7, 1980, is being regulated under section 111 or 112 of the Act.

(v)(A) Major modification means any physical change in or change in the method of operation of a major stationary source that would result in:

(1) A significant emissions increase of a regulated NSR pollutant (as defined in paragraph (a)(1)(xxxvii) of this section); and

(2) A significant net emissions increase of that pollutant from the major stationary source.

(B) Any significant emissions increase (as defined in paragraph (a)(1)(xxvii) of this section) from any emissions units or net emissions increase (as defined in paragraph (a)(1)(vi) of this section) at a major stationary source that is significant for volatile organic compounds shall be considered significant for ozone.

(C) A physical change or change in the method of operation shall not include:

(1) Routine maintenance, repair and replacement. Routine maintenance, repair and replacement shall include, but not be limited to, any activity(s) that meets the requirements of the equipment replacement provisions contained in paragraph (h) of this section;

Note to paragraph (a)(1)(v)(C)(1): On December 24, 2003, the second sentence of this paragraph (a)(1)(v)(C)(1) is stayed indefinitely by court order. The stayed provisions willbecome effective immediately if the court terminates the stay. At that time, EPA will publish a document in the Federal Register advising the public of the termination of the stay.

(2) Use of an alternative fuel or raw material by reason of an order under sections 2 (a) and (b) of the Energy Supply and Environmental Coordination Act of 1974 (or any superseding legislation) or by reason of a natural gas curtailment plan pursuant to the Federal Power Act;

(3) Use of an alternative fuel by reason of an order or rule section 125 of the Act;

(4) Use of an alternative fuel at a steam generating unit to the extent that the fuel is generated from municipal solid waste;

(5) Use of an alternative fuel or raw material by a stationary source which;

(i) The source was capable of accommodating before December 21, 1976, unless such change would be prohibited under any federally enforceable permit condition which was established after December 12, 1976 pursuant to *40 CFR 52.21* or under regulations approved pursuant to 40 CFR subpart I or § 51.166, or

(ii) The source is approved to use under any permit issued under regulations approved pursuant to this section;

(6) An increase in the hours of operation or in the production rate, unless such change is prohibited under any federally enforceable permit condition which was established after December 21, 1976 pursuant to *40 CFR 52.21* or regulations approved pursuant to 40 CFR part 51 subpart I or *40 CFR 51.166*.

(7) Any change in ownership at a stationary source.

(8) [Reserved]

40 CFR 51.165

(9) The installation, operation, cessation, or removal of a temporary clean coal technology demonstration project, provided that the project complies with:

(i) The State Implementation Plan for the State in which the project is located, and

(ii) Other requirements necessary to attain and maintain the national ambient air quality standard during the project and after it is terminated.

(D) This definition shall not apply with respect to a particular regulated NSR pollutant when the major stationary source is complying with the requirements under paragraph (f) of this section for a PAL for that pollutant. Instead, the definition at paragraph (f)(2)(viii) of this section shall apply.

(E) For the purpose of applying the requirements of (a)(8) of this section to modifications at major stationary sources of nitrogen oxides located in ozone nonattainment areas or in ozone transport regions, whether or not subject to subpart 2, part D, title I of the Act, any significant net emissions increase of nitrogen oxides is considered significant for ozone.

(F) Any physical change in, or change in the method of operation of, a major stationary source of volatile organic compounds that results in any increase in emissions of volatile organic compounds from any discrete operation, emissions unit, or other pollutant emitting activity at the source shall be considered a significant net emissions increase and a major modification for ozone, if the major stationary source is located in an extreme ozone nonattainment area that is subject to subpart 2, part D, title I of the Act.

(G) Fugitive emissions shall not be included in determining for any of the purposes of this section whether a physical change in or change in the method of operation of a major stationary source is a major modification, unless the source belongs to one of the source categories listed in paragraph (a)(1)(iv)(C) of this section.

(vi)(A) Net emissions increase means, with respect to any regulated NSR pollutant emitted by a major stationary source, the amount by which the sum of the following exceeds zero:

(1) The increase in emissions from a particular physical change or change in the method of operation at a stationary source as calculated pursuant to paragraph (a)(2)(ii) of this section; and

(2) Any other increases and decreases in actual emissions at the major stationary source that are contemporaneous with the particular change and are otherwise creditable. Baseline actual emissions for calculating increases and decreases under this paragraph (a)(1)(vi)(A)(2) shall be determined as provided in paragraph (a)(1)(xxxv) of this section, except that paragraphs (a)(1)(xxxv)(A)(3) and (a)(1)(xxxv)(B)(4) of this section shall not apply.

(B) An increase or decrease in actual emissions is contemporaneous with the increase from the particular change only if it occurs before the date that the increase from the particular change occurs;

(C) An increase or decrease in actual emissions is creditable only if:

(1) It occurs within a reasonable period to be specified by the reviewing authority; and

(2) The reviewing authority has not relied on it in issuing a permit for the source under regulations approved pursuant to this section, which permit is in effect when the increase in actual emissions from the particular change occurs; and

(3) As it pertains to an increase or decrease in fugitive emissions (to the extent quantifiable), it occurs at an emissions unit that is part of one of the source categories listed in paragraph (a)(1)(iv)(C) of this section or it occurs at an emissions unit that is located at a major stationary source that belongs to one of the listed source categories. Fugitive emission increases or decreases are not creditable for those emissions units located at a facility whose primary activity

is not represented by one of the source categories listed in paragraph (a)(1)(iv)(C) of this section and that are not, by themselves, part of a listed source category.

(D) An increase in actual emissions is creditable only to the extent that the new level of actual emissions exceeds the old level.

(E) A decrease in actual emissions is creditable only to the extent that:

(1) The old level of actual emission or the old level of allowable emissions whichever is lower, exceeds the new level of actual emissions;

(2) It is enforceable as a practical matter at and after the time that actual construction on the particular change begins; and

(3) The reviewing authority has not relied on it in issuing any permit under regulations approved pursuant to 40 CFR part 51 subpart I or the state has not relied on it in demonstrating attainment or reasonable further progress;

(4) It has approximately the same qualitative significance for public health and welfare as that attributed to the increase from the particular change; and

(F) An increase that results from a physical change at a source occurs when the emissions unit on which construction occurred becomes operational and begins to emit a particular pollutant. Any replacement unit that requires shakedown becomes operational only after a reasonable shakedown period, not to exceed 180 days.

(G) Paragraph (a)(1)(xii)(B) of this section shall not apply for determining creditable increases and decreases or after a change.

(vii) Emissions unit means any part of a stationary source that emits or would have the potential to emit any regulated NSR pollutant and includes an electric steam generating unit as defined in paragraph (a)(1)(xx) of this section. For purposes of this section, there are two types of emissions units as described in paragraphs (a)(1)(vii)(A) and (B) of this section.

(A) A new emissions unit is any emissions unit which is (or will be) newly constructed and which has existed for less than 2 years from the date such emissions unit first operated.

(B) An existing emissions unit is any emissions unit that does not meet the requirements in paragraph (a)(1)(vii)(A) of this section. A replacement unit, as defined in paragraph (a)(1)(xxi) of this section, is an existing emissions unit.

(viii) Secondary emissons means emissions which would occur as a result of the construction or operation of a major stationary source or major modification, but do not come from the major stationary source or major modification itself. For the purpose of this section, secondary emissions must be specific, well defined, quantifiable, and impact the same general area as the stationary source or modification which causes the secondary emissions. Secondary emissions include emissions from any offsite support facility which would not be constructed or increase its emissions except as a result of the construction of operation of the major stationary source of major modification. Secondary emissions do not include any emissions which come directly from a mobile source such as emissions from the tailpipe of a motor vehicle, from a train, or from a vessel.

(ix) Fugitive emissions means those emissions which could not reasonably pass through a stack, chimney, vent or other functionally equivalent opening.

(x)(A) Significant means, in reference to a net emissions increase or the potential of a source to emit any of the following pollutants, a rate of emissions that would equal or exceed any of the following rates:

40 CFR 51.165

Pollutant Emission Rate

Carbon monoxide: 100 tons per year (tpy)

Nitrogen oxides: 40 tpy

Sulfur dioxide: 40 tpy

Ozone: 40 tpy of volatile organic compounds or nitrogen oxides

Lead: 0.6 tpy

PM[10]: 15 tpy

PM[2.5]: 10 tpy of direct PM[2.5] emissions; 40 tpy of sulfur dioxide emissions; 40 tpy of nitrogen oxide emissions unless demonstrated not to be a PM[2.5] precursor under paragraph (a)(1)(xxxvii) of this section

(B) Notwithstanding the significant emissions rate for ozone in paragraph (a)(1)(x)(A) of this section, significant means, in reference to an emissions increase or a net emissions increase, any increase in actual emissions of volatile organic compounds that would result from any physical change in, or change in the method of operation of, a major stationary source locating in a serious or severe ozone nonattainment area that is subject to subpart 2, part D, title I of the Act, if such emissions increase of volatile organic compounds exceeds 25 tons per year.

(C) For the purposes of applying the requirements of paragraph (a)(8) of this section to modifications at major stationary sources of nitrogen oxides located in an ozone nonattainment area or in an ozone transport region, the significant emission rates and other requirements for volatile organic compounds in paragraphs (a)(1)(x)(A), (B), and (E) of this section shall apply to nitrogen oxides emissions.

(D) Notwithstanding the significant emissions rate for carbon monoxide under paragraph (a)(1)(x)(A) of this section, significant means, in reference to an emissions increase or a net emissions increase, any increase in actual emissions of carbon monoxide that would result from any physical change in, or change in the method of operation of, a major stationary source in a serious nonattainment area for carbon monoxide if such increase equals or exceeds 50 tons per year, provided the Administrator has determined that stationary sources contribute significantly to carbon monoxide levels in that area.

(E) Notwithstanding the significant emissions rates for ozone under paragraphs (a)(1)(x)(A) and (B) of this section, any increase in actual emissions of volatile organic compounds from any emissions unit at a major stationary source of volatile organic compounds located in an extreme ozone nonattainment area that is subject to subpart 2, part D, title I of the Act shall be considered a significant net emissions increase.

(xi) Allowable emissions means the emissions rate of a stationary source calculated using the maximum rated capacity of the source (unless the source is subject to federally enforceable limits which restrict the operating rate, or hours of operation, or both) and the most stringent of the following:

(A) The applicable standards set forth in 40 CFR part 60 or 61;

(B) Any applicable State Implementation Plan emissions limitation including those with a future compliance date; or

(C) The emissions rate specified as a federally enforceable permit condition, including those with a future compliance date.

(xii)(A) Actual emissions means the actual rate of emissions of a regulated NSR pollutant from an emissions unit,

as determined in accordance with paragraphs (a)(1)(xii)(B) through (D) of this section, except that this definition shall not apply for calculating whether a significant emissions increase has occurred, or for establishing a PAL under paragraph (f) of this section. Instead, paragraphs (a)(1)(xxviii) and (xxxv) of this section shall apply for those purposes.

(B) In general, actual emissions as of a particular date shall equal the average rate, in tons per year, at which the unit actually emitted the pollutant during a consecutive 24-month period which precedes the particular date and which is representative of normal source operation. The reviewing authority shall allow the use of a different time period upon a determination that it is more representative of normal source operation. Actual emissions shall be calculated using the unit's actual operating hours, production rates, and types of materials processed, stored, or combusted during the selected time period.

(C) The reviewing authority may presume that source-specific allowable emissions for the unit are equivalent to the actual emissions of the unit.

(D) For any emissions unit that has not begun normal operations on the particular date, actual emissions shall equal the potential to emit of the unit on that date.

(xiii) Lowest achievable emission rate (LAER) means, for any source, the more stringent rate of emissions based on the following:

(A) The most stringent emissions limitation which is contained in the implementation plan of any State for such class or category of stationary source, unless the owner or operator of the proposed stationary source demonstrates that such limitations are not achievable; or

(B) The most stringent emissions limitation which is achieved in practice by such class or category of stationary sources. This limitation, when applied to a modification, means the lowest achievable emissions rate for the new or modified emissions units within or stationary source. In no event shall the application of the term permit a proposed new or modified stationary source to emit any pollutant in excess of the amount allowable under an applicable new source standard of performance.

(xiv) Federally enforceable means all limitations and conditions which are enforceable by the Administrator, including those requirements developed pursuant to 40 CFR parts 60 and 61, requirements within any applicable State implementation plan, any permit requirements established pursuant to *40 CFR 52.21* or under regulations approved pursuant to 40 CFR part 51, subpart I, including operating permits issued under an EPA-approved program that is incorporated into the State implementation plan and expressly requires adherence to any permit issued under such program.

(xv) Begin actual construction means in general, initiation of physical on-site construction activities on an emissions unit which are of a permanent nature. Such activities include, but are not limited to, installation of building supports and foundations, laying of underground pipework, and construction of permanent storage structures. With respect to a change in method of operating this term refers to those on-site activities other than preparatory activities which mark the initiation of the change.

(xvi) Commence as applied to construction of a major stationary source or major modification means that the owner or operator has all necessary preconstruction approvals or permits and either has:

(A) Begun, or caused to begin, a continuous program of actual on-site construction of the source, to be completed within a reasonable time; or

(B) Entered into binding agreements or contractual obligations, which cannot be canceled or modified without substantial loss to the owner or operator, to undertake a program of actual construction of the source to be completed within a reasonable time.

(xvii) Necessary preconstruction approvals or permits means those Federal air quality control laws and regulations and those air quality control laws and regulations which are part of the applicable State Implementation Plan.

(xviii) Construction means any physical change or change in the method of operation (including fabrication, erection, installation, demolition, or modification of an emissions unit) that would result in a change in emissions.

(xix) Volatile organic compounds (VOC) is as defined in § 51.100(s) of this part.

(xx) Electric utility steam generating unit means any steam electric generating unit that is constructed for the purpose of supplying more than one-third of its potential electric output capacity and more than 25 MW electrical output to any utility power distribution system for sale. Any steam supplied to a steam distribution system for the purpose of providing steam to a steam-electric generator that would produce electrical energy for sale is also considered in determining the electrical energy output capacity of the affected facility.

(xxi) Replacement unit means an emissions unit for which all the criteria listed in paragraphs (a)(1)(xxi)(A) through (D) of this section are met. No creditable emission reductions shall be generated from shutting down the existing emissions unit that is replaced.

(A) The emissions unit is a reconstructed unit within the meaning of § 60.15(b)(1) of this chapter, or the emissions unit completely takes the place of an existing emissions unit.

(B) The emissions unit is identical to or functionally equivalent to the replaced emissions unit.

(C) The replacement does not alter the basic design parameters (as discussed in paragraph (h)(2) of this section) of the process unit.

(D) The replaced emissions unit is permanently removed from the major stationary source, otherwise permanently disabled, or permanently barred from operation by a permit that is enforceable as a practical matter. If the replaced emissions unit is brought back into operation, it shall constitute a new emissions unit.

(xxii) Temporary clean coal technology demonstration project means a clean coal technology demonstration project that is operated for a period of 5 years or less, and which complies with the State Implementation Plan for the State in which the project is located and other requirements necessary to attain and maintain the national ambient air quality standards during the project and after it is terminated.

(xxiii) Clean coal technology means any technology, including technologies applied at the precombustion, combustion, or post combustion stage, at a new or existing facility which will achieve significant reductions in air emissions of sulfur dioxide or oxides of nitrogen associated with the utilization of coal in the generation of electricity, or process steam which was not in widespread use as of November 15, 1990.

(xxiv) Clean coal technology demonstration project means a project using funds appropriated under the heading "Department of Energy-Clean Coal Technology," up to a total amount of $ 2,500,000,000 for commercial demonstration of clean coal technology, or similar projects funded through appropriations for the Environmental Protection Agency. The Federal contribution for a qualifying project shall be at least 20 percent of the total cost of the demonstration project.

(xxv) [Reserved]

(xxvi) Pollution prevention means any activity that through process changes, product reformulation or redesign, or substitution of less polluting raw materials, eliminates or reduces the release of air pollutants (including fugitive emissions) and other pollutants to the environment prior to recycling, treatment, or disposal; it does not mean recycling (other than certain "in-process recycling" practices), energy recovery, treatment, or disposal.

(xxvii) Significant emissions increase means, for a regulated NSR pollutant, an increase in emissions that is significant (as defined in paragraph (a)(1)(x) of this section) for that pollutant.

(xxviii)(A) Projected actual emissions means, the maximum annual rate, in tons per year, at which an existing emissions unit is projected to emit a regulated NSR pollutant in any one of the 5 years (12-month period) following the date the unit resumes regular operation after the project, or in any one of the 10 years following that date, if the project involves increasing the emissions unit's design capacity or its potential to emit of that regulated NSR pollutant and full utilization of the unit would result in a significant emissions increase or a significant net emissions increase at the major stationary source.

(B) In determining the projected actual emissions under paragraph (a)(1)(xxviii)(A) of this section before beginning actual construction, the owner or operator of the major stationary source:

(1) Shall consider all relevant information, including but not limited to, historical operational data, the company's own representations, the company's expected business activity and the company's highest projections of business activity, the company's filings with the State or Federal regulatory authorities, and compliance plans under the approved plan; and

(2) Shall include fugitive emissions to the extent quantifiable, and emissions associated with startups, shutdowns, and malfunctions; and

(3) Shall exclude, in calculating any increase in emissions that results from the particular project, that portion of the unit's emissions following the project that an existing unit could have accommodated during the consecutive 24-month period used to establish the baseline actual emissions under paragraph (a)(1)(xxxv) of this section and that are also unrelated to the particular project, including any increased utilization due to product demand growth; or,

(4) In lieu of using the method set out in paragraphs (a)(1)(xxviii)(B)(1) through (3) of this section, may elect to use the emissions unit's potential to emit, in tons per year, as defined under paragraph (a)(1)(iii) of this section.

(xxix) [Reserved]

(xxx) Nonattainment major new source review (NSR) program means a major source preconstruction permit program that has been approved by the Administrator and incorporated into the plan to implement the requirements of this section, or a program that implements part 51, appendix S, Sections I through VI of this chapter. Any permit issued under such a program is a major NSR permit.

(xxxi) Continuous emissions monitoring system (CEMS) means all of the equipment that may be required to meet the data acquisition and availability requirements of this section, to sample, condition (if applicable), analyze, and provide a record of emissions on a continuous basis.

(xxxii) Predictive emissions monitoring system (PEMS) means all of the equipment necessary to monitor process and control device operational parameters (for example, control device secondary voltages and electric currents) and other information (for example, gas flow rate, O[2] or CO[2] concentrations), and calculate and record the mass emissions rate (for example, lb/hr) on a continuous basis.

(xxxiii) Continuous parameter monitoring system (CPMS) means all of the equipment necessary to meet the data acquisition and availability requirements of this section, to monitor process and control device operational parameters (for example, control device secondary voltages and electric currents) and other information (for example, gas flow rate, O[2] or CO[2] concentrations), and to record average operational parameter value(s) on a continuous basis.

(xxxiv) Continuous emissions rate monitoring system (CERMS) means the total equipment required for the determination and recording of the pollutant mass emissions rate (in terms of mass per unit of time).

40 CFR 51.165

(xxxv) Baseline actual emissions means the rate of emissions, in tons per year, of a regulated NSR pollutant, as determined in accordance with paragraphs (a)(1)(xxxv)(A) through (D) of this section.

(A) For any existing electric utility steam generating unit, baseline actual emissions means the average rate, in tons per year, at which the unit actually emitted the pollutant during any consecutive 24-month period selected by the owner or operator within the 5-year period immediately preceding when the owner or operator begins actual construction of the project. The reviewing authority shall allow the use of a different time period upon a determination that it is more representative of normal source operation.

(1) The average rate shall include fugitive emissions to the extent quantifiable, and emissions associated with startups, shutdowns, and malfunctions.

(2) The average rate shall be adjusted downward to exclude any non-compliant emissions that occurred while the source was operating above any emission limitation that was legally enforceable during the consecutive 24-month period.

(3) For a regulated NSR pollutant, when a project involves multiple emissions units, only one consecutive 24-month period must be used to determine the baseline actual emissions for the emissions units being changed. A different consecutive 24-month period can be used for each regulated NSR pollutant.

(4) The average rate shall not be based on any consecutive 24-month period for which there is inadequate information for determining annual emissions, in tons per year, and for adjusting this amount if required by paragraph (a)(1)(xxxv)(A)(2) of this section.

(B) For an existing emissions unit (other than an electric utility steam generating unit), baseline actual emissions means the average rate, in tons per year, at which the emissions unit actually emitted the pollutant during any consecutive 24-month period selected by the owner or operator within the 10-year period immediately preceding either the date the owner or operator begins actual construction of the project, or the date a complete permit application is received by the reviewing authority for a permit required either under this section or under a plan approved by the Administrator, whichever is earlier, except that the 10-year period shall not include any period earlier than November 15, 1990.

(1) The average rate shall include fugitive emissions to the extent quantifiable, and emissions associated with startups, shutdowns, and malfunctions.

(2) The average rate shall be adjusted downward to exclude any non-compliant emissions that occurred while the source was operating above an emission limitation that was legally enforceable during the consecutive 24-month period.

(3) The average rate shall be adjusted downward to exclude any emissions that would have exceeded an emission limitation with which the major stationary source must currently comply, had such major stationary source been required to comply with such limitations during the consecutive 24-month period. However, if an emission limitation is part of a maximum achievable control technology standard that the Administrator proposed or promulgated under part 63 of this chapter, the baseline actual emissions need only be adjusted if the State has taken credit for such emissions reductions in an attainment demonstration or maintenance plan consistent with the requirements of paragraph (a)(3)(ii)(G) of this section.

(4) For a regulated NSR pollutant, when a project involves multiple emissions units, only one consecutive 24-month period must be used to determine the baseline actual emissions for the emissions units being changed. A different consecutive 24-month period can be used For each regulated NSR pollutant.

(5) The average rate shall not be based on any consecutive 24-month period for which there is inadequate information for determining annual emissions, in tons per year, and for adjusting this amount if required by paragraphs

(a)(1)(xxxv)(B)(2) and (3) of this section.

(C) For a new emissions unit, the baseline actual emissions for purposes of determining the emissions increase that will result from the initial construction and operation of such unit shall equal zero; and thereafter, for all other purposes, shall equal the unit's potential to emit.

(D) For a PAL for a major stationary source, the baseline actual emissions shall be calculated for existing electric utility steam generating units in accordance with the procedures contained in paragraph (a)(1)(xxxv)(A) of this section, for other existing emissions units in accordance with the procedures contained in paragraph (a)(1)(xxxv)(B) of this section, and for a new emissions unit in accordance with the procedures contained in paragraph (a)(1)(xxxv)(C) of this section.

(xxxvi) [Reserved]

(xxxvii) Regulated NSR pollutant, for purposes of this section, means the following:

(A) Nitrogen oxides or any volatile organic compounds;

(B) Any pollutant for which a national ambient air quality standard has been promulgated;

(C) Any pollutant that is identified under this paragraph (a)(1)(xxxvii)(C) as a constituent or precursor of a general pollutant listed under paragraph (a)(1)(xxxvii)(A) or (B) of this section, provided that such constituent or precursor pollutant may only be regulated under NSR as part of regulation of the general pollutant. Precursors identified by the Administrator for purposes of NSR are the following:

(1) Volatile organic compounds and nitrogen oxides are precursors to ozone in all ozone nonattainment areas.

(2) Sulfur dioxide is a precursor to PM[2.5] in all PM[2.5] nonattainment areas.

(3) Nitrogen oxides are presumed to be precursors to PM[2.5] in all PM[2.5] nonattainment areas, unless the State demonstrates to the Administrator's satisfaction or EPA demonstrates that emissions of nitrogen oxides from sources in a specific area are not a significant contributor to that area's ambient PM[2.5] concentrations.

(4) Volatile organic compounds and ammonia are presumed not to be precursors to PM[2.5] in any PM[2.5] nonattainment area, unless the State demonstrates to the Administrator's satisfaction or EPA demonstrates that emissions of volatile organic compounds or ammonia from sources in a specific area are a significant contributor to that area's ambient PM[2.5] concentrations; or

(D) PM[2.5] emissions and PM[10] emissions shall include gaseous emissions from a source or activity which condense to form particulate matter at ambient temperatures. On or after January 1, 2011 (or any earlier date established in the upcoming rulemaking codifying test methods), such condensable particulate matter shall be accounted for in applicability determinations and in establishing emissions limitations for PM[2.5] and PM[10] in nonattainment major NSR permits. Compliance with emissions limitations for PM[2.5] and PM[10] issued prior to this date shall not be based on condensable particulate matter unless required by the terms and conditions of the permit or the applicable implementation plan. Applicability determinations made prior to this date without accounting for condensable particulate matter shall not be considered in violation of this section unless the applicable implementation plan required condensable particulate matter to be included.

(xxxviii) Reviewing authority means the State air pollution control agency, local agency, other State agency, Indian tribe, or other agency authorized by the Administrator to carry out a permit program under this section and § 51.166, or the Administrator in the case of EPA-implemented permit programs under § 52.21.

(xxxix) Project means a physical change in, or change in the method of operation of, an existing major stationary

source.

(xl) *Best available control technology (BACT)* means an emissions limitation (including a visible emissions standard) based on the maximum degree of reduction for each regulated NSR pollutant which would be emitted from any proposed major stationary source or major modification which the reviewing authority, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for such source or modification through application of production processes or available methods, systems, and techniques, including fuel cleaning or treatment or innovative fuel combustion techniques for control of such pollutant. In no event shall application of best available control technology result in emissions of any pollutant which would exceed the emissions allowed by any applicable standard under 40 CFR part 60 or 61. If the reviewing authority determines that technological or economic limitations on the application of measurement methodology to a particular emissions unit would make the imposition of an emissions standard infeasible, a design, equipment, work practice, operational standard, or combination thereof, may be prescribed instead to satisfy the requirement for the application of BACT. Such standard shall, to the degree possible, set forth the emissions reduction achievable by implementation of such design, equipment, work practice or operation, and shall provide for compliance by means which achieve equivalent results.

(xli) *Prevention of Significant Deterioration (PSD) permit* means any permit that is issued under a major source preconstruction permit program that has been approved by the Administrator and incorporated into the plan to implement the requirements of § 51.166 of this chapter, or under the program in § 52.21 of this chapter.

(xlii) *Federal Land Manager* means, with respect to any lands in the United States, the Secretary of the department with authority over such lands.

(xliii)(A) In general, *process unit* means any collection of structures and/or equipment that processes, assembles, applies, blends, or otherwise uses material inputs to produce or store an intermediate or a completed product. A single stationary source may contain more than one process unit, and a process unit may contain more than one emissions unit.

(B) Pollution control equipment is not part of the process unit, unless it serves a dual function as both process and control equipment. Administrative and warehousing facilities are not part of the process unit.

(C) For replacement cost purposes, components shared between two or more process units are proportionately allocated based on capacity.

(D) The following list identifies the process units at specific categories of stationary sources.

(1) For a steam electric generating facility, the process unit consists of those portions of the plant that contribute directly to the production of electricity. For example, at a pulverized coal-fired facility, the process unit would generally be the combination of those systems from the coal receiving equipment through the emission stack (excluding post-combustion pollution controls), including the coal handling equipment, pulverizers or coal crushers, feedwater heaters, ash handling, boiler, burners, turbine-generator set, condenser, cooling tower, water treatment system, air preheaters, and operating control systems. Each separate generating unit is a separate process unit.

(2) For a petroleum refinery, there are several categories of process units: those that separate and/or distill petroleum feedstocks; those that change molecular structures; petroleum treating processes; auxiliary facilities, such as steam generators and hydrogen production units; and those that load, unload, blend or store intermediate or completed products.

(3) For an incinerator, the process unit would consist of components from the feed pit or refuse pit to the stack, including conveyors, combustion devices, heat exchangers and steam generators, quench tanks, and fans.

Note to paragraph (a)(1)(xliii): By a court order on December 24, 2003, this paragraph (a)(1)(xliii) is stayed

40 CFR 51.165

indefinitely. The stayed provisions will become effective immediately if the court terminates the stay. At that time, EPA will publish a document in the Federal Register advising the public of the termination of the stay.

(xliv) Functionally equivalent component means a component that serves the same purpose as the replaced component.

Note to paragraph (a)(1)(xliv): By a court order on December 24, 2003, this paragraph (a)(1)(xliv) is stayed indefinitely. The stayed provisions will become effective immediately if the court terminates the stay. At that time, EPA will publish a document in the Federal Register advising the public of the termination of the stay.

(xlv) Fixed capital cost means the capital needed to provide all the depreciable components. "Depreciable components" refers to all components of fixed capital cost and is calculated by subtracting land and working capital from the total capital investment, as defined in paragraph (a)(1)(xlvi) of this section.

Note to paragraph (a)(1)(xlv): By a court order on December 24, 2003, this paragraph (a)(1)(xlv) is stayed indefinitely. The stayed provisions will become effective immediately if the court terminates the stay. At that time, EPA will publish a document in the Federal Register advising the public of the termination of the stay.

(xlvi) Total capital investment means the sum of the following: All costs required to purchase needed process equipment (purchased equipment costs); the costs of labor and materials for installing that equipment (direct installation costs); the costs of site preparation and buildings; other costs such as engineering, construction and field expenses, fees to contractors, startup and performance tests, and contingencies (indirect installation costs); land for the process equipment; and working capital for the process equipment.

Note to paragraph (a)(1)(xlvi): By a court order on December 24, 2003, this paragraph (a)(1)(xlvi) is stayed indefinitely. The stayed provisions will become effective immediately if the court terminates the stay. At that time, EPA will publish a document in the Federal Register advising the public of the termination of the stay.

(2) Applicability procedures. (i) Each plan shall adopt a preconstruction review program to satisfy the requirements of sections 172(c)(5) and 173 of the Act for any area designated nonattainment for any national ambient air quality standard under subpart C of 40 CFR part 81. Such a program shall apply to any new major stationary source or major modification that is major for the pollutant for which the area is designated nonattainment under section 107(d)(1)(A)(i) of the Act, if the stationary source or modification would locate anywhere in the designated nonattainment area.

(ii) Each plan shall use the specific provisions of paragraphs (a)(2)(ii)(A) through (F) of this section. Deviations from these provisions will be approved only if the State specifically demonstrates that the submitted provisions are more stringent than or at least as stringent in all respects as the corresponding provisions in paragraphs (a)(2)(ii)(A) through (F) of this section.

(A) Except as otherwise provided in paragraphs (a)(2)(iii) and (iv) of this section, and consistent with the definition of major modification contained in paragraph (a)(1)(v)(A) of this section, a project is a major modification for a regulated NSR pollutant if it causes two types of emissions increases -- a significant emissions increase (as defined in paragraph (a)(1)(xxvii) of this section), and a significant net emissions increase (as defined in paragraphs (a)(1)(vi) and (x) of this section). The project is not a major modification if it does not cause a significant emissions increase. If the project causes a significant emissions increase, then the project is a major modification only if it also results in a significant net emissions increase.

(B) The procedure for calculating (before beginning actual construction) whether a significant emissions increase (i.e., the first step of the process) will occur depends upon the type of emissions units being modified, according to paragraphs (a)(2)(ii)(C) through (F) of this section. The procedure for calculating (before beginning actual construction) whether a significant net emissions increase will occur at the major stationary source (i.e., the second step of the

process) is contained in the definition in paragraph (a)(1)(vi) of this section. Regardless of any such preconstruction projections, a major modification results if the project causes a significant emissions increase and a significant net emissions increase.

(C) Actual-to-projected-actual applicability test for projects that only involve existing emissions units. A significant emissions increase of a regulated NSR pollutant is projected to occur if the sum of the difference between the projected actual emissions (as defined in paragraph (a)(1)(xxviii) of this section) and the baseline actual emissions (as defined in paragraphs (a)(1)(xxxv)(A) and (B) of this section, as applicable), for each existing emissions unit, equals or exceeds the significant amount for that pollutant (as defined in paragraph (a)(1)(x) of this section).

(D) Actual-to-potential test for projects that only involve construction of a new emissions unit(s). A significant emissions increase of a regulated NSR pollutant is projected to occur if the sum of the difference between the potential to emit (as defined in paragraph (a)(1)(iii) of this section) from each new emissions unit following completion of the project and the baseline actual emissions (as defined in paragraph (a)(1)(xxxv)(C) of this section) of these units before the project equals or exceeds the significant amount for that pollutant (as defined in paragraph (a)(1)(x) of this section).

(E) [Reserved]

(F) Hybrid test for projects that involve multiple types of emissions units. A significant emissions increase of a regulated NSR pollutant is projected to occur if the sum of the emissions increases for each emissions unit, using the method specified in paragraphs (a)(2)(ii)(C) through (D) of this section as applicable with respect to each emissions unit, for each type of emissions unit equals or exceeds the significant amount for that pollutant (as defined in paragraph (a)(1)(x) of this section).

(iii) The plan shall require that for any major stationary source for a PAL for a regulated NSR pollutant, the major stationary source shall comply with requirements under paragraph (f) of this section.

(3)(i) Each plan shall provide that for sources and modifications subject to any preconstruction review program adopted pursuant to this subsection the baseline for determining credit for emissions reductions is the emissions limit under the applicable State Implementation Plan in effect at the time the application to construct is filed, except that the offset baseline shall be the actual emissions of the source from which offset credit is obtained where;

(A) The demonstration of reasonable further progress and attainment of ambient air quality standards is based upon the actual emissions of sources located within adesignated nonattainment area for which the preconstruction review program was adopted; or

(B) The applicable State Implementation Plan does not contain an emissions limitation for that source or source category.

(ii) The plan shall further provide that:

(A) Where the emissions limit under the applicable State Implementation Plan allows greater emissions than the potential to emit of the source, emissions offset credit will be allowed only for control below this potential;

(B) For an existing fuel combustion source, credit shall be based on the allowable emissions under the applicable State Implementation Plan for the type of fuel being burned at the time the application to construct is filed. If the existing source commits to switch to a cleaner fuel at some future date, emissions offset credit based on the allowable (or actual) emissions for the fuels involved is not acceptable, unless the permit is conditioned to require the use of a specified alternative control measure which would achieve the same degree of emissions reduction should the source switch back to a dirtier fuel at some later date. The reviewing authority should ensure that adequate long-term supplies of the new fuel are available before granting emissions offset credit for fuel switches,

(C)(1) Emissions reductions achieved by shutting down an existing emission unit or curtailing production or operating hours may be generally credited for offsets if they meet the requirements in paragraphs (a)(3)(ii)(C)(1)(i) through (ii) of this section.

(i) Such reductions are surplus, permanent, quantifiable, and federally enforceable.

(ii) The shutdown or curtailment occurred after the last day of the base year for the SIP planning process. For purposes of this paragraph, a reviewing authority may choose to consider a prior shutdown or curtailment to have occurred after the last day of the base year if the projected emissions inventory used to develop the attainment demonstration explicitly includes the emissions from such previously shutdown or curtailed emission units. However, in no event may credit be given for shutdowns that occurred before August 7, 1977.

(2) Emissions reductions achieved by shutting down an existing emissions unit or curtailing production or operating hours and that do not meet the requirements in paragraph (a)(3)(ii)(C)(1)(ii) of this section may be generally credited only if:

(i) The shutdown or curtailment occurred on or after the date the construction permit application is filed; or

(ii) The applicant can establish that the proposed new emissions unit is a replacement for the shutdown or curtailed emissions unit, and the emissions reductions achieved by the shutdown or curtailment met the requirements of paragraph (a)(3)(ii)(C)(1)(i) of this section.

(D) No emissions credit may be allowed for replacing one hydrocarbon compound with another of lesser reactivity, except for those compounds listed in Table 1 of EPA's "Recommended Policy on Control of Volatile Organic Compounds" *(42 FR 35314,* July 8, 1977; (This document is also available from Mr. Ted Creekmore, Office of Air Quality Planning and Standards, (MD-15) Research Triangle Park, NC 27711.))

(E) All emission reductions claimed as offset credit shall be federally enforceable;

(F) Procedures relating to the permissible location of offsetting emissions shall be followed which are at least as stringent as those set out in 40 CFR part 51 appendix S section IV.D.

(G) Credit for an emissions reduction can be claimed to the extent that the reviewing authority hasnot relied on it in issuing any permit under regulations approved pursuant to 40 CFR part 51 subpart I or the State has not relied on it in demonstration attainment or reasonable further progress.

(H) [Reserved]

(I) [Reserved]

(J) The total tonnage of increased emissions, in tons per year, resulting from a major modification that must be offset in accordance with section 173 of the Act shall be determined by summing the difference between the allowable emissions after the modification (as defined by paragraph (a)(1)(xi) of this section) and the actual emissions before the modification (as defined in paragraph (a)(1)(xii) of this section) for each emissions unit.

(4) Each plan may provide that the provisions of this paragraph do not apply to a source or modification that would be a major stationary source or major modification only if fugitive emissions, to the extent quantifiable, are considered in calculating the potential to emit of the stationary source or modification and the source does not belong to any of the following categories:

(i) Coal cleaning plants (with thermal dryers);

(ii) Kraft pulp mills;

40 CFR 51.165

(iii) Portland cement plants;

(iv) Primary zinc smelters;

(v) Iron and steel mills;

(vi) Primary aluminum ore reduction plants;

(vii) Primary copper smelters;

(viii) Municipal incinerators capable of charging more than 250 tons of refuse per day;

(ix) Hydrofluoric, sulfuric, or citric acid plants;

(x) Petroleum refineries;

(xi) Lime plants;

(xii) Phosphate rock processing plants;

(xiii) Coke oven batteries;

(xiv) Sulfur recovery plants;

(xv) Carbon black plants (furnace process);

(xvi) Primary lead smelters;

(xvii) Fuel conversion plants;

(xviii) Sintering plants;

(xix) Secondary metal production plants;

(xx) Chemical process plants--The term chemical processing plant shall not include ethanol production facilities that produce ethanol by natural fermentation included in NAICS codes 325193 or 312140;

(xxi) Fossil-fuel boilers (or combination thereof) totaling more than 250 million British thermal units per hour heat input;

(xxii) Petroleum storage and transfer units with a total storage capacity exceeding 300,000 barrels;

(xxiii) Taconite ore processing plants;

(xxiv) Glass fiber processing plants;

(xxv) Charcoal production plants;

(xxvi) Fossil fuel-fired steam electric plants of more than 250 million British thermal units per hour heat input;

(xxvii) Any other stationary source category which, as of August 7, 1980, is being regulated under section 111 or 112 of the Act.

(5) Each plan shall include enforceable procedures to provide that:

40 CFR 51.165

(i) Approval to construct shall not relieve any owner or operator of the responsibility to comply fully with applicable provision of the plan and any other requirements under local, State or Federal law.

(ii) At such time that a particular source or modification becomes a major stationary source or major modification solely by virtue of a relaxation in any enforcement limitation which was established after August 7, 1980, on the capacity of the source or modification otherwise to emit a pollutant, such as a restriction on hours of operation, then the requirements of regulations approved pursuant to this section shall apply to the source or modification as though construction had not yet commenced on the source or modification;

(6) Each plan shall provide that, except as otherwise provided in paragraph (a)(6)(vi) of this section, the following specific provisions apply with respect to any regulated NSR pollutant emitted from projects at existing emissions units at a major stationary source (other than projects at a source with a PAL) in circumstances where there is a reasonable possibility, within the meaning of paragraph (a)(6)(vi) of this section, that a project that is not a part of a major modification may result in a significant emissions increase of such pollutant, and the owner or operator elects to use the method specified in paragraphs (a)(1)(xxviii)(B)(1) through (3) of this section for calculating projected actual emissions. Deviations from these provisions will be approved only if the State specifically demonstrates that the submitted provisions are more stringent than or at least as stringent in all respects as the corresponding provisions in paragraphs (a)(6)(i) through (vi) of this section.

(i) Before beginning actual construction of the project, the owner or operator shall document and maintain a record of the following information:

(A) A description of the project;

(B) Identification of the emissions unit(s) whose emissions of a regulated NSR pollutant could be affected by the project; and

(C) A description of the applicability test used to determine that the project is not a major modification for any regulated NSR pollutant, including the baseline actual emissions, the projected actual emissions, the amount of emissions excluded under paragraph (a)(1)(xxviii)(B)(3) of this section and an explanation for why such amount was excluded, and any netting calculations, if applicable.

(ii) If the emissions unit is an existing electric utility steam generating unit, before beginning actual construction, the owner or operator shall provide a copy of the information set out in paragraph (a)(6)(i) of this section to the reviewing authority. Nothing in this paragraph (a)(6)(ii) shall be construed to require the owner or operator of such a unit to obtain any determination from the reviewing authority before beginning actual construction.

(iii) The owner or operator shall monitor the emissions of any regulated NSR pollutant that could increase as a result of the project and that is emitted by any emissions units identified in paragraph (a)(6)(i)(B) of this section; and calculate and maintain a record of the annual emissions, in tons per year on a calendar year basis, for a period of 5 years following resumption of regular operations after the change, or for a period of 10 years following resumption of regular operations after the change if the project increases the design capacity or potential to emit of that regulated NSR pollutant at such emissions unit.

(iv) If the unit is an existing electric utility steam generating unit, the owner or operator shall submit a report to the reviewing authority within 60 days after the end of each year during which records must be generated under paragraph (a)(6)(iii) of this section setting out the unit's annual emissions during the year that preceded submission of the report.

(v) If the unit is an existing unit other than an electric utility steam generating unit, the owner or operator shall submit a report to the reviewing authority if the annual emissions, in tons per year, from the project identified in paragraph (a)(6)(i) of this section, exceed the baseline actual emissions (as documented and maintained pursuant to paragraph (a)(6)(i)(C) of this section, by a significant amount (as defined in paragraph (a)(1)(x) of this section) for that

regulated NSR pollutant, and if such emissions differ from the preconstruction projection as documented and maintained pursuant to paragraph (a)(6)(i)(C) of this section. Such report shall be submitted to the reviewing authority within 60 days after the end of such year. The report shall contain the following:

(A) The name, address and telephone number of the major stationary source;

(B) The annual emissions as calculated pursuant to paragraph (a)(6)(iii) of this section; and

(C) Any other information that the owner or operator wishes to include in the report (e.g., an explanation as to why the emissions differ from the preconstruction projection).

(vi) A "reasonable possibility" under paragraph (a)(6) of this section occurs when the owner or operator calculates the project to result in either:

(A) A projected actual emissions increase of at least 50 percent of the amount that is a "significant emissions increase," as defined under paragraph (a)(1)(xxvii) of this section (without reference to the amount that is a significant net emissions increase), for the regulated NSR pollutant; or

(B) A projected actual emissions increase that, added to the amount of emissions excluded under paragraph (a)(1)(xxviii)(B)(3), sums to at least 50 percent of the amount that is a "significant emissions increase," as defined under paragraph (a)(1)(xxvii) of this section (without reference to the amount that is a significant net emissions increase), for the regulated NSR pollutant. For a project for which a reasonable possibility occurs only within the meaning of paragraph (a)(6)(vi)(B) of this section, and not also within the meaning of paragraph (a)(6)(vi)(A) of this section, then provisions (a)(6)(ii) through (v) do not apply to the project.

(7) Each plan shall provide that the owner or operator of the source shall make the information required to be documented and maintained pursuant to paragraph (a)(6) of this section available for review upon a request for inspection by the reviewing authority or the general public pursuant to the requirements contained in § 70.4(b)(3)(viii) of this chapter.

(8) The plan shall provide that the requirements of this section applicable to major stationary sources and major modifications of volatile organic compounds shall apply to nitrogen oxides emissions from major stationary sources and major modifications of nitrogen oxides in an ozone transport region or in any ozone nonattainment area, except in ozone nonattainment areas or in portions of an ozone transport region where the Administrator has granted a NO[X] waiver applying the standards set forth under section 182(f) of the Act and the waiver continues to apply.

(9)(i) The plan shall require that in meeting the emissions offset requirements of paragraph (a)(3) of this section, the ratio of total actual emissions reductions to the emissions increase shall be at least 1:1 unless an alternative ratio is provided for the applicable nonattainment area in paragraphs (a)(9)(ii) through (a)(9)(iv) of this section.

(ii) The plan shall require that in meeting the emissions offset requirements of paragraph (a)(3) of this section for ozone nonattainment areas that are subject to subpart 2, part D, title I of the Act, the ratio of total actual emissions reductions of VOC to the emissions increase of VOC shall be as follows:

(A) In any marginal nonattainment area for ozone -- at least 1.1:1;

(B) In any moderate nonattainment area for ozone -- at least 1.15:1;

(C) In any serious nonattainment area for ozone -- at least 1.2:1;

(D) In any severe nonattainment area for ozone -- at least 1.3:1 (except that the ratio may be at least 1.2:1 if the approved plan also requires all existing major sources in such nonattainment area to use BACT for the control of VOC); and

40 CFR 52.21

(r)(5) of this section apply shall begin actual construction without a permit that states that the major stationary source or major modification will meet those requirements. The Administrator has authority to issue any such permit.

(iv) The requirements of the program will be applied in accordance with the principles set out in paragraphs (a)(2)(iv)(a) through (f) of this section.

(a) Except as otherwise provided in paragraphs (a)(2)(v) and (vi) of this section, and consistent with the definition of major modification contained in paragraph (b)(2) of this section, a project is a major modification for a regulated NSR pollutant if it causes two types of emissions increases -- a significant emissions increase (as defined in paragraph (b)(40) of this section), and a significant net emissions increase (as defined in paragraphs (b)(3) and (b)(23) of this section). The project is not a major modification if it does not cause a significant emissions increase. If the project causes a significant emissions increase, then the project is a major modification only if it also results in a significant net emissions increase.

(b) The procedure for calculating (before beginning actual construction) whether a significant emissions increase (i.e., the first step of the process) will occur depends upon the type of emissions units being modified, according to paragraphs (a)(2)(iv)(c) through (f) of this section. The procedure for calculating (before beginning actual construction) whether a significant net emissions increase will occur at the major stationary source (i.e., the second step of the process) is contained in the definition in paragraph (b)(3) of this section. Regardless of any such preconstruction projections, a major modification results if the project causes a significant emissions increase and a significant net emissions increase.

(c) Actual-to-projected-actual applicability test for projects that only involve existing emissions units. A significant emissions increase of a regulated NSR pollutant is projected to occur if the sum of the difference between the projected actual emissions (as defined in paragraph (b)(41) of this section) and the baseline actual emissions (as defined in paragraphs (b)(48)(i) and (ii) of this section), for each existing emissions unit, equals or exceeds the significant amount for that pollutant (as defined in paragraph (b)(23) of this section).

(d) Actual-to-potential test for projects that only involve construction of a new emissions unit(s). A significant emissions increase of a regulated NSR pollutant is projected to occur if the sum of the difference between the potential to emit (as defined in paragraph (b)(4) of this section) from each new emissions unit following completion of the project and the baseline actual emissions (as defined in paragraph (b)(48)(iii) of this section) of these units before the project equals or exceeds the significant amount for that pollutant (as defined in paragraph (b)(23) of this section).

(e) [Reserved]

(f) Hybrid test for projects that involve multiple types of emissions units. A significant emissions increase of a regulated NSR pollutant is projected to occur if the sum of the emissions increases for each emissions unit, using the method specified in paragraphs (a)(2)(iv)(c) through (d) of this section as applicable with respect to each emissions unit, for each type of emissions unit equals or exceeds the significant amount for that pollutant (as defined in paragraph (b)(23) of this section).

(v) For any major stationary source for a PAL for a regulated NSR pollutant, the major stationary source shall comply with the requirements under paragraph (aa) of this section.

(b) Definitions. For the purposes of this section:

(1)(i) Major stationary source means:

(a) Any of the following stationary sources of air pollutants which emits, or has the potential to emit, 100 tons per year or more of any regulated NSR pollutant: Fossil fuel-fired steam electric plants of more than 250 million British thermal units per hour heat input, coal cleaning plants (with thermal dryers), kraft pulp mills, portland cement plants,

primary zinc smelters, iron and steel mill plants, primary aluminum ore reduction plants (with thermal dryers), primary copper smelters, municipal incinerators capable of charging more than 250 tons of refuse per day, hydrofluoric, sulfuric, and nitric acid plants, petroleum refineries, lime plants, phosphate rock processing plants, coke oven batteries, sulfur recovery plants, carbon black plants (furnace process), primary lead smelters, fuel conversion plants, sintering plants, secondary metal production plants, chemical process plants (which does not include ethanol production facilities that produce ethanol by natural fermentation included in NAICS codes 325193 or 312140), fossil-fuel boilers (or combinations thereof) totaling more than 250 million British thermal units per hour heat input, petroleum storage and transfer units with a total storage capacity exceeding 300,000 barrels, taconite ore processing plants, glass fiber processing plants, and charcoal production plants;

(b) Notwithstanding the stationary source size specified in paragraph (b)(1)(i) of this section, any stationary source which emits, or has the potential to emit, 250 tons per year or more of a regulated NSR pollutant; or

(c) Any physical change that would occur at a stationary source not otherwise qualifying under paragraph (b)(1) of this section, as a major stationary source, if the changes would constitute a major stationary source by itself.

(ii) A major source that is major for volatile organic compounds or NO[X] shall be considered major for ozone.

(iii) The fugitive emissions of a stationary source shall not be included in determining for any of the purposes of this section whether it is a major stationary source, unless the source belongs to one of the following categories of stationary sources:

(a) Coal cleaning plants (with thermal dryers);

(b) Kraft pulp mills;

(c) Portland cement plants;

(d) Primary zinc smelters;

(e) Iron and steel mills;

(f) Primary aluminum ore reduction plants;

(g) Primary copper smelters;

(h) Municipal incinerators capable of charging more than 250 tons of refuse per day;

(i) Hydrofluoric, sulfuric, or nitric acid plants;

(j) Petroleum refineries;

(k) Lime plants;

(l) Phosphate rock processing plants;

(m) Coke oven batteries;

(n) Sulfur recovery plants;

(o) Carbon black plants (furnace process);

(p) Primary lead smelters;

(q) Fuel conversion plants;

(r) Sintering plants;

(s) Secondary metal production plants;

(t) Chemical process plants -- The term chemical processing plant shall not include ethanol production facilities that produce ethanol by natural fermentation included in NAICS codes 325193 or 312140;

(u) Fossil-fuel boilers (or combination thereof) totaling more than 250 million British thermal units per hour heat input;

(v) Petroleum storage and transfer units with a total storage capacity exceeding 300,000 barrels;

(w) Taconite ore processing plants;

(x) Glass fiber processing plants;

(y) Charcoal production plants;

(z) Fossil fuel-fired steam electric plants of more that 250 million British thermal units per hour heat input, and

(aa) Any other stationary source category which, as of August 7, 1980, is being regulated under section 111 or 112 of the Act.

(2)(i) Major modification means any physical change in or change in the method of operation of a major stationary source that would result in: a significant emissions increase (as defined in paragraph (b)(40) of this section) of any regulated NSR pollutant (as defined in paragraph (b)(50) of this section); and a significant net emissions increase of that pollutant from the major stationary source.

(ii) Any significant emissions increase (as defined at paragraph (b)(40) of this section) from any emissions units or net emissions increase (as defined in paragraph (b)(3) of this section) at a major stationary source that is significant for volatile organic compounds or NO[X] shall be considered significant for ozone.

(iii) A physical change or change in the method of operation shall not include:

(a) Routine maintenance, repair and replacement. Routine maintenance, repair and replacement shall include, but not be limited to, any activity(s) that meets the requirements of the equipment replacement provisions contained in paragraph (cc) of this section;

Note to paragraph (b)(2)(iii)(a): By court order on December 24, 2003, the second sentence of this paragraph (b)(2)(iii)(a) is stayed indefinitely. The stayed provisions will become effective immediately if the court terminates the stay. At that time, EPA will publish a document in the Federal Register advising the public of the termination of the stay.

(b) Use of an alternative fuel or raw material by reason of an order under sections 2 (a) and (b) of the Energy Supply and Environmental Coordination Act of 1974 (or any superseding legislation) or by reason of a natural gas curtailment plant pursuant to the Federal Power Act;

(c) Use of an alternative fuel by reason of an order or rule under section 125 of the Act;

(d) Use of an alternative fuel at a steam generating unit to the extent that the fuel is generated from municipal solid waste;

(e) Use of an alternative fuel or raw material by a stationary source which:

(1) The source was capable of accommodating before January 6, 1975, unless such change would be prohibited under any federally enforceable permit condition which was established after January 6, 1975 pursuant to *40 CFR 52.21* or under regulations approved pursuant to 40 CFR subpart I or *40 CFR 51.166*; or

(2) The source is approved to use under any permit issued under *40 CFR 52.21* or under regulations approved pursuant to *40 CFR 51.166*;

(f) An increase in the hours of operation or in the production rate, unless such change would be prohibited under any federally enforceable permit condition which was established after January 6, 1975, pursuant to *40 CFR 52.21* or under regulations approved pursuant to 40 CFR subpart I or *40 CFR 51.166*.

(g) Any change in ownership at a stationary source.

(h) [Reserved]

(i) The installation, operation, cessation, or removal of a temporary clean coal technology demonstration project, provided that the project complies with:

(1) The State implementation plan for the State in which the project is located, and

(2) Other requirements necessary to attain and maintain the national ambient air quality standards during the project and after it is terminated.

(j) The installation or operation of a permanent clean coal technology demonstration project that constitutes repowering, provided that the project does not result in an increase in the potential to emit any regulated pollutant emitted by the unit. This exemption shall apply on a pollutant-by-pollutant basis.

(k) The reactivation of a very clean coal-fired electric utility steam generating unit.

(iv) This definition shall not apply with respect to a particular regulated NSR pollutant when the major stationary source is complying with the requirements under paragraph (aa) of this section for a PAL for that pollutant. Instead, the definition at paragraph (aa)(2)(viii) of this section shall apply.

(v) Fugitive emissions shall not be included in determining for any of the purposes of this section whether a physical change in or change in the method of operation of a major stationary source is a major modification, unless the source belongs to one of the source categories listed in paragraph (b)(1)(iii) of this section.

(3)(i) Net emissions increase means, with respect to any regulated NSR pollutant emitted by a major stationary source, the amount by which the sum of the following exceeds zero:

(a) The increase in emissions from a particular physical change or change in the method of operation at a stationary source as calculated pursuant to paragraph (a)(2)(iv) of this section; and

(b) Any other increases and decreases in actual emissions at the major stationary source that are contemporaneous with the particular change and are otherwise creditable. Baseline actual emissions for calculating increases and decreases under this paragraph (b)(3)(i)(b) shall be determined as provided in paragraph (b)(48) of this section, except that paragraphs (b)(48)(i)(c) and (b)(48)(ii)(d) of this section shall not apply.

(ii) An increase or decrease in actual emissions is contemporaneous with the increase from the particular change only if it occurs between:

# MCRC CEII/FOIA LETTER



THE LAW OFFICES OF
**CAROLYN ELEFANT**

"Admitted in NY, MD, DC"

2200 Pennsylvania Avenue, NW Fourth Floor East
Washington, D.C. 20037
(202) 297-6100
carolyn@carolynelefant.com

July 5, 2012

ELECTRONIC FILING
Secretary Kimberly Bose
Federal Energy Regulatory Commission
888 First Street NE
Washington DC 20426

**Re:    *DTI/ Myersville Compression Station***
***Docket CP12-72***
***Request for Extension of Time to Comment on EA by the Myersville***
***Citizens for a Rural Community (MCRC) Pending Resolution of Outstanding***
***CEII/FOIA Requests***

Dear Ms. Bose,

As of last month, I have been retained to represent the Myersville Citizens for a Rural Community (MCRC) in the above-captioned docket concerning DTI's Application for a Section 7 Certificate for the proposed Allegheny Storage Project, Docket No. CP12-72. My clients, individually as residents of Myersville, Maryland and collectively as members of MCRC are intervenors in the proceeding because they are directly and adversely impacted by the 16,000 horsepower Myersville Compressor Station that will be sited directly within their community under DTI's proposal.

On Friday, June 15, 2012, the Commission released the 149-page Draft Environmental Assessment for the proposed storage project. I am writing to request that the Commission hold open the time for comment on the EA until one month my clients' pending CEII and FOIA requests are resolved. As discussed in this letter, DTI has unreasonably objected to every CEII and FOIA request filed by my clients and erected obstacles to expeditious release of materials to deprive my clients of their ability to meaningfully comment on the EA and to participate fully in this proceeding. The D.C. Circuit has held that the inability of intervenors to access documents upon which an agency decision is based violates due process and principles of reasoned decision-making under the Administrative Procedure Act. *Gerber v. Norton*, 294 F.3d 173 (D.C. Cir. 2002)(ruling that intervenors are prejudiced by agency's failure to disclose map showing site for squirrel relocation which precluded meaningful comment on proposal). Discussion of my clients' CEII and FOIA requests, and DTI's objections follow.

ADDENDUM-000042

## I.      FOIA Requests 1

### A.      FOIA Request 10-45: Exhibit H Gas Supply Information

On May 10, 2012, prior to the time that I was retained in this matter, MCRC filed a request seeking the Exhibit H Gas Supply Information to DTI's Application that was classified as "privileged." (FOIA Request 10-45).  Ordinarily, most pipelines make Exhibit H materials publicly available at both the Commission's online docket and their own websites.[1] Moreover, as the eventually released exhibit shows (See Exhibit H, Attachment I), the information labeled as privileged consists of a discussion of DTI's activities, many of which have already been disclosed in other public dockets.

Now that Exhibit H has been produced, here is no doubt that DTI, whether inadvertently or intentionally, misclassified these materials as privileged. Nevertheless, once a company asserts privilege, a party seeking disclosure has no choice but to initiate the FOIA process.  Still, once MCRC submitted its FOIA request for Exhibit H, DTI could have admitted error and promptly produced Exhibit H.

Instead, DTI chose to prolong the FOIA process.  By letter dated May 21, 2012, DTI insisted that Exhibit H was confidential.  (DTI FOIA Letter, May 21, 2012, Attachment 2) Though DTI begrudgingly agreed to disclose some of the information, DTI stated that it would do so only upon execution of an onerous Non–Disclosure Agreement (NDA) by Franz Gerner, MCRC's president.  Not only is DTI's NDA inconsistent with FERC's version, but worse, it would have effectively required MCRC to waive several substantive arguments in opposition to the project.[2]  In addition, by signing the NDA, MCRC would have been forced to admit that the Exhibit H information is confidential when it is not, which would interfere with the group's ability to share the Exhibit H information freely between members and with counsel.

---

[1]      *See, e.g.*, Ruby Pipeline Company, *http://www.rubypipeline.com/docs/application/Exhibit_HTotalGasSupplyData.pdf;* Fayetteville Pipeline Express,  *http://www.fepipeline.com/FERC/02_FERC_Application.pdf*

[2]   The first paragraph of DTI's NDA, included in Attachment 2, states: "*DTI is providing confidential and proprietary information […] The DTI pipeline system and related expansion is a vital component of American energy infrastructure providing certain natural gas transpiration to a variety of customers.*"  By signing the agreement, Mr. Gerner would be forced to acknowledge the necessity of the DTI expansion, thereby foregoing the ability to oppose the project based on lack of need later on if the facts so warrant.

2

Because DTI and MCRC could not resolve the FOIA process, FERC was required to devote staff and resources to rule on MCRC'ss FOIA request. On June 8, 2012, FERC sought an extension of time to rule on MCRC's request, and not surprisingly, on June 22, 2012 ruled in MCRC's favor and disclosed Exhibit H.

Although MCRC won the proverbial battle on Exhibit H, the small victory comes at great cost. MCRC was forced to divert limited resources to fighting for access to information that should have never been classified as privileged instead of preparing comments on the EA which was released on June 15, 2012.

## B.    FOIA Request 10-57: Cultural Resource Reports

On May 11, 2012, Mr. Gerner filed a second FOIA Request 10-57 seeking access to various Cultural Resource Reports. On June 26, 2012, DTI opposed the request claiming that the reports relate to information about the location of sensitive cultural resources and artifacts. MCRC recognizes and respects the importance of preserving historical and cultural resources which is precisely why it seeks to review the information in the cultural resource reports. Based on the information available in the EA, it appears that certain historic and cultural resources were omitted from DTI's survey. Yet without access to Resource Report 4, MCRC cannot meaningfully comment.

Further exacerbating the situation, it also appears that ACHP may not have been consulted as required under the National Historic Preservation Act (Separately, MCPC has sent a letter to the Commission on this issue). Thus, the resource reports are even more important to ensure that the Commission has fully considered project impacts on all historical properties and cultural resources within the area. At the very least, while awaiting a decision from other agencies on whether Resource Report 4 is appropriate for release (subject to NDAs if needed), DTI could produce a redacted version of these reports for MCRC's review, along with a summary of the data and description of the methodology used for the survey. Though redacted disclosure might not fully address MCRC's need for information, it would serve as a step forward.

## II.    CEII Request 12-107 Exhibit G, Exhibit G-1 (Flow data and diagrams)

Finally, on May 11, 2012, Mr. Gerner, on behalf of MCRC filed a request for CEII information submitted as part of DTI's Application, Exhibit G, G-1 and G-2 which includes capacity and flow rates and diagrams for various DTI pipelines and facilities. Though a seemingly straightforward request, on May 24, 2012, DTI filed an opposition, stating that MCRC did not demonstrate a need for the information.

Again, DTI is attempting to unnecessarily obstruct release of information needed by an intervenor group. DTI is aware that Mr. Gerner individually and as president of MCRC is an intervenor and thus, presumptively entitled to access all CEII information submitted by DTI that FERC. The Commission has recognized the need to ensure that intervenors have the ability to promptly access CEII materials. In a Notice of Proposed Rulemaking (NOPR) issued in December 2011 (not yet adopted), the Commission would permit intervenors to access privileged information directly from the filer within five days upon execution of an

3

ADDENDUM-000044

NDA. *NOPR on Filing of Privileged Information*, 137 FERC ¶ 61,219 (2011). While not yet adopted, the NOPR demonstrates the Commission's desire to alleviate the current burden on intervenors to fight tooth and nail for access to information to which they are entitled.

In any event, as a result of DTI's tactics, the Commission's response to MCRC's CEII request has now been delayed due to internal technical difficulties. Commission staff has estimated it may require as much as two weeks to process current pending CEII requests assuming that they have not been deleted and need to be re-filed. By that time, the deadline for comment on the EA will have expired unless an extension is granted.

## III.    Request for Relief: Extension of Time for A Month Beyond Resolution of Outstanding CEII and FOIA Issues

Given MCRC's difficulty in accessing information critical to inform meaningful comment in this proceeding, MCRC requests that the Commission hold the comment period on the EA open until all outstanding CEII and FOIA requests are resolved. At that point, the Commission should provide MCRC and other intervenors with a month to review the additional material and file comments.

MCRC's extension request is not only justified, but imperative to protect MCRC's due process rights and ensure that the Commission satisfies its statutory obligation to engage in on-the-record decision-making consistent with the Administrative Procedure Act. Moreover, the prospect of delay will give DTI incentive to cooperate with intervenors like MCRC by producing requested information in an expeditious fashion, rather than throwing up objections to run the clock on the deadline for EA comments or fritter away intervenors' tight budgets on procedural brouhaha.

Currently, DTI can withhold information, intentionally or inadvertently without impunity. For example, DTI's submission of Exhibit H -- a document that other pipelines commonly file publicly and which contained information available in other public dockets -- represents an abuse of the Commission's rules on privileged filings. Although MCRC eventually obtained the information, it did so only with considerable cost (consultation with counsel, letters back and forth), unnecessary expenditure of staff resources and delay. Likewise, DTI's objection to disclosure of CEII information that is provided as a matter of course to intervenors in similar proceedings as these necessitated additional involvement of counsel and more delay.[3]

To the extent that DTI seeks to assert privilege over virtually every document that it files in an abundance of caution, fair enough. But MCRC should not have to suffer as a result of DTI's unnecessary and unjustified confidentiality practices, or surrender its due process rights to meaningfully comment on the EA and other aspects of this process. Therefore, if DTI insists on withholding documents and forcing MCRC to jump through

---

[3] To be fair, DTI cannot be faulted for the recent CEII system breakdown; rather if DTI had simply provided the information -- which it can still do -- the delay would also be avoided.

4

ADDENDUM-000045

procedural hoops, it is only fair that the comment period on the EA be held open until these procedural disclosure issues are resolved.  Once MCRC receives the information that it has requested, the Commission can restart the clock for comment on the EA and allow an additional month for MCRC and other intervenors to comment.

Thank you for your consideration.  You may contact me at 202-297-6100 with any further questions.

Respectfully submitted,

Carolyn Elefant

ADDENDUM-000046

# AFFIDAVITS
# MCRC MEMBERS

## BEFORE THE UNITED STATES COURT OF APPEALS
## DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| **Myersville Citizens for a** | | |
| **Rural Community et. al.** | ) | |
| Petitioners | ) | **Docket No. 13-1219** |
| | ) | |
| v. | ) | |
| | ) | |
| **Federal Energy Regulatory** | ) | |
| **Commission,** | ) | |
| **Respondents** | ) | |
| _____ | ) | |

## DECLARATION OF TED CADY

I am over the age of eighteen and competent to testify. I have personal knowledge of the events discussed below. Under penalty of perjury, I state the following:

1.     My name is Ted Cady. I am a petitioner in the above-captioned proceeding. I am also Secretary of the Myersville Citizens for a Rural Community Incorporated (MCRC), which was formed to oppose the siting of the Myersville Compressor Station in the Town of Myersville, in Frederick County Maryland. I am providing this declaration in support of standing.

2.     I am currently a resident of the Town of Myersville, Maryland. I have lived here since 1998. My home is approximately one mile from the location of the intended site for the Myersville Compressor Station. I drive by the proposed site on a daily basis returning from work. My daughter rides the school bus that passes by the site twice a day.

3.     I have reviewed Dominion's application seeking approval for the Myersville Compressor Station, and participated extensively as an intervenor in the FERC process. Based on what I have learned about the

1

Myersville Compressor Station, I believe that it will directly and adversely impact my community, my family and me.

4.    I am very concerned about the health and safety of me, my family and our community given the tons of cancerous compounds that will be emitting annually.  There are numerous catastrophic events each year and this proposed gas compressor station to be built within our town puts me, my family and the entire town at serious risk

5.    I declare under penalty of perjury that the foregoing is true and correct.

_____          11/11/13
              Ted Cady                                 Date

BEFORE THE UNITED STATES COURT OF APPEALS
DISTRICT OF COLUMBIA CIRCUIT


Myersville Citizens for a
    Rural Community et. al.  )
          Petitioners  )    Docket No. 13-1219
                     )
        v.          )
                     )
Federal Energy Regulatory  )
    Commission,  )
    Respondents  )
_____)


### DECLARATION OF ANN NAU

      I am over the age of eighteen and competent to testify. I have personal knowledge of the events discussed below. Under penalty of perjury, I state the following:

      1.     My name is Ann Nau. I am a member of the Myersville Citizens for a Rural Community Incorporated (MCRC), which was formed to oppose the siting of the Myersville Compressor Station in the Town of Myersville, in Frederick County Maryland. I am providing this declaration in support of standing.

      2.     I am currently a resident of the Town of Myersville, Maryland. I have lived here since 2001. My home is approximately 1.7 miles from the location of the intended site for the Myersville Compressor Station. My 11-year-old daughter passes by the site at least twice a day on her way to school.

      3.     I have reviewed Dominion's application seeking approval for the Myersville Compressor Station, and participated extensively as an intervenor in the FERC process. Based on what I have learned about the

1

Myersville Compressor Station, I believe that it will directly and adversely impact my community, my family and me.

4. Maryland was found to have the highest number of deaths due to air pollution than any other state, according to a recent MIT study and the compressor station would release tons of toxic and air polluting emissions that pose health and safety concerns for my family and my community. In addition, having chosen to purchase our home in Myersville, I am concerned that the compressor station would negatively impact both the quality of life in our rural community and our property values.

5.    I declare under penalty of perjury that the foregoing is true and correct.

_____  _____
                 Ann Nau                         Date

2

### BEFORE THE UNITED STATES COURT OF APPEALS
### DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| Myersville Citizens for a Rural Community et. al. | | |
| Petitioners | ) | Docket No. 13-1219 |
| | ) | |
| v. | ) | |
| | ) | |
| Federal Energy Regulatory Commission, | ) | |
| Respondents | ) | |
| ——————————————— | ) | |

### DECLARATION OF TAMMY MANGAN

I am over the age of eighteen and competent to testify. I have personal knowledge of the events discussed below. Under penalty of perjury, I state the following:

1. My name is Tammy Mangan. I am a petitioner in the above-captioned proceeding. I am also the Treasurer of Myersville Citizens for a Rural Community (MCRC), which was formed to oppose the siting of a natural gas compressor station in the Town of Myersville, in Frederick County Maryland. I am providing this declaration in support of standing.

2. I am currently a resident of the Town of Myersville, Maryland. I have lived here since 1999. My home is approximately 2 miles from the location of the intended site for the Myersville Compressor Station. I, my husband, daughter and mother drive past the proposed site multiple times per day as we go to work, school and go about daily life.

3. I have reviewed Dominion's application seeking approval for the Myersville Compressor Station, and participated extensively as an intervenor in the FERC process. Based on what I have learned about the

1

Myersville Compressor Station, I believe that it will directly and adversely impact my community, my family and me.

   4. I am very concerned about the impact to the health of my family and community.  I am particularly concerned about my mother who suffers from a serious pulmonary condition and has already survived one bout with cancer.  More carcinogens being released into our valley, which is already a non-attainment area, is risk we should not be asked to accept.

Additionally, I am very disturbed that with the blessing of a federal agency, FERC, Dominion is being allowed to "take" the sole piece of commercial property available to the Myersville community for its industrial purpose. This erodes the chance for economic expansion for our community and people so that one company, that provides no services to our community, can benefit.

   5.    I declare under penalty of perjury that the foregoing is true and correct.

_____     11-12-13
           Tammy Mangan                        Date

2

ADDENDUM-000052

BEFORE THE UNITED STATES COURT OF APPEALS
DISTRICT OF COLUMBIA CIRCUIT

Myersville Citizens for a               )
    Rural Community et. al.              )
         Petitioners                )     Docket No. 13-1219
                             )
           v.                       )
                             )
Federal Energy Regulatory               )
    Commission,                         )
    Respondents                         )
_____ )

## DECLARATION OF FRANZ GERNER

    I am over the age of eighteen and competent to testify. I have personal knowledge of the events discussed below. Under penalty of perjury, I state the following:

    1.    My name is Franz Gerner. I am a petitioner in the above-captioned proceeding. I am also president of the Myersville Citizens for a Rural Community Incorporated (MCRC), which was formed to oppose the siting of the Myersville Compressor Station in the Town of Myersville, in Frederick County Maryland. I am providing this declaration in support of standing.

    2.    I am currently a resident of the Frederick County, Maryland. I have lived at my current residence since 2006. My home is approximately 1 (one) mile from the location of the intended site for the Myersville Compressor Station. I drive by the proposed site on a daily basis to work. Starting in Fall of 2014, my children will attend the Myersville Elementary School, which is located about 1 (one) mile from the location of the intended site for the Myersville Compressor Station.

3.       I have reviewed Dominion's application seeking approval for the Myersville Compressor Station, and participated extensively as an intervenor in the FERC process.  Based on what I have learned about the Myersville Compressor Station, I believe that it will directly and adversely impact my community, my family and me.

4. I am very concerned about the impact by the proposed station on the health and safety of me, my family, and the community, especially due to the tons of dangerous, carcinogenic and toxic gases which would be emitted by the proposed station.  Several major incidents, including explosions of such compressor stations, are reported each month. By operating the proposed Myersville Compressor Station, I, my family, and the community is exposed to this serious risk.

In addition, this station would convert the sole commercial property of the Town of Myersville into industrial land, even though the Town has voted against such a conversion. This interferes significantly with the economic self-determination of the Town.

5.       I declare under penalty of perjury that the foregoing is true and correct.


_____                 November 12, 2013
         Franz Gerner                                              Date

40 CFR 52.21

(a) The date five years before construction on the particular change commences; and

(b) The date that the increase from the particular change occurs.

(iii) An increase or decrease in actual emissions is creditable only if:

(a) The Administrator or other reviewing authority has not relied on it in issuing a permit for the source under this section, which permit is in effect when the increase in actual emissions from the particular change occurs; and

(b) The increase or decrease in emissions did not occur at a Clean Unit except as provided in paragraphs (x)(8) and (y)(10) of this section.

(c) As it pertains to an increase or decrease in fugitive emissions (to the extent quantifiable), it occurs at an emissions unit that is part of one of the source categories listed in paragraph (b)(1)(iii) of this section or it occurs at an emission unit that is located at a major stationary source that belongs to one of the listed source categories.

(iv) An increase or decrease in actual emissions of sulfur dioxide, particulate matter, or nitrogen oxides that occurs before the applicable minor source baseline date is creditable only if it is required to be considered in calculating the amount of maximum allowable increases remaining available.

(v) An increase in actual emissions is creditable only to the extent that the new level of actual emissions exceeds the old level.

(vi) A decrease in actual emissions is creditable only to the extent that:

(a) The old level of actual emissions or the old level of allowable emissions, whichever is lower, exceeds the new level of actual emissions;

(b) It is enforceable as a practical matter at and after the time that actual construction on the particular change begins.

(c) It has approximately the same qualitative significance for public health and welfare as that attributed to the increase from the particular change; and

(vii) [Reserved]

(viii) An increase that results from a physical change at a source occurs when the emissions unit on which construction occurred becomes operational and begins to emit a particular pollutant. Any replacement unit that requires shakedown becomes operational only after a reasonable shakedown period, not to exceed 180 days.

(ix) Paragraph (b)(21)(ii) of this section shall not apply for determining creditable increases and decreases.

(4) Potential to emit means the maximum capacity of a stationary source to emit a pollutant under its physical and operational design. Any physical or operational limitation on the capacity of the source to emit a pollutant, including air pollution control equipment and restrictions on hours of operation or on the type or amount of material combusted, stored, or processed, shall be treated as part of its design if the limitation or the effect it would have on emissions is federally enforceable. Secondary emissions do not count in determining the potential to emit of a stationary source.

(5) Stationary source means any building, structure, facility, or installation which emits or may emit a regulated NSR pollutant.

(6) Building, structure, facility, or installation means all of the pollutant-emitting activities which belong to the same industrial grouping, are located on one or more contiguous or adjacent properties, and are under the control of the



LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright (c) 2013, by Matthew Bender & Company, a member
of the LexisNexis Group. All rights reserved.

*** This section is current through the November 7, 2013 ***
*** issue of the Federal Register ***

TITLE 40-- PROTECTION OF ENVIRONMENT
CHAPTER V -- COUNCIL ON ENVIRONMENTAL QUALITY
PART 1502 -- ENVIRONMENTAL IMPACT STATEMENT

**Go to the CFR Archive Directory**

*40 CFR 1502.14*

§ 1502.14 Alternatives including the proposed action.

  This section is the heart of the environmental impact statement. Based on the information and analysis presented in the sections on the Affected Environment (§ 1502.15) and the Environmental Consequences (§ 1502.16), it should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public. In this section agencies shall:

  (a) Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated.

  (b) Devote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits.

  (c) Include reasonable alternatives not within the jurisdiction of the lead agency.

  (d) Include the alternative of no action.

  (e) Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference.

  (f) Include appropriate mitigation measures not already included in the proposed action or alternatives.

**HISTORY:** *43 FR 55994,* Nov. 29, 1978.

**AUTHORITY:** NEPA, the Environmental Quality Improvement Act of 1970, as amended *(42 U.S.C. 4371* et seq.),

sec. 309 of the Clean Air Act, as amended *(42 U.S.C. 7609),* and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

**NOTES:** NOTES APPLICABLE TO ENTIRE PART:
[PUBLISHER'S NOTE: For Federal Register citations concerning Part 1502 Notice of availability, see: *75 FR 75628,* Dec. 6, 2010; *76 FR 3843,* Jan. 21, 2011; *77 FR 14473,* Mar. 12, 2012.]

**LexisNexis (R) Notes:**

CASE NOTES

CASE NOTES Applicable to entire Part:Part Note



LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright (c) 2013, by Matthew Bender & Company, a member
of the LexisNexis Group. All rights reserved.

*** This section is current through the November 7, 2013 ***
*** issue of the Federal Register ***

TITLE 40-- PROTECTION OF ENVIRONMENT
CHAPTER V -- COUNCIL ON ENVIRONMENTAL QUALITY
PART 1502 -- ENVIRONMENTAL IMPACT STATEMENT

**Go to the CFR Archive Directory**

*40 CFR 1502.16*

§ 1502.16 Environmental consequences.

   This section forms the scientific and analytic basis for the comparisons under § 1502.14. It shall consolidate the discussions of those elements required by sections 102(2)(C)(i), (ii), (iv), and (v) of NEPA which are within the scope of the statement and as much of section 102(2)(C)(iii) as is necessary to support the comparisons. The discussion will include the environmental impacts of the alternatives including the proposed action, any adverse environmental effects which cannot be avoided should the proposal be implemented, the relationship between short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and any irreversible or irretrievable commitments of resources which would be involved in the proposal should it be implemented. This section should not duplicate discussions in § 1502.14. It shall include discussions of:

   (a) Direct effects and their significance (§ 1508.8).

   (b) Indirect effects and their significance (§ 1508.8).

   (c) Possible conflicts between the proposed action and the objectives of Federal, regional, State, and local (and in the case of a reservation, Indian tribe) land use plans, policies and controls for the area concerned. (See § 1506.2(d).)

   (d) The environmental effects of alternatives including the proposed action. The comparisons under § 1502.14 will be based on this discussion.

   (e) Energy requirements and conservation potential of various alternatives and mitigation measures.

   (f) Natural or depletable resource requirements and conservation potential of various alternatives and mitigation measures.

   (g) Urban quality, historic and cultural resources, and the design of the built environment, including the reuse and

40 CFR 1502.16

conservation potential of various alternatives and mitigation measures.

(h) Means to mitigate adverse environmental impacts (if not fully covered under § 1502.14(f)).

**HISTORY:** *[43 FR 55994,* Nov. 29, 1978; *44 FR 873,* Jan. 3, 1979]

**AUTHORITY:** NEPA, the Environmental Quality Improvement Act of 1970, as amended *(42 U.S.C. 4371* et seq.), sec. 309 of the Clean Air Act, as amended *(42 U.S.C. 7609),* and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

**NOTES:** NOTES APPLICABLE TO ENTIRE PART:
[PUBLISHER'S NOTE: For Federal Register citations concerning Part 1502 Notice of availability, see: *75 FR 75628,* Dec. 6, 2010; *76 FR 3843,* Jan. 21, 2011; *77 FR 14473,* Mar. 12, 2012.]

NOTES TO DECISIONS: COURT AND ADMINISTRATIVE DECISIONS SIGNIFICANTLY DISCUSSING SECTION --
*Robertson v Methow Valley Citizens Council (1989) 490 US 332, 104 L Ed 2d 351, 109 S Ct 1835*

**LexisNexis (R) Notes:**

CASE NOTES

CASE NOTES Applicable to entire Part:Part Note

*Pac. Coast Fedn. of Fishermen's Ass'ns v. Blank, 693 F.3d 1084, 2012 U.S. App. LEXIS 18974* (9th Cir Sept. 10, 2012).

***Overview:*** *In adopting amendments to a fishery management plan, the National Marine Fisheries Service complied with 16 U.S.C.S. § 1853a, which did not guarantee fishing communities a particular role in a limited access program or restrict privileges to those who substantially participated in the fishery. The agency also complied with NEPA.*

40 CFR 1508.25

(b) Alternatives, which include: (1) No action alternative.

(2) Other reasonable courses of actions.

(3) Mitigation measures (not in the proposed action).

(c) Impacts, which may be: (1) Direct; (2) indirect; (3) cumulative.

**HISTORY:** *43 FR 56003,* Nov. 29, 1978.

**AUTHORITY:** NEPA, the Environmental Quality Improvement Act of 1970, as amended *(42 U.S.C. 4371* et seq.), sec. 309 of the Clean Air Act, as amended *(42 U.S.C. 7609),* and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

**NOTES:** NOTES APPLICABLE TO ENTIRE PART:
[PUBLISHER'S NOTE: For Federal Register citations concerning Part 1508 Notice of availability, see: *75 FR 75628,* Dec. 6, 2010; *76 FR 3843,* Jan. 21, 2011; *77 FR 14473,* Mar. 12, 2012.]

NOTES TO DECISIONS: COURT AND ADMINISTRATIVE DECISIONS SIGNIFICANTLY DISCUSSING SECTION --
*Robertson v Methow Valley Citizens Council (1989) 490 US 332, 104 L Ed 2d 351, 109 S Ct 1835*
*Klamath-Siskiyou Wildlands Ctr. v BLM (2004, CA9 Or) 387 F3d 989, 59 Envt Rep Cas 1389, 34 ELR 20127*
*Morongo Band of Mission Indians v FAA (1998, CA9) 161 F3d 569, 98 CDOS 8560, 98 Daily Journal DAR 11975, 29 ELR 20336*
*South Bronx Coalition for Clean Air v Conroy (1998, SD NY) 20 F Supp 2d 565, 29 ELR 20318*

**LexisNexis (R) Notes:**

CASE NOTES